## THE STATE OF SOUTH CAROLINA
## In the Supreme Court

Planned Parenthood South Atlantic; Greenville Women's Clinic; Katherine Farris, M.D.; and Terry Buffkin, M.D., Petitioners,

v.

State of South Carolina; Alan McCrory Wilson, in his official capacity as Attorney General of the State of South Carolina; Edward Simmer, in his official capacity as Director of the South Carolina Department of Health and Environmental Control; Anne G. Cook, in her official capacity as President of the South Carolina Board of Medical Examiners; Stephen I. Schabel, in his official capacity as Vice President of the South Carolina Board of Medical Examiners; Ronald Januchowski, in his official capacity as Secretary of the South Carolina Board of Medical Examiners; George S. Dilts, in his official capacity as a Member of the South Carolina Board of Medical Examiners; Dion Franga, in his official capacity as a Member of the South Carolina Board of Medical Examiners; Richard Howell, in his official capacity as a Member of the South Carolina Board of Medical Examiners; Theresa Mills-Floyd, in her official capacity as a Member of the South Carolina Board of Medical Examiners; Jennifer R. Root, in her official capacity as a Member of the South Carolina Board of Medical Examiners; Christopher C. Wright, in his official capacity as a Member of the South Carolina Board of Medical Examiners; Scarlett Anne Wilson, in her official capacity as Solicitor for South Carolina's 9th Judicial Circuit; Byron E. Gipson, in his official capacity as Solicitor for South Carolina's 5th Judicial Circuit; and William Walter Wilkins III, in his official capacity as Solicitor for South Carolina's 13th Judicial Circuit, Respondents,

&

G. Murrell Smith, Jr., in his official capacity as Speaker of the South Carolina House of Representatives; Thomas C. Alexander, in his official capacity as President of the South Carolina Senate; and Henry Dargan McMaster, in his official capacity as Governor of the State of South Carolina, Respondents-Intervenors.

Appellate Case No. 2022-001062

---

**IN THE COURT'S ORIGINAL JURISDICTION**

---

Opinion No. 28127
Heard October 19, 2022 – Filed January 5, 2023

---

**RELIEF GRANTED**

---

M. Malissa Burnette, Kathleen McColl McDaniel, and Grant Burnette LeFever, of Burnette Shutt & McDaniel, PA, of Columbia, for Petitioners.

Julia A. Murray and Hannah Swanson, of Washington, DC; for Petitioners Planned Parenthood South Atlantic and Katherine Farris, M.D.

Genevieve Scott and Astrid Ackerman, of New York, NY; for Petitioner Greenville Women's Clinic and Terry Buffkin, M.D.

Jacquelyn S. Dickman, Ashley Caroline Biggers, and William Marshall Taylor, Jr., of Columbia, for Respondent Edward Simmer, in his official capacity as Director of the South Carolina Department of Health and Environmental Control.

Robert E. Horner and Erin G. Baldwin, of Columbia, for Respondents Anne G. Cook, in her official capacity as President of the South Carolina Board of Medical Examiners; Stephen I. Schabel, in his official capacity as Vice President of the South Carolina Board of Medical Examiners; Ronald Januchowski, in his official capacity as Secretary of the South Carolina Board of Medical Examiners; George S. Dilts, in his official capacity as a Member of the South Carolina Board of Medical Examiners; Dion Franga, in his official capacity as a Member of the South Carolina Board of Medical Examiners; Richard Howell, in his official capacity as a Member of the South Carolina Board of Medical Examiners; Theresa Mills-Floyd, in her official capacity as a Member of the South Carolina Board of Medical Examiners; Jennifer R. Root, in her official capacity as a Member of the South Carolina Board of Medical Examiners; and Christopher C. Wright, in his official capacity as a Member of the South Carolina Board of Medical Examiners.

Robert David Garfield and Steven R. Spreeuwers, of Crowe Lafave Garfield & Bagley, LLC, of Columbia, for Respondent Byron E. Gipson, in his official capacity as Solicitor for South Carolina's 5th Judicial Circuit.

Amanda K. Dudgeon and James Matthew Johnson, of Chandler & Dudgeon, LLC, of Charleston, for Respondent Scarlett Anne Wilson, in her official capacity as Solicitor for South Carolina's 9th Judicial Circuit.

Attorney General Alan McCrory Wilson, Solicitor General Robert D. Cook, Deputy Solicitor General J. Emory Smith, Jr., and Assistant Deputy Solicitor General Thomas Tyler Hydrick, all of Columbia, for Respondents the State of South Carolina, Alan McCrory Wilson, in his official capacity as Attorney General of the State of South Carolina, and William Walter Wilkins III, in his official capacity as Solicitor for South Carolina's 13th Judicial Circuit.

Kevin A. Hall and Matthew Todd Carroll, of Womble Bond Dickinson LLP, of Columbia, for Respondents-Intervenors G. Murrell Smith, Jr., in his official capacity as Speaker of the South Carolina House of Representatives, and Thomas C. Alexander, in his official capacity as President of the South Carolina Senate.

Chief Legal Counsel Thomas Ashley Limehouse, Jr., Senior Legal Counsel William Grayson Lambert, and Deputy Legal Counsel Erica Wells Shedd, of Columbia, for Respondent-Intervenor Henry Dargan McMaster, in his official capacity as Governor of the State of South Carolina.

Randall Scott Hiller, of Randall S. Hiller, P.A., of Greenville; Kimberly A. Parker, of Wilmer Cutler Pickering Hale and Dorr, LLP, of Washington, DC; and Jessica Notebaert, of Wilmer Cutler Pickering Hale and Dorr, LLP, of Boston, MA; all for Amici Curiae American College of Obstetricians and Gynecologists, American Medical Association, American Academy of Family Physicians, American Academy of Pediatrics, American College of Physicians, National Hispanic Medical Association, and Society for Maternal-Fetal Medicine.

Brennan Tyler Brooks, of Law Office of B. Tyler Brooks, PLLC, of Greensboro, NC, and Matthew Staver, of Liberty Counsel, of Maitland, FL; for Amici Curiae Frederick Douglass Foundation and National Hispanic Christian Leadership Conference.

Andrew C. Nichols, of Charis Lex P.C., of Reston, VA; and Timothy J. Newton, of Murphy & Grantland, P.A.; of Columbia, for Amicus Curiae Christian Medical and Dental Associations.

Barry L. Johnson and William Lamar Johnson, II, of Johnson & Davis, P.A., of Bluffton, for Amicus Curiae American Center for Law & Justice.

Samuel Darryl Harms, III, of Greenville, for Amicus Curiae Elliot Institute.

Henry Wilkins Frampton, IV, and Denise M. Harle, of Leesburg, VA; for Amici Curiae American Association of Pro-Life Obstetricians and Gynecologists and Dr. Christine Hemphill.

Larry Shawn Sullivan, of Sullivan Law Group, LLC, of Myrtle Beach, and John G. Knepper, of Law Office of John G. Knepper, LLC, of Cheyenne, WY; for Amicus Curiae Alliance for Hippocratic Medicine.

---

**JUSTICE HEARN:** Today we consider whether The Fetal Heartbeat and Protection from Abortion Act ("the Act") violates a woman's constitutional right to privacy, as guaranteed in article I, section 10 of the South Carolina Constitution. We hold that the decision to terminate a pregnancy rests upon the utmost personal and private considerations imaginable, and implicates a woman's right to privacy. While this right is not absolute, and must be balanced against the State's interest in protecting unborn life, this Act, which severely limits—and in many instances completely forecloses—abortion, is an unreasonable restriction upon a woman's right to privacy and is therefore unconstitutional.[1]

## FACTUAL/PROCEDURAL BACKGROUND

In 2021, the General Assembly passed the Act, which prohibits an abortion after around six weeks gestation. *See* S.C. Code Ann. § 44-41-680 (Supp. 2022). This is before many women—excluding those who are trying to become pregnant and are therefore closely monitoring their menstrual cycles—even know they are pregnant. *See* Amici Curiae Br. of Am. Coll. of Obstetricians & Gynecologists, et. al. The Act requires physicians to scan for "cardiac activity…within the gestational

---

[1] As a point of clarity, today a majority of this Court—Chief Justice Beatty, Justice Few, and myself—agrees the Act violates our state's constitutional right to privacy. There are two dissents: Justice Kittredge, while believing that our state's right to privacy is broader than searches and seizures, does not find it implicated here. Justice James believes article I, section 10 only applies within the search and seizure context. While each member of the Court has written an opinion, this is considered the lead opinion.

sac[,]" record the results, and ask the patient if she would like to listen. *See* S.C. Code Ann. §§ 44-41-610 and 44-41-640. If the defined activity[2] is detected, abortion is prohibited.[3] Physicians who violate the Act must pay a ten-thousand dollar fine and face imprisonment of up to two years. S.C. Code Ann. § 44-41-680. In passing this legislation, the General Assembly made these findings:

(1) as many as thirty percent of natural pregnancies end in spontaneous miscarriage;

(2) fewer than five percent of all natural pregnancies end in spontaneous miscarriage after the detection of a fetal heartbeat;

(3) over ninety percent of in vitro pregnancies survive the first trimester if a fetal heartbeat is detected;

(4) nearly ninety percent of in vitro pregnancies do not survive the first trimester if a fetal heartbeat is not detected;

(5) a fetal heartbeat is a key medical predictor that an unborn human individual will reach live birth;

---

[2] While the General Assembly chose to use the term "fetus" to apply to this early stage of gestation, we note that this and other terminology in the Act are inconsistent with medical science. The Act defines "human fetus" as "an individual organism of the species homo sapiens from fertilization until live birth." S.C. Code Ann. § 44-41-610 (2021). Conversely, the scientific community delineates a blastocyte (fertilization to three weeks), embryos (up to eight weeks gestation), and fetuses (eight to forty weeks gestation). *See Fetal Development: Stages of Growth*, Cleveland Clinic, https://my.clevelandclinic.org/health/articles/7247-fetal-development-stages-of-growth (last accessed October 16, 2022). Additionally, while the Act refers to a "heartbeat," the overwhelming consensus in the medical community is that, at this early stage of gestation, what is being recorded as "cardiac activity" is merely an electrical flickering occurring prior to the development of any chambers of the heart. *See* Amicus Br. of American Medical Association at 10.

[3] There are exceptions for rape (if less than twenty weeks gestation), incest (if less than twenty weeks gestation), health of the patient, and fetal anomaly (as defined by the legislature). *See* S.C. Code Ann. § 44-41-680 (2021).

(6) a fetal heartbeat begins at a biologically identifiable moment in time, normally when the fetal heart is formed in the gestational sac;

(7) the State of South Carolina has legitimate interests from the outset of a pregnancy in protecting the health of the pregnant woman and the life of the unborn child who may be born; and

(8) in order to make an informed choice about whether to continue a pregnancy, a pregnant woman has a legitimate interest in knowing the likelihood of the human fetus surviving to full-term birth based upon the presence of a fetal heartbeat.

South Carolina Fetal Heartbeat and Protection from Abortion Act, Act No. 1, 2021 S.C. Acts 2, 3 §2. Petitioner Planned Parenthood South Atlantic is a non-profit organization dedicated to providing a wide range of medical care, including therapeutic options to terminate a pregnancy. Petitioners Katherine Farris and Terry Buffkin are physicians and abortion providers working in South Carolina. Both parties filed petitions in our original jurisdiction, and this Court granted Petitioners' request.[4] We subsequently granted Petitioners' request for a temporary injunction to enjoin enforcement of the Act pending the Court's resolution of the merits. Petitioners raise numerous legal theories as to why the Act fails, but we limit our review to the privacy argument under the South Carolina Constitution. Respondents disagree that the Act is unconstitutional, citing to years of abortion restrictions and the language of the recent decision of the Supreme Court of the United States in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022). While we set forth our holding in full below, we agree with Petitioners that the Act constitutes an unreasonable invasion of privacy, and thus is unconstitutional under article I, section 10 of the South Carolina Constitution.

## STANDARD OF REVIEW

The party challenging the validity of a statute bears the burden of proving it is unconstitutional. *See Knotts v. S.C. Dep't of Nat. Res.*, 348 S.C. 1, 6, 558 S.E.2d 511, 513 (2002) (noting the appellant bore the burden of proving the statute unconstitutional). "This Court has a limited scope of review in cases involving a constitutional challenge to a statute because all statutes are presumed constitutional and, if possible, will be construed to render them valid." *Curtis v. State*, 345 S.C.

---

[4] As we noted in our order granting a temporary injunction enjoining the enforcement of the Act, we denied Respondents-Intervenors' request to avoid administrative redundancy.

557, 569, 549 S.E.2d 591, 597 (2001). "A legislative act will not be declared unconstitutional unless its repugnance to the constitution is clear and beyond a reasonable doubt." *Joytime Distribs. & Amusement Co. v. State*, 338 S.C. 634, 640, 528 S.E.2d 647, 650 (1999).

## DISCUSSION

### I. Implication of article I, section 10

Unlike the United States Constitution and the constitutions of most of our sister states, South Carolina's Constitution includes a specific reference to a citizen's right to privacy. That provision states: "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures and unreasonable invasions of privacy shall not be violated . . . ." S.C. Const., art I, § 10. In this case, we are asked to determine whether that right to privacy extends to a woman's decision to have an abortion, and, if so, whether the Act unconstitutionally infringes upon that right. We are not asked to determine whether our constitution mentions the word "abortion"—clearly it does not. Instead, the fundamental question before the Court is whether this Act, which severely restricts and, in many cases, prohibits a woman's decision to terminate a pregnancy, constitutes an "unreasonable invasion of privacy."

According to Respondents, this right to privacy applies only to criminal defendants in the context of Fourth Amendment search and seizure. In support of this contention, Respondents argue that there is no mention of a woman's right to bodily autonomy in the amendment and also point to the notes of the West Committee, which recommended submitting the amendment to the voters. Petitioners, on the other hand, argue that an "unreasonable invasion of privacy" should include an individual's decisions concerning his or her own medical care and treatment, and that there are few rights so personal within the concept of privacy as a woman's right to determine whether or not to terminate a pregnancy.

We reject Respondents' argument to limit the right to privacy guaranteed in our constitution merely because the words used do not specifically mention medical care or bodily autonomy. This narrow interpretation would render the words "and unreasonable invasions of privacy" superfluous, as the preceding clause speaks specifically to searches and seizures. In interpreting this text, we must not only give the words their plain and ordinary meaning, but we must also give meaning to the entire text, and not render any provision meaningless. *See Hodges v. Rainey*, 341 S.C. 79, 87, 533 S.E.2d 578, 582 (2000). Though attached to the same modifying clause, article I, section 10 protects citizens from two distinct actions by the

government: first are "unreasonable searches and seizures[,]" largely mirroring our federal constitution's Fourth Amendment, and second is a protection not found in the United States Constitution, to be secure from "unreasonable invasions of privacy." S.C. Const., art I, § 10. Both phrases are modified by the same clause, "to be secure in their persons, houses, papers, and effects against . . . ." *Id.* This modifying clause identifies the scope of these protections—stated differently, the right protects from both unreasonable government invasions of privacy in citizens' persons, houses, papers, and effects and against unreasonable government searches and seizures of citizens' persons, houses, papers, and effects. Each of these modifying nouns has independent meaning. *See In re Decker*, 322 S.C. 215, 219, 471 S.E.2d 462, 463 (1995) ("[N]o word, clause, sentence, provision or part shall be rendered surplusage, or superfluous . . . .") (quoting 82 C.J.S. *Statutes* § 346). To accept Respondents' interpretation would be to render the words "unreasonable invasions of privacy" inconsequential. Further, we agree with Justice Few that the "unreasonable invasion of privacy" language, while broad, is not ambiguous. Accordingly, we cannot use interpretative tools to effectuate some other intent when the words are clear. *See Acker v. Cooley*, 177 S.C. 144, 145, 181 S.E. 10, 11 (1934) (acknowledging that "legislative interpretation of a constitutional provision should be given much weight" but declining to do so when the provision "is not ambiguous and needs no construction").

In analyzing the import of the words of the amendment, it is important to note that this right to privacy was not created out of whole cloth in 1971, but instead was *recognized* as having always existed. Similar to the Second Amendment to the United States Constitution, our privacy right's text that it "shall not be violated" is an implicit recognition of the pre-existence of the right. *See* S.C. Const. art. I, § 10 and *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008) (holding that the Second Amendment's text "implicitly recognizes the pre-existence of the right and declares only that it 'shall not be infringed'"). The *Heller* court relied on *United States v. Cruikshank*'s reasoning that "[t]his is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence. The second amendment declares that it shall not be infringed . . . ." *Heller*, 554 U.S. at 592 (quoting *United States v. Cruikshank*, 92 U.S. 542, 553 (1875)). The language, "shall not be violated" is likewise an implicit recognition, not that the right was then granted to the people of South Carolina, but that it shall not now be violated.

The litigants in this case have offered differing interpretations of this privacy right. Petitioners claim this right to be free from "unreasonable invasions of privacy" extends to medical decisions such as deciding whether to carry a pregnancy to term or to terminate it—which are inherently personal and private matters. Conversely,

Respondents claim this right deals only with data privacy and has no application to medical decisions. As support for that position, Respondents cite to some of the notes of the West Committee. Prior to determining if a woman's right to bodily autonomy is protected by the South Carolina Constitution, and whether the work of the West Committee assists us in that decision, we briefly trace the historical development of the right to privacy.

In the United States, the right to privacy is often credited as being first identified by Louis Brandeis and Samuel Warren in their seminal Harvard Law Review article, *The Right to Privacy*. *See* 4 Harv. L. Rev. 193 (1890). Recounting the evolution of the "right to be let alone[,]" the authors were primarily concerned with the creation of a tort for redressing invasions of privacy in an increasingly interconnected world. In 1905, our sister state of Georgia adopted such a cause of action, citing to the natural law's right of privacy that has existed since the formation of the common law in England. *See Pavesich v. New England Life Ins. Co.*, 50 S.E. 68, 70 (Ga. 1905) ("The right of privacy has its foundation in the instincts of nature. It is recognized intuitively, consciousness being the witness that can be called to establish its existence."). In 1940, this Court implicitly accepted this reasoning in *Holloman v. Life Insurance Company of Virginia*, 192 S.C. 454, 459 7 S.E.2d 169, 171 (1940) ("We do not consider the law a closed system, but on the contrary it is our view that its concepts should expand to meet changing conditions arising in the course of human experience.") (holding reiterated and clarified in *Meetze v. Associated Press*, 230 S.C. 330, 336, 95 S.E.2d 606, 609 (1956)).

Following the onset of the Second World War, the Supreme Court first protected the right to procreate in *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942) ("We are dealing here with legislation which involves one of the basic civil rights of man. Marriage and procreation are fundamental to the very existence and survival of the race . . . [any sterilization] which the State conducts is to his irreparable injury. He is forever deprived of a basic liberty."). This decision broke new ground and departed from the controversial holding in *Buck v. Bell*, which upheld state-sterilization power under the rationale that "[t]hree generations of imbeciles are enough." *Buck v. Bell*, 274 U.S. 200, 207 (1927).

Flowing directly from this right to procreation, the Supreme Court recognized that the right to marital privacy was violated by a contraception ban in *Griswold v. Connecticut*, 381 U.S. 479, 485 (1965). The Supreme Court subsequently extended this right to unwed individuals in *Eisenstadt v. Baird*, arguing that privacy in intimate relations cannot be limited based on marital status. 405 U.S. 438, 453 (1972) ("It is true that in *Griswold* the right of privacy in question inhered in the marital relationship. Yet the marital couple is not an independent entity with a mind

and heart of its own, but an association of two individuals each with a separate intellectual and emotional makeup."). The *Eisenstadt* court also held, "[i]f the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Id.*

Fast on the heels of *Griswold*, the Supreme Court ruled that the right to privacy, emanating from the Bill of Rights and applying to the states through the Fourteenth Amendment, protected a woman's decision to terminate pregnancy in the first trimester without interference from the state. *Roe v. Wade*, 410 U.S. 113, 163-64 (1973) (overruled by *Dobbs*, 142 S. Ct. at 2240). Earlier this year, that decision was overturned because "abortion is fundamentally different" from contraception and marriage in that it involves the ending of fetal life. *Dobbs*, 142 S. Ct. at 2243. A critical part of the *Dobbs* Court's justification for overruling *Roe* was that *Roe* "held that the abortion right, which is not mentioned in the Constitution, is part of the right to privacy, *which is also not mentioned*." *Id.* at 2245 (emphasis added). Recognizing that *Roe* was overturned partially based on its reliance on an unmentioned and hence arguably nonexistent constitutional right to privacy, *Dobbs* does not control, nor even shed light on, our decision today since the South Carolina Constitution expressly includes a right to privacy.

Turning towards the concept of privacy in our state, only six years after *Griswold* recognized marital privacy rights, South Carolina adopted article I, section 10. There can be no doubt that the authors of this provision were aware of *Griswold* and its use of the right to privacy. Indeed, the *Griswold* decision was contained in an article that staff presented to the West Committee. *See* Committee to Make a Study of the Constitution of South Carolina of 1895, *Appendix A*. To be sure, there was also much discussion in the Committee notes of the burgeoning considerations of electronic surveillance and its progeny. *See id.*, West Committee Meeting Minutes 62 (Sept. 15, 1967); *id.* at 5 (Oct. 6, 1967). Cognizant of the ongoing developments and extensions of privacy law into areas such as marriage and intimacy, the authors nevertheless chose broad language, which we cannot now simply ignore by looking to discrete references to data security in the Committee notes. *See Heller*, 554 U.S. at 590 ("It is always perilous to derive the meaning of an adopted provision from another provision deleted in the drafting process."). Believing we should not supplant the broad language set forth in our constitution with what the Committee members may have thought the provision protected, we reject Respondents' entreaty to base our decision regarding the scope of the right to privacy on select portions of the West Committee notes. *State v. Forrester*, 343 S.C. 637, 647 n.7, 541 S.E.2d 837, 842 n.7 (2001) ("It is important to note that committee minutes will not be

controlling of the intent behind, or interpretation of, our state constitution."). While Justice Kittredge's dissent finds our rejection of the West Committee notes "stunning," we believe it is faithful to our precedent because we have specifically rejected the same argument now again advanced that the West Committee notes confine our privacy right to electronic surveillance. *Id.* at 647, 541 S.E.2d at 841 ("[T]he drafters of our state constitution's right to privacy provision were principally concerned with the emergence of new electronic technologies that increased the government's ability to conduct searches . . . [h]owever, the committee also recognized that the provision would have an impact beyond just the area of electronic surveillance. As Committee Member Sinkler stated, 'I think this is an area that, really, should develop and should not be confined to the intent of those who sit around this table.'") (internal citations omitted). Indeed, the only thing remotely breathtaking about our approach is its adherence to precedent.

Moreover, Respondents' argument that the West Committee notes control our decision as to the scope of our privacy provision completely ignores, and arguably perpetuates, the societal landscape of the time. Respondents' insistence that we are bound to rely on the committee notes in delineating the scope of our state's privacy provision requires a brief review of our state's history in affording equal rights to women.[5] Although the Nineteenth Amendment granting women the right to vote was ratified by the requisite number of states and adopted in 1920, South Carolina rejected it at the time. It was not until 1969—*nearly fifty years later*—that the South Carolina General Assembly finally ratified it, and even then, the vote was not certified for another four years "because the state had never confirmed ratification with the Secretary of State or the House Speaker."[6] Additionally, while some

---

[5] I defend against the dissent's criticism of this unnecessary "history lesson" by noting the obvious fact that abortion—and its preclusion—while affecting both women and men, impact women most severely. Accordingly, in view of Respondents' insistence that we should consider that the West Committee did not include any reference to abortion in its notes, I insist that the composition of that committee as well as the societal climate of the time, are highly relevant. Indeed, if the dissenting opinions are going to rely on notes outside the actual text of article I, section 10, then this history should not be ignored.

[6] *See* T. Michael Boddie, *SC Waited Until 1969 to Ratify the 19th Amendment, Giving Women the Right to Vote*, THE POST AND COURIER (Sep. 14, 2020), https://www.postandcourier.com/news/sc-waited-until-1969-to-ratify-the-19th-amendment-giving-women-the-right-to-vote/article_a5e5849e-99bd-11e9-a42c-bb2445ba6a81.html.

western states permitted women to serve on juries as early as the late 1800's, and federal law gave women the right in 1957, South Carolina was among the very last of the states to permit it in 1967, eclipsed only by Mississippi a year later.[7] Thus, in 1966 when the West Committee—initially composed of nine men and not a single woman—began discussing whether to add a state constitutional privacy amendment, the General Assembly had neither permitted women to serve on juries in this state nor ratified the Nineteenth Amendment.[8] Given this historical backdrop, we decline to limit our review of article I, section 10 to what the West Committee members may have thought at the time. While we certainly agree with Respondents that abortion was not mentioned in the amendment nor was including a woman's right to bodily autonomy uppermost in the minds of the Committee members, those facts neither guide nor end our inquiry. We cannot relegate our role of declaring whether a legislative act is constitutional by blinding ourselves to everything that has transpired since the amendment was adopted. Indeed, the United States Supreme Court declined to do so in the context of "separate but equal" education in *Brown v. Board of Education*:

> [W]e cannot turn the clock back to 1868 when the Amendment was adopted, or even to 1896 when Plessy v. Ferguson was written. We must consider public education in the light of its full development and its present place in American life throughout the Nation. Only in this way can it be determined if segregation in public schools deprives these plaintiffs of the equal protection of the laws.

*Brown v. Bd. of Ed. of Topeka, Shawnee Cnty., Kan.*, 347 U.S. 483, 492-93, (1954). Nor did it do so in *Loving v. Virginia*, where the Supreme Court reiterated the rationale from *Brown* and struck down Virginia's longstanding laws against interracial marriage. 388 U.S. 1, 9 (1967). This focus continued with *Griswold*, *Lawrence v. Texas*, 539 U.S. 558 (2003), and *Obergefell v. Hodges*, 576 U.S. 644

---

[7] *See* Clif LeBlanc, *S.C. was Second to Last State to Allow Women Jurors*, THE STATE (Dec. 16, 2015), https://www.thestate.com/news/special-reports/state-125/article47616240.html; *Women on Mississippi Juries*, THE NEW YORK TIMES (June 15, 1968), https://timesmachine.nytimes.com/timesmachine/1968/06/15/88953741.html?pageNumber=33.

[8] Throughout its work from 1966-1969, a total of fourteen people served on the West Committee, only one of whom was a woman. *See* Committee to Make a Study of the Constitution of South Carolina of 1895, *Final Report* (1969).

(2015), just to name a few. In the final analysis, we find the notes of the West Committee irrelevant to the question before us today.

Additionally, Respondents' position to limit the reach of the constitutional right to privacy to the criminal arena of search and seizure is also contrary to the jurisprudence of this Court. We have found that the right to privacy may be implicated in many ways, from requiring a witness to divulge medical information during a criminal trial to forcing a convicted felon to take medication so that he may be competent enough to be executed. *See State v. Blackwell*, 420 S.C. 127, 151, 801 S.E.2d 713, 725 (2017) (noting the novel issue before the Court was "whether a criminal defendant's constitutional right to confront a witness trumps a witness's state constitutional right to privacy and statutory privilege to maintain confidential mental health records") (footnotes omitted) and *Singleton v. State*, 313 S.C. 75, 90, 437 S.E.2d 53, 62 (1993) (finding compulsory medication implicated a prisoner's state constitutional right to privacy). In *Blackwell*, the Court, in an attempt to recognize both the right to privacy and the United States Constitution's Sixth Amendment right of confrontation, proffered a balancing test to determine when a witness may be forced to divulge personal medical testimony. 420 S.C. at 146, 801 S.E.2d at 723.

In *Singleton*, this Court held that forcibly giving a prisoner medication, for the sole purpose of competency for execution, was a violation of the prisoner's right to privacy under the South Carolina Constitution. 313 S.C. at 89, 437 S.E.2d at 62. The Court held:

> We hold that the South Carolina Constitutional right of privacy would be violated if the State were to sanction forced medication solely to facilitate execution. An inmate in South Carolina has a very limited privacy interest when weighed against the State's penological interest; however, the inmate must be free from unwarranted medical intrusions.

*Id.* at 89, 437 S.E.2d at 61. The Court cited to Louisiana's Supreme Court in *State v. Perry*, which held, "the right to decide what is to be done medically with one's brain and body" was contained in Louisiana's right to privacy. *Perry*, 610 So.2d 746, 755 (La. 1992) and *Singleton*, 313 S.C. at 89, 437 S.E.2d at 61. Our Court noted that Louisiana's right to privacy was "strikingly similar" to ours and adopted the logic of *Perry* in holding, the "provision in the S.C. Constitution is no less compelling than the provision in the Louisiana Constitution." 313 S.C. at 88, 437 S.E.2d at 61. Notably, in reaching this decision, we did not ask whether our constitution specifically prohibited forced medication of an inmate in order to carry out an execution. Just as the provision does not specifically refer to abortion, neither does

it mention forcing medication on an inmate. Nor did we limit ourselves to whether the West Committee specifically contemplated that issue. Instead, we simply asked whether the privacy language in article I, section 10 encompassed the circumstances before us. We find it inconceivable that under Respondents' interpretation of article I, section 10, in South Carolina, a convicted murderer has a greater right to privacy than a pregnant woman.

We reiterate the holding of *Singleton* that certain instances of medical intervention implicate the right to be secure in one's person from unreasonable invasions of privacy. However, before extending that implication to the decision to terminate a pregnancy, we survey our sister jurisdictions, with particular attention to those few who have strikingly similar constitutional privacy protections.

Like ours, Alaska's constitution also expressly acknowledges a right to privacy. *See* Alaska Const. art. I, § 22 ("The right of the people to privacy is recognized and shall not be infringed."). In *Valley Hospital Association v. Mat-Su Coalition for Choice*, the Alaska Supreme Court held that "few things are more personal than a woman's control of her own body, including the choice of whether and when to have children[,]" concluding, "we are of the view that reproductive rights are fundamental, and that they are encompassed within the right to privacy expressed in the Alaska Constitution." 948 P.2d 968-69 (Alaska 1997). In so ruling, the court considered and rejected the argument, similar to the one advanced today, that its state constitution's privacy right merely "encompass[ed] protection from unwarranted surveillance and data collection . . . ." *Id.* at 969. Much like Respondents' argument here, the argument to limit Alaska's privacy provision relied primarily on the legislative history's focus on data privacy, but the court concluded that the actual language of the provision controlled and found that language broad enough to implicate the abortion decision. *Id.*

In Florida, the state constitution protects "the right to be let alone and free from government intrusion into the person's private life . . . ." Fla. Const. art. I, § 23. The Florida Supreme Court has found that a woman's decision to terminate pregnancy implicates this privacy right, holding, "Florida's privacy provision is clearly implicated in a woman's decision of whether or not to continue her pregnancy." *In re T.W.*, 551 So.2d 1186, 1192 (Fla. 1989). In reaching that decision, the court considered that the choice "whether to obtain an abortion is fraught with specific physical, psychological, and economic implications of a uniquely personal nature for each woman." *Id.* at 1193. This holding, the court found, was consistent with its line of privacy cases where the right was implicated by a "number of cases dealing with personal decisionmaking [sic]" such as the refusal of a blood transfusion when necessary to sustain life, the removal of a feeding tube from a

vegetative patient, and the removal of a respirator from a competent adult. *Id.* at 1192. The court reasoned that these medical choices, just like the abortion decision, were necessarily personal and thus, at some level, must be protected from government intrusion.

The Minnesota Supreme Court found that several provisions in its state constitution's bill of rights encompassed a woman's decision to terminate her pregnancy. *Women of State of Minn. by Doe v. Gomez*, 542 N.W.2d 17, 26-27 (Minn. 1995) ("[T]he right of privacy under the Minnesota Constitution encompasses a woman's right to decide to terminate her pregnancy."). The court surveyed its prior decisions where the privacy right was implicated in medical decision-making and concluded that abortion was no different. *Id*. at 27 ("[T]he right to be free from intrusive medical treatment is a fundamental right encompassed by the right to privacy under the Minnesota Constitution.").

In *Armstrong v. State*, the Montana Supreme Court struck down a law that prohibited physician assistants from performing pre-viability abortions, and found that "the procreative autonomy component of personal autonomy is protected by Montana's constitutional right to privacy." 989 P.2d 364, 384 (Mont. 1999). Montana's constitutional provision reads, "[t]he right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest." Mont. Const. art II, § 10. The court considered the "broader context of one's right to choose or refuse medical treatment" and concluded that "[f]ew matters more directly implicate personal autonomy and individual liberty than medical judgments affecting one's bodily integrity and health" like the decision to have an abortion. 989 P.2d at 381. The court traced this right back throughout American jurisprudential history and rejected the notion that abortion is somehow different than other medical decisions on the issue of whether restrictions implicate the right to privacy. *Id.* at 376 ("Facially, then, procreative autonomy being grounded in the right of privacy, there is no reason why this right would not also be encompassed within the broader personal autonomy protections afforded by the fundamental right of individual privacy guaranteed by Article II, Section 10 of the Montana Constitution."). Further, because the Montana Constitution specifically included privacy in its constitution, the court concluded, "it is a fundamental right." *Id.* at 374.[9]

---

[9] Justice James faults us for citing *Armstrong* because the Montana Supreme Court relied in part on reviewing the intent of that state's 1972 Constitutional Convention. We agree with Chief Justice Beatty that characterizing a constitutional convention

The Tennessee Supreme Court found that the decision to terminate a pregnancy was protected as part of its state constitutional right to privacy before a referendum vote amended the state constitution to specifically exclude abortion rights. *See Planned Parenthood of Middle Tenn. v. Sundquist*, 38 S.W.3d 1, 4 (Tenn. 2000) ("We specifically hold that a woman's right to terminate her pregnancy is a vital part of the right to privacy guaranteed by the Tennessee Constitution.") and Tenn. Const. art I, § 36 (2014) ("Nothing in this Constitution secures or protects a right to abortion . . . ."). We note that this suitably comports with the Supreme Court's hope in *Dobbs* that "the issue of abortion [be returned] to the people's elected representatives." 142 S. Ct. at 2243. The Tennessee Supreme Court interpreted the language and history of the right to privacy and found it encompassed the abortion decision, and the citizens of Tennessee responded by voting to amend their constitution's text. The court answered the question before it using both its own jurisprudence and the broad language of the privacy right, and the people responded by changing the language itself.[10]

South Carolina is one of only ten states to include a specific right to privacy in its constitution. *Forrester*, 343 S.C. at 644, 541 S.E.2d at 841. Of those ten, it appears several have not addressed whether abortion implicates their privacy right.

_____

and the West Committee as "close cousin[s]" is an "overstatement at best." Regardless, we do not rely on the decisions from other states as binding, and we acknowledge one can parse differences with each, as can be done in any case. Nevertheless, the central point remains that we are far from alone in concluding that medical decisions such as an abortion fall within the scope of an explicit privacy protection contained in a state constitution.

[10] A request to let the people of South Carolina decide the scope of the right to privacy language was made on the floor of the South Carolina Senate but was rejected as being "out of order." *See* S. Journal, 124th Leg. Sess. (S.C. Sept. 8, 2022), available at https://www.scstatehouse.gov/sess124_2021-2022/sj22/20220908.htm. We note that the request would have followed the approach taken in at least six other states that have had referendums on abortion rights following *Dobbs*. Those states are Kansas, where a referendum was held in August of 2022, and Michigan, Montana, Vermont, Kentucky, and California, which held referendums on November 8, 2022, during the general election. Joshua Needelman, *Five States Have Abortion Referendums on the Ballot*, THE NEW YORK TIMES (Nov. 8, 2022), https://www.nytimes.com/2022/11/08/us/politics/abortion-ballot-state-referendums.html.

Of the states that have addressed the question, Alaska, Florida, Minnesota, Montana, and Tennessee[11] have answered in the affirmative. Additionally, Washington has held its explicit privacy right protects "autonomous decision-making[,]" making special note of the privacy right's important role in cases involving "marriage, procreation, family relationships, child rearing, and education." *Wash. Pub. Emps. Ass'n v. Wash. State Ctr. for Childhood Deafness & Hearing Loss*, 450 P.3d 601, 611-12 (Wash. 2019) (quoting *O'Hartigan v. Dep't of Pers.*, 821 P.2d 44, 47 (Wash. 1991)). Most certainly, in reaching our decision today that the Act unreasonably intrudes on a woman's right to privacy, we do not merely count the rulings of our sister states, yet the reasoning undergirding their decisions informs our own. We also readily acknowledge that these decisions were issued before *Dobbs* created a sea change in federal abortion jurisprudence. While *Dobbs* did not invalidate these decisions because each invoked their respective state constitutions rather than the federal constitution, we recognize that some may be called into question in future litigation. Nevertheless, we are persuaded by the logic replete in the opinions we have surveyed that few decisions in life are more private than the decision whether to terminate a pregnancy. Our privacy right must be implicated by restrictions on that decision. As stated by the Supreme Court in *Eisenstadt*, "[i]f the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." 405 U.S. at 453.

## II.     The Act's Constitutionality under article I, section 10

Although the General Assembly has plenary authority to legislate, it cannot violate, implicitly or explicitly, the South Carolina Constitution or the United States Constitution. *See Ashmore v. Greater Greenville Sewer Dist.*, 211 S.C. 77, 96, 44 S.E.2d 88, 97 (1947). Finding the Act implicates article I, section 10, we now determine whether it is unconstitutional.

In determining whether a fundamental right is violated, we employ strict scrutiny. *In re Luckabaugh*, 351 S.C. 122, 140, 568 S.E.2d 338, 347 (2002) (applying strict scrutiny because the statute implicates a fundamental right). The State

---

[11] As noted above, when presented with the question solely based on the right to privacy and Tennessee jurisprudence, the court answered the question in the affirmative. *See Planned Parenthood of Middle Tenn.*, 38 S.W.3d at 4. Now that the text itself has changed, their right to privacy is more limited than other jurisdictions, such as our own. *See* Tenn. Const. art I, § 36 (2014).

advances three interests in support of this restriction. First[12] is the State's legitimate interest in fetal health, present throughout the entire pregnancy. Second is the State's interest in protecting maternal health, which is unquestionably part of its larger interest in promoting the health and welfare of its citizenry. Third is the unborn fetus's own interest, which historically has been recognized at two different times: "quickening" at common law, and viability under since-overturned Supreme Court precedent. Within the context of abortion laws, any action restricting the right of privacy by the government necessarily relies on one or more of these interests as justification for the invasion of the privacy right. We analyze each in turn as support of the Act before us today.

The State relies on its interest in fetal health, which is indisputably important but not dispositive. Of course, the State has a legitimate interest in fetal health, but at early stages of pregnancy implicated by the Act, the fetus cannot be considered its own legal entity. In *Crosby v. Glasscock*, we were asked to determine whether a father, whose wife was twenty-weeks pregnant with a nonviable stillborn fetus, could recover under our wrongful death statute, on behalf of the fetus. 340 S.C. 626, 627-29, 532 S.E.2d 856, 856-57 (2000). We held he could not. *Id.* at 629, 532 S.E.2d at 857. The wrongful death statute required that the deceased be a "person", and this court reaffirmed the viability distinction that "a nonviable stillborn fetus cannot maintain a wrongful death action . . . [however a] mother who is negligently injured by the same act that results in the stillbirth of her fetus may, of course seek recovery for her own personal injuries." *Id.* at 628-29, 532 S.E.2d at 857 (referencing *West v. McCoy*, 233 S.C. 369, 105 S.E.2d 88 (1958)). The court reiterated the distinction between nonviable fetuses who are not able to recover and viable fetuses who are able to recover that has been present in our law for some time. *Compare West*, 233 S.C. at 369, 105 S.E.2d at 89 (holding a nonviable fetus's estate could not recover), *with Hall v. Murphy*, 236 S.C. 257, 263, 113 S.E.2d 790, 793 (1960) (holding the death of a viable fetus could support a wrongful death action) and *Fowler v. Woodward*, 244 S.C. 608, 613, 138 S.E.2d 42, 44 (1964) (holding fetus in eighth month of gestation was presumed viable and thus wrongful death action could be maintained).

Our criminal law likewise mirrors this delineation. In *State v. Horne*, this Court determined that a defendant could not be charged with murder for the ending of fetal life. 282 S.C. 444, 447, 319 S.E.2d 703, 704 (1984) ("[W]e hold an action for homicide may be maintained in the future when the state can prove beyond a reasonable doubt the fetus involved was viable, i.e., able to live separate and apart

---

[12] The order of these interests in no way connotes a ranking of their importance.

from its mother without the aid of artificial support."). The Court further noted that "at the time of the stabbing, no South Carolina decision had held that killing of a viable human being in utero could constitute a criminal homicide." *Id.* at 447, 319 S.E.2d at 704. In 2006, the General Assembly added the crime of "death or injury of a child in utero due to commission of violent crime" as a separate offense to the crime of murder. S.C. Code Ann. § 16-3-1083.

This distinction is present in our abortion jurisprudence as well. In *State v. Steadman*, which involved the criminal prosecution of a woman for undergoing an abortion, this court noted that the specific statutory language describing death as either resulting from or not resulting from an abortion was based on the reasoning that, "the child with which the woman is pregnant must be so far advanced as to be regarded in law as having a separate existence-a life capable of being destroyed." 214 S.C. 1, 8, 51 S.E.2d 91, 93 (1948). The *Steadman* court also noted that, "[a]t common law, an abortion, produced with the woman's consent, was not a crime unless the woman was quick with child" because, "[i]n contemplation of law, life commences at the moment of quickening, at that moment when the embryo gives first physical proof of life, no matter when it first received it." *Id.* at 7, 51 S.E.2d at 93.

In interpreting South Carolina's abortion statutes at the time, the *Steadman* court drew this critical distinction on the question of the State's historical interest in restricting abortion:

> From the earliest enactment of statutes designating the offense under discussion as 'abortion', and until the present day, a distinction between the condition of the child before and after quickening has been recognized by providing a much severer punishment for the destruction of a child after it has quickened than for the destruction of a child before it has quickened.

*Id.* at 8, 51 S.E.2d at 93. It is clear that in South Carolina, and indeed in all common law jurisdictions, the State has historically tied the potency of its interest in fetal life to quickening, where the fetus's own interest also emerges.

Second is the State's interest in maternal health. The General Assembly included this interest in at least two of its legislative findings. *See* South Carolina Fetal Heartbeat and Protection from Abortion Act, Act No. 1, 2021 S.C. Acts 2, 3 §2. Specifically, the eighth finding states, "[I]n order to make an informed choice about whether to continue a pregnancy, a pregnant woman has a legitimate interest in knowing the likelihood of the human fetus surviving to full-term birth based upon

the presence of a fetal heartbeat." *Id.* It is immediately apparent that this finding ties a woman's decision to continue a pregnancy with the likelihood that a fetus will survive to term. Indeed, the language itself overtly characterizes the decision as an *informed choice*. Thus, whether women know they are pregnant by the time the Act prohibits most abortions and have a meaningful opportunity to decide whether to abort or to carry the pregnancy to full term, is unequivocally relevant to question before us.

We have noted before that when the constitutionality of an act rests on legislative findings, we will generally presume the findings are valid and uphold the provision. *Richards v. City of Columbia*, 227 S.C. 538, 560, 88 S.E.2d 683, 694 (1955). Nevertheless, this does not mean we must relinquish our judicial duty of declaring what the law is; otherwise, we would abrogate our constitutional role as a coequal branch of government. As we have noted before:

> [T]here are many instances where the constitutionality of an act depends upon pertinent facts and in such a case it is presumed from the mere passage of the act that there was a finding of such facts as were necessary to authorize the enactment. However, by the better rule, such implied or express finding is subject to judicial review, and the court may consider extrinsic evidence or this purpose, although the statute will not be held unconstitutional unless such (legislative) finding is clearly erroneous.

*Id.* at 560-61, 88 S.E.2d at 694. In its legislative findings, the General Assembly ostensibly realized the importance of a woman having an informed choice to continue her pregnancy. Nevertheless, the actual scientific data demonstrates that the guise of an "informed choice" is merely an illusion in many instances because women typically do not realize they are pregnant until around six weeks, precisely when the Act bans this medical procedure. *See Dobbs*, 142 S. Ct. at 2315 (Roberts, C.J., concurring) ("[A] woman ordinarily discovers she is pregnant by six weeks of gestation.") (citing Amy M. Branum & Katherine A. Ahrens, *Trends in Timing of Pregnancy Awareness Among US Women*, Maternal and Child Health Journal (2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5269518/ ("Among all pregnancies reported, gestational age at time of pregnancy awareness was 5.5 weeks.")).[13] Therefore, the beginning point in our inquiry as to when the average

---

[13] Juxtaposed against the Act's six-week limitation, Chief Justice John Roberts concurred in *Dobbs*, noting he would have upheld Mississippi's 15-week deadline while declining to address the continuing validity of *Roe*. Chief Justice Roberts

woman realizes she may be pregnant is over five weeks gestation. At the risk of stating the obvious, in order for a choice to be informed, a woman must know she is pregnant.

Once a woman knows she is pregnant, in order to have a choice, options must be available. It is impossible to conclude that the average woman who determines she is pregnant at just over five weeks has sufficient time to weigh her options, schedule an appointment at one of the three clinics in the state, and comply with the mandatory waiting periods before having an abortion. This confirms that in reality, there is no "choice" at all. Accordingly, because the scientific data belies the suggestion that women may actually have an "informed choice", something the Act provides for, this interest heavily favors Petitioners.[14]

The third interest is the unborn fetus's own interests. Unquestionably, the fetus's interest is important and worthy of consideration by the General Assembly.

---

acknowledged that fifteen weeks provides an "adequate opportunity" to decide whether to have an abortion, evidenced by the fact that most abortions occur in the first trimester. 142 S. Ct. at 2315 (Roberts, C.J., concurring). In other words, "Ample evidence thus suggests that a 15-week ban provides sufficient time, absent rare circumstances, for a woman 'to decide for herself' whether to terminate her pregnancy." *Id.* In reaching this conclusion, Chief Justice Roberts relied on the Branum and Ahrens study finding the average gestational age of a fetus at the time a woman determines she is pregnant is 5.5 weeks. Respectfully, our "own research" that Justice Kittredge refers to as being so troubling, merely springs from *Dobbs*, a decision he quotes verbatim.

[14] Additionally, in safeguarding maternal health, data points to a heightened risk of complications from an abortion procedure after sixteen weeks, although the procedure still carries fewer health complications than carrying a pregnancy to term. *See* Amici Curiae Br. of Am. Coll. of Obstetricians & Gynecologists, et al. (citing Raymond & Grimes, *The Comparative Safety of Legal Induced Abortion and Childbirth in the United States*, 119 Obstetrics & Gynecology 215, 216 (2012)). As one of the amicus briefs noted, "the estimated increase in the risk of death due to delaying the procedure by 1 week at 17 weeks of gestation is 18 times greater than the estimated increase in the risk of death by delaying the procedure by 1 week at 8 weeks of gestation." *See* Amicus Br. of Christian Med. & Dental Ass'n. (quoting Linda A. Bartlett, et al., *Risk Factors for Legal Induced Abortion Mortality in the United States*, 103(4) Obstet. & Gyn. 729, 732 (2004)).

However, as we note in recounting our jurisprudence above, because the fetus's interest has historically been recognized much later than six weeks, it cannot displace the pregnant woman's interest at this early stage. *Compare Whitner v. State*, 328 S.C. 1, 17, 492 S.E.2d 777, 785 (1997) ("[T]he State's interest in protecting the life and health of the *viable* fetus is not merely legitimate. It is compelling.") (emphasis added), *with Crosby*, 340 S.C. at 629, 532 S.E.2d at 859 (holding "a nonviable stillborn fetus may not maintain a wrongful death action . . . ."); *West*, 233 S.C. at 376, 105 S.E.2d at 91 (same); *Steadman*, 214 S.C. at 8, 51 S.E.2d at 93. Moreover, even the concept of a fetus at this early stage is a misnomer in terms of medical science. *See supra* note 2.

Overall, after comparing the varying interests, the Act cannot withstand the clear directive of our state constitution—that "unreasonable invasions of privacy shall not be violated . . . ." While the State has an interest in fetal life and in providing women with vital medical information about their pregnancy, we agree with Petitioners that the Act's six-week ban does not serve that interest. Rather, it forecloses abortion in South Carolina for many pregnant women who may seek it, underscoring the fact that any inclusion of an "informed choice" is contradictory with the remaining provisions. By leaving no room for many women to exercise that choice, the Act prohibits certain South Carolinians from making their own medical decisions. Under the Respondents' view, while an "inmate must be free from unwarranted medical intrusions[,]" *Singleton*, 313 S.C. at 89, 437 S.E.2d at 61, women can be subject to them before they even have sufficient information to make an informed choice. Thus, it cannot be deemed a reasonable restriction on privacy, and accordingly, the Act violates article I, section 10 of the South Carolina Constitution.[15]

---

[15] While I agree with much of the Chief Justice's separate writing, because I believe the six-week restriction is an unreasonable invasion of privacy and thus, unconstitutional pursuant to article I, section 10, I do not reach Petitioners remaining contentions that the Act violates the equal protection clause or due process clause of our constitution, the Act is void ab initio, or that the Act unconstitutionally conditions medical care on requiring a doctor to report rape or incest. While the Act has a severance clause, the hallmark feature of this law is to restrict abortion post-six weeks. Accordingly, it is highly dubious that without the six-week restriction, the Act as a whole would have passed. As we recently noted,

> When determining whether a statutory provision can be severed, we consider "whether the constitutional portion of the statute remains

# CONCLUSION

We hold that our state constitutional right to privacy extends to a woman's decision to have an abortion. The State unquestionably has the authority to limit the right of privacy that protects women from state interference with her decision, but any such limitation must be reasonable and it must be meaningful in that the time frames imposed must afford a woman sufficient time to determine she is pregnant and to take reasonable steps to terminate that pregnancy. Six weeks is, quite simply, not a reasonable period of time for these two things to occur, and therefore the Act violates our state Constitution's prohibition against unreasonable invasions of privacy.

**BEATTY, C.J., concurring in a separate opinion, FEW, J., concurring in result only in a separate opinion, KITTREDGE, J., dissenting in a separate opinion, JAMES, J., dissenting in a separate opinion and concurring in part with KITTREDGE, J.**

---

complete in itself, wholly independent of that which is rejected, and is of such a character that it may fairly be presumed the legislature would have passed it independent of that which conflicts with the constitution."

*Pinckney v. Peeler*, 434 S.C. 272, 288, 862 S.E.2d 906, 915 (2021) (quoting *Joytime Distribs. & Amusement Co.*, 338 S.C. at 648-49, 528 S.E.2d at 654). Thus, despite the existence of a severability clause, the Act as a whole must fail. *See, e.g.*, *Sojourner v. Town of St. George*, 383 S.C. 171, 178, 679 S.E.2d 182, 186 (2009) (striking down as not severable provisions that were "mutually dependent" and where legislative intent appeared to be "for both provisions to operate as a cohesive procedure").

**CHIEF JUSTICE BEATTY:** Privacy has no meaning if we fail to limit how closely the state may regulate our personal, medical, intimate, and moral decisions. While all agree our government generally cannot search our homes—the pinnacle of privacy—without a warrant, the outer bounds of privacy are still debated. Today, we recognize the true breadth of this fundamental right, which all South Carolinians enjoy: "If the right of privacy *means anything*, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so *fundamentally* affecting a person as *the decision whether to bear or beget a child*."[16]

In this case, we are asked to consider whether a woman has the right to make her own decisions regarding her reproductive health and whether to continue a pregnancy involving a quarter-inch long, six-week-old embryo.[17] I take judicial notice of the fact that at six weeks of pregnancy there is no fetus, baby, or child as those terms are commonly understood to mean. What actually exists at this stage of pregnancy is an embryo containing an amorphous collection of cells.

To be clear, the state has a legitimate interest in regulating abortion. The question is when does the state's legitimate interest rise to a level where it is paramount to a woman's constitutional right to privacy? The answer is indeed a policy decision of the legislature; however, this decision is necessarily tempered by constitutional restraints. The South Carolina Constitution is the ultimate authority in this regard.

We do not take our role lightly in this ongoing dispute. Each branch of our government must fulfill its constitutional duty as the people of this state have mandated. Today, we review the Fetal Heartbeat and Protection from Abortion Act[18]

---

[16] *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972) (emphasis added).

[17] *See* S.C. Dep't of Health & Env't Control, *Embryonic & Fetal Development*, 5 (2018) (stating that, by six weeks, "[t]he embryo grows to a length of 6 mm (about ¼ inch)"), https://scdhec.gov/sites/default/files/Library/ML-017049.pdf; *cf.* Mayo Clinic, *Pregnancy week by week* (June 3, 2022) (at the end of eight weeks, an embryo is about one-half inch long, and at the end of eleven weeks, it weighs one-third of an ounce), https://www.mayoclinic.org/healthy-lifestyle/pregnancy-week-by-week/in-depth/prenatal-care/art-20045302.

[18] S.C. Code Ann. §§ 44-41-610 to -740 (Supp. 2022).

("the Act") in light of the rights that the people of this state enjoy. Based on our state constitution's right to privacy, we conclude that the Act violates the protection against unreasonable invasions of privacy.[19] Although our determination turns on the right to privacy, I believe the Act is also void ab initio and denies state constitutional rights to equal protection, procedural due process, and substantive due process. Therefore, the Act violates our state constitution beyond a reasonable doubt. For the foregoing reasons, I concur with Justice Hearn's lead opinion regarding the right to privacy, and I write separately to address all of Petitioners' issues because our decision today will likely not be the final resolution of the quandary.

## I. PROCEDURAL BACKGROUND

The South Carolina General Assembly adopted the Act in February 2021, and Governor McMaster signed the law into effect on February 18, 2021. The Act bans abortions after the detection of a "fetal heartbeat." S.C. Code Ann § 44-41-680(A) (Supp. 2022). The Act defines "fetal heartbeat" as "any cardiac activity, or the steady and repetitive rhythmic contraction of the fetal heart, within the gestational sac." *Id*. § 44-41-610(3). The Act provides four circumstantial exceptions to this general ban: Rape, incest, risk of death or impairment, and fetal anomaly. *Id*. § 44-41-680(B)(1)–(4).

Before the passage of the Act in question today, a 2016 "Pain-Capable Unborn Child Protection Act" ("the 2016 Act") was in effect. *Id*. § 44-41-410 to -480 (2018). The 2016 Act prohibited abortions when the post-fertilization age of the fetus was twenty or more weeks. *Id*. § 44-41-450. Predating either of these acts, a 1974 enactment required all second-trimester abortions to be performed by an attending physician in a hospital or certified clinic. *Id*. § 44-41-20. Because of this and by their own concession, Petitioners are only certified to perform abortions before fourteen weeks.

A majority of Petitioners sued in federal court to enjoin the enforcement of the Act. The United States District Court for the District of South Carolina issued a preliminary injunction on March 19, 2021 because Petitioners showed a likelihood

---

[19] S.C. Const. art. I, § 10.

to succeed on the merits based on *Roe*[20] and *Casey*.[21]  *Planned Parenthood S. Atl. v. Wilson*, 527 F. Supp. 3d 801 (D.S.C. 2021).  Defendants in the federal proceeding appealed, and the United States Court of Appeals for the Fourth Circuit affirmed the district court's order on February 22, 2022.  *Planned Parenthood S. Atl. v. Wilson*, 26 F.4th 600 (4th Cir. 2022).

On June 24, 2022 the United States Supreme Court issued its ruling in *Dobbs v. Jackson Women's Health Organization* and reversed nearly five decades of abortion precedent.  142 S. Ct. 2228 (2022).  The Fourth Circuit subsequently vacated its opinion and the preliminary injunction and remanded the case to the district court.  *Planned Parenthood S. Atl. v. Wilson*, No. 21-1369, 2022 WL 2900658 (4th Cir. July 21, 2022).  The district court dismissed the case without prejudice the next day.  *Planned Parenthood S. Atl. v. Wilson*, No. 3:21-00508-MGL, 2022 WL 2905496 (D.S.C. July 22, 2022).

Respondents petitioned this Court for original jurisdiction on July 20, 2022.  Meanwhile, Petitioners commenced a state action on July 31, 2022.  However, the circuit court canceled its scheduled hearing and issued an order to facilitate transfer to this Court.  We accepted this case in our original jurisdiction pursuant to Rule 245(a), SCACR.  Simultaneously, we granted Petitioners' motion for a temporary injunction to maintain the status quo and on the grounds that the new law[22] inconsistently did not overrule the previous codification[23] of *Roe*.  That inconsistency remains today.

## II.  DISCUSSION

Petitioners argue the Act is unconstitutional in contravention of several provisions in the South Carolina Constitution.  These include the right against unreasonable invasions of privacy in article I, section 10; the equal protection clause in article I, section 3; and the due process clause in article I, section 3.  Further,

---

[20] *Roe v. Wade*, 410 U.S. 113 (1973), *overruled by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022).

[21] *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992), *overruled by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022).

[22] S.C. Code Ann. § 44-41-710 (Supp. 2022).

[23] *Id*. § 44-41-20 (2018).

Petitioners contend the Act is void ab initio. Respondents collectively oppose Petitioners' allegations and maintain that the Act is constitutional.

## A.    Premise of "Fetal Heartbeat" Laws

In analyzing the questions before us, it is important to recognize what this case is—and is not—about. Philosophers, lawyers, politicians, and the general public have long known that words matter, so understanding the terms before us is a key component of our review.

The American College of Obstetricians and Gynecologists ("ACOG") has observed that the language used in discussing reproductive health, in particular, has a profound impact on what people understand to be true, so care should be taken to avoid language that is biased or medically inaccurate. *See* American College of Obstetricians and Gynecologists, *ACOG Guide to Language and Abortion* 1 (March 2022), https://www.acog.org/contact/media-center/abortion-language-guide (then select box "Download Guide as PDF") [hereinafter *ACOG Guide*].

As will be discussed further, South Carolina enacted in 2021 what it titled a "fetal heartbeat" act banning, with limited exceptions, an abortion after a "fetal heartbeat has been detected." S.C. Code Ann. § 44-41-680(A) (Supp. 2022). The Act defines "fetal heartbeat" to "mean[] cardiac activity, or the steady and repetitive rhythmic contraction of the fetal heart, within the gestational sac." *Id.* § 44-41-610(3).

The number of weeks of gestation is not specified in the law, but the parties indicate it is their understanding that the law was intended to target gestation of six weeks or more, based on the idea that nascent "cardiac activity" emerges from a small cluster of cells at that time. However, South Carolina's law is based on a factual premise—the existence of a fetal heartbeat as early as six weeks of gestation—that has been deemed factually and medically inaccurate by numerous medical professionals.

As an initial matter, I note the same terminology is not appropriate at all stages of pregnancy and, at this early stage, medical experts universally identify the fertilized egg as an embryo; it is not yet a fetus. *See* "Baby" or "unborn child," ACOG Guide, *supra* (stating "[c]entering the language on a future state of a pregnancy is medically inaccurate," so generalized lay terms, such as "baby," are not clinically appropriate to describe every stage of pregnancy); *id.* (noting that, until at least eight weeks after the first date of the last menstrual period, or "LMP," the term "embryo" is the medically correct term; after that point until delivery, the appropriate

term is "fetus"); *cf.* S.C. Dep't of Health & Env't Control, *Embryonic & Fetal Development*, 6 (2018), https://scdhec.gov/sites/default/files/Library/ML-017049.pdf (stating an embryo does not become a fetus until approximately eleven to twelve weeks after LMP or nine to ten weeks after conception).

Further, while a pregnancy may be characterized as being at six weeks gestational age, the embryo is not actually at the same level of development because the gestational age starts about two weeks ahead of conception. *See* Cleveland Clinic, "*Fetal Development: Stages of Growth*," https://my.clevelandclinic.org/health/articles/7247-fetal-development-stages-of-growth (observing a typical pregnancy lasts approximately forty weeks and physicians count the start of a pregnancy from the first day of the LMP because that date is more readily ascertainable than the date of conception, and this is referred to as the gestational age; the gestational age is, therefore, about two weeks ahead of when conception actually occurs). A pregnancy that is at six weeks gestational age (counted from the first date of the LMP) is actually at an embryonic age of only four weeks of development (counted from the date of conception).

In addition, physicians who specialize in reproductive health have stated that, at six weeks, an embryo has not yet developed a heart. *See, e.g.*, "Fetal heartbeat," *ACOG Guide*, *supra*. The chambers of the heart do not develop until a fetus is at least at seventeen to twenty weeks of gestation, at which point, a true heartbeat can be detected. *Id.* At six weeks, what exists in the quarter-inch-long embryo is solely a collection of emerging cardiac cells, which are just beginning to create a flutter of electrical impulses. There is no detectible sound that can be heard by a medical provider. Rather, the "sound" that is heard is the sound manufactured by the ultrasound machine itself, which translates the electrical impulses. *See* "Heartbeat bill," *ACOG Guide*, *supra*. Justice Kittredge takes issue with the source for this information; however, this information was discussed at length during oral argument and neither the Respondents nor the Petitioners took issue with the accuracy of the information.

Justice Kittredge's criticism of my use of information allegedly not in the record would be justified under normal circumstances, but is it justified in this case? Maybe, maybe not. Two members of this Court requested that the Court ask the parties to submit additional information for our consideration. This type of request is not uncommon, in fact similar requests were made recently in two other cases:

*Quinn*[24] and *Protestant Episcopal Church*.[25]  However, three members of the Court placed an unusual condition on our request for additional information.  They required the parties to be asked if they objected to the request; the Respondents objected, and compliance was not required.  We did not need the permission of the parties.  In my view, the imposition of this condition intentionally thwarted efforts to get beneficial information that would assist the Court in this weighty decision.

I accept full responsibility for seeking information that would facilitate a better understanding of the subject matter and the real issues before the Court.  The misnomer of the title of the Act vindicates the request for supplemental information.  Misinformation is pervasive in the abortion debate.  Misinformation has influenced public opinion and fanned the flames of hostility in this very sensitive discussion.  I will not willingly participate in the perpetuation of misinformation.  I stand by efforts to be better informed on the true issues before the Court.  *Men do not get pregnant.* Now back to the task at hand.

As medical experts have explained, at this early stage, a substantial number of women do not even know that they are pregnant, so there is no realistic opportunity to make a medical decision as to the (unknown) pregnancy at this point. Medical experts have indicated there are many reasons why a woman may not know she is pregnant at six weeks, including the fact that the pregnancy was not anticipated, the existence of hormonal variations, the presence of spotting after pregnancy that can be mistaken for a period, a lack of education, and a lack of immediate access to medical care.  Women may face hurdles in obtaining timely medical care due to poverty, work schedules, existing childcare obligations, or other personal circumstances.  In addition, most home pregnancy tests do not give results until at least five or six weeks into the pregnancy, and they often have to be repeated to confirm a pregnancy.

In light of the foregoing, a restriction at this early stage of pregnancy is, for all practical purposes, the equivalent of a de facto ban on abortion.  It effectively usurps a woman's authority to make medical decisions regarding her reproductive health, including the decision whether to have children, and places this power, instead, solely in the hands of a political body.  While government officials have assumed the role of overseer of a woman's reproductive health, it is troubling that

---

[24] *State v. Quinn*, 430 S.C. 115, 843 S.E.2d 355 (2020).

[25] *Protestant Episcopal Church in the Diocese of S.C. v. Episcopal Church*, No. 28095, 2022 WL 3560664 (S.C. Sup. Ct. filed Aug. 17, 2022).

the woman who is tasked with the burden of pregnancy, its associated health risks, and its lifetime of financial and emotional impacts, would no longer have a voice in this important and very personal decision. Further, even assuming that a woman's right to control her reproductive health decisions at this early stage is subject to the vote of a political body (a question that must be decided today), it is particularly concerning when considering the fact that the law has been enacted by a political body that is overwhelmingly comprised of men.

Moreover, this broad stroke to eliminate a woman's right to make her own reproductive health decisions at such an early stage of pregnancy affects more than just the pregnant woman. These decisions have traditionally been made in consultation with a woman's medical provider, along with family, including a spouse or partner, and with considerations as to a woman's existing physical and mental health, employment and school obligations, any existing children, and financial circumstances. The Act substitutes this private and very personal decision-making process with the collective view of a political body, and it interferes with a woman's ability to obtain medical advice and treatment during this critical time by threatening physicians with $10,000 fines, felony convictions, and imprisonment. *See* S.C. Code Ann. §§ 44-41-650(B), -680(D) (Supp. 2022) (stating the penalties for violations).

When life begins is a theoretical and religious question upon which there is no universal agreement among various religious faiths. In fact, because there are differing views on abortion and when life begins among religious faiths, challenges are already being made to some abortion laws on the basis they violate religious freedom by elevating one faith's views over the views of others.[26] The question of

---

[26] For example, while Florida courts had previously found its state constitution protected privacy rights and abortion rights, a newly enacted abortion ban that provides no exceptions for rape and incest and that criminalizes care by physicians, as well as counseling about abortion provided by others (including clergy) is being challenged by clergy members of five religions on the basis that it violates First Amendment rights to freedom of speech, religious liberty, and the separation of church and state under the Establishment Clause, which prohibits the government from favoring one religion over another. The lawsuits allege, *inter alia*, that the ban infringes on faiths that believe life begins at birth or other points, not at conception, and interferes with the ability of clergy to counsel their members regarding abortion. *See Hafner v. State*, No. 2022-014370-CA-01 (Fla. Cir. Ct. filed Aug. 1, 2022); *Chotso v. State*, No. 2022-014371-CA-01 (Fla. Cir. Ct. filed Aug. 1, 2022); *Priest of the Episcopal Church in Miami-Dade Cnty. v. State*, No. 2022-014372-CA-01 (Fla. Cir. Ct. filed Aug. 1, 2022); *Pomerantz v. State*, No. 2022-014373-CA-01 (Fla.

when life begins is distinguishable from the constitutional questions raised here regarding whether a woman has the right to make her own medical decisions regarding her reproductive health (in consultation with her medical provider and based on scientific evidence). At its core, the question the Court faces today is can the government—by force of law—force a woman to give birth without her consent? As will be discussed, for a reasonable period of time, a woman, rather than the government, retains this important right to choose whether to become a mother.

This right to choose is often characterized as "pro-choice," but this is not the same as being "pro-abortion." Many individuals who would not choose abortion for themselves on religious, political, or other grounds would never presume to impose their beliefs on their neighbors or delve into the private conversations of a woman and her medical provider.

With this understanding of the terms and issues that are before the Court, I will examine Petitioner's constitutional challenges to South Carolina's fetal heartbeat law.

**B.      Void ab initio**

Petitioners argue, as a threshold issue, that because South Carolina's Act was unlawful on the day it was passed in 2021, it was and remains void ab initio as a matter of South Carolina law. I agree; however, it is unnecessary to address this issue because the majority of the Court agrees that the Act violates a woman's right to privacy as guaranteed by article 1, section 10 of our state's constitution. As such, the question is moot and not capable of being repeated.

**C.      Right Against Unreasonable Invasions of Privacy**

This Court is presented today with a novel question involving our state constitution's right to privacy. This right to privacy is deeply rooted in our federal and state jurisprudence and history. Consequently, it is appropriate to review precedent from the United States Supreme Court and our appellate courts to understand the foundation and the evolutionary interpretation of this right. I begin by chronicling the decisions from the United States Supreme Court leading up to *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), which precipitated the case currently before us.

---

Cir. Ct. filed Aug. 1, 2022); *Capo v. State*, No. 2022-014374-CA-01 (Fla. Cir. Ct. filed Aug. 1, 2022).

Initially, in *Griswold v. Connecticut*, the United States Supreme Court reiterated that the Fourth and Fifth Amendments to the United States Constitution encompassed the "right to privacy" to ensure "the sanctity of a man's home and the privacies of life." 381 U.S. 479, 484–85 (1965). The Court recognized the penumbral right of privacy flowing from these amendments created a "legitimate" right. *Id*. at 485. The Court consequently struck down a Connecticut law criminalizing the use of contraceptives: "Would we allow the police to search the *sacred* precincts of marital bedrooms for telltale signs of the use of contraceptives? The very idea is *repulsive* to the notions of privacy surrounding the marriage relationship." *Id*. at 485–86 (emphasis added).

Then, in *Eisenstadt v. Baird*, the Court found similar constitutional repugnance with a Massachusetts law prohibiting the distribution of contraceptives to single persons. 405 U.S. 438 (1972). Logically, the Court extended the reasoning of *Griswold* because marriage is an independent association of two individuals:

> *If the right of privacy means anything*, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters *so fundamentally affecting a person* as the decision whether to bear or beget a child.

*Id*. at 453 (emphasis added).

Subsequently, the Court rendered its most controversial ruling, a ruling which, at the time of this writing, has been overturned, *Roe v. Wade*. There, the Court traced the amendments from which the right of privacy emanates: The First, the Fourth, the Fifth, and the Ninth. 410 U.S. 113, 152. However, the Court identified the concept of ordered liberty in the Fourteenth Amendment as another vehicle for the right to privacy. *Id*. The Court did not firmly hold if one source trumped the other. *Id*. at 153. Regardless of its source, the Court held the right to privacy was broad enough to encompass a person's decision whether or not to terminate a pregnancy. *Id*. Before the constitutional jolt delivered by overturning *Roe*, Americans enjoyed nearly five decades of its precedent.

In the interim, the Court continued to recognize that "in some situations the Constitution confers a right of privacy." *Runyon v. McCrary*, 427 U.S. 160, 177 (1976). The Court concluded, "A person's decision whether to bear a child and a parent's decision concerning the manner in which his child is to be educated may fairly be characterized as exercises of familial rights and responsibilities. But it does

not follow that because government is largely *or even entirely precluded from regulating the child-bearing decision*, it is similarly restricted by the Constitution from regulating the implementation of parental decisions concerning a child's education." *Id*. at 178 (emphasis added).

One year later, the Court concluded the right to privacy, in connection with decisions regarding procreation, extended to both adults and minors. *Carey v. Population Servs., Int'l*, 431 U.S. 678, 693 (1977). In so ruling, the Court again recognized "that one aspect of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment is 'a right of personal privacy, or a guarantee of certain areas or zones of privacy.'" *Id*. at 684 (quoting *Roe*, 410 U.S. at 152). The Court further noted that "the decisions that an individual may make *without unjustified government interference* are personal decisions" related to marriage, procreation, contraception, family relationships, and child rearing and education. *Id.* at 684-85. (emphasis added).

Subsequently came another monumental decision, *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992). In a split decision, the Court reconsidered the source of the right to privacy. Writing for the plurality, Justice Kennedy answered the question posed by *Roe*. He reasoned that the right to make the decision regarding abortion rested in the concept of ordered liberty in the Due Process Clause of the Fourteenth Amendment. *Id*. at 847–50. Although it seems the right to privacy took a backseat to the guarantee of liberty, liberty encompassed those rights from which privacy was first identified: "The most familiar of the substantive liberties protected by the Fourteenth Amendment are those recognized by the Bill of Rights." *Id*. at 847. Stated differently, liberty is a broader concept than privacy and, thus, necessarily contains the right to privacy. Our constitutionally ordered society centers on the same goals of liberty and privacy and the original Bill of Rights drafted shortly after the founding of our nation:

> These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment. *At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life.*

*Id*. at 851 (emphasis added).

Although not directly on point with the instant case, several other decisions concerning personal freedoms and liberty established the foundation for the right to

privacy.  They, nevertheless, have an important place in our jurisprudence of freedom.  *See, e.g.*, *Loving v. Virginia*, 388 U.S. 1 (1967) (holding prohibitions on interracial marriage violate the Equal Protection and Due Process Clauses of the Fourteenth Amendment); *Lawrence v. Texas*, 539 U.S. 558 (2003) (concluding laws criminalizing same sex relations violates the Fourteenth Amendment); *Obergefell v. Hodges*, 576 U.S. 644 (2015) (ruling the right to marriage inherent in the Due Process and Equal Protection Clauses cannot be denied to same sex couples).

Recently, the United States Supreme Court delivered a catastrophic blow to stare decisis, which severed the ongoing development of privacy and ordered liberty. In *Dobbs*, the Court ruled that the right to obtain an abortion does not fall within the right to privacy or the concept of ordered liberty in the Due Process Clause of the Fourteenth Amendment.  142 S. Ct. at 2242–43.  The Court left untouched the broader right to privacy—at least it said—and distinguished the right to obtain an abortion from both privacy and liberty.  *Id*. at 2257–58.  The Court divorced abortion from privacy because "[a]bortion destroys what those decisions call 'potential life' and what the law at issue in this case regards as the life of an 'unborn human being.'" *Id*. at 2258.

At the expense of Americans' right to privacy, the *Dobbs* majority relied heavily on the following troubling argument:  "These attempts to justify abortion through appeals to a broader right to autonomy and to define one's 'concept of existence' *prove too much*.  Those criteria, at a *high level of generality*, could license fundamental rights to illicit drug use, prostitution, and the like."  *Id*. (emphasis added).  The use of the phrase "at a high level of generality" is noteworthy—translated meaning:  within the realm of possibility but highly improbable.  It appears that the Court recognizes that this argument is very weak and relies on extreme, if not absurd, analogies.

While the *Dobbs* decision reversed decades of precedent establishing that the right to an abortion emanated from provisions of the federal constitution, our analysis does not end there because our state constitution explicitly guarantees South Carolinians an express right to privacy:

> *The right of the people* to be secure *in their persons*, houses, papers, and effects against unreasonable searches and seizures and *unreasonable invasions of privacy shall not be violated*.

S.C. Const. art. I, § 10 (emphasis added).

Much is said about the importance of the intent or thoughts of the Committee to Make a Study of the Constitution of South Carolina of 1895 ("The West Study Committee") in recommending the language in article I, section 10. Both Petitioners and Respondents discuss the intent of the language in their briefs. Justice James relies heavily on his perceived intent of this language in his dissent. Petitioners, Respondents, and members of this Court refer to notes, minutes of the committee meetings, statements made during the meeting, and letters to and from members of the committee and outside consultants. All of which are interesting but unavailing in our interpretation of the breadth of the privacy rights addressed in article I, section 10.

Unfortunately, the parties and this Court have raised the West Study Committee to an undeserved level of importance in the exclusive judicial task of interpreting our state's constitution. This Court's unintended role in this undeserved elevation of importance is crucial in that it created a false appearance of high importance in our prior opinions by not clearly disabusing the notion that the Committee had any authority or part in the interpretation of our constitution. The Court's discussion of members' statements and meeting minutes gave the appearance that they were somehow ultra-important. Yet, all the while, the Court recognized the Committee's lack of binding authority and utility. *See State v. Forrester*, 343 S.C. 637, 647 n.7, 541 S.E.2d 837, 842 n.7 (2001) ("It is important to note that committee minutes will not be controlling of the intent behind, or interpretation of, our state constitution. This fact was even noted in Committee Member Sinkler's observation that their discussion would not control any subsequent interpretation. We include these discussions for their historical context and interest." (citations omitted)). Perhaps, if the Court had been more direct in identifying the true status of the West Study Committee the debate on the intent of its members would be unnecessary. The West Study Committee was just that—a study committee. It was not the General Assembly and it was not a constitutional convention.

In South Carolina, the only entities with the authority to propose constitutional provisions are the General Assembly and an approved constitutional convention. S.C. Const. art. XVI, §§ 1, 3. At bottom, the General Assembly is the official drafter of the privacy provision. The actions of the West Study Committee may be historically important but have no relevance when interpreting our constitution. The Court is constitutionally constrained to consider the intent of the General Assembly and the intent of the electorate.[27]

---

[27] Although the parties and some members of this Court put substantial emphasis on committee reports and public news sources, our analysis is not bound by the opinions

I emphasize today: "It is important to note that committee minutes will not be controlling of the intent behind, or interpretation of, our state constitution." *Forrester*, 343 S.C. at 647 n.7, 541 S.E.2d at 842 n.7. The final words of the constitution, submitted to the people and their representatives, has more meaning than the discussions of the study committee. *See* 16 C.J.S. *Constitutional Law* § 108 (2022) ("Ultimately, it is the final product—the constitution actually submitted to the people for adoption, as they understood it—that is controlling.").[28] I believe and reaffirm that the right against unreasonable invasions of privacy "applies both within and outside the search and seizure context." *Forrester*, 343 S.C. at 644, 541 S.E.2d at 841.

The General Assembly's intent also stands as a persuasive basis to interpret the right broadly. Article I, section 10 was drafted following the United States Supreme Court's 1965 *Griswold* decision, which recognized a right to privacy in the federal constitution. When the General Assembly acts, we presume it knows how terms and phrases have been used in the past. *See State v. Bridgers*, 329 S.C. 11, 14, 495 S.E.2d 196, 197–98 (1997) ("The General Assembly is presumed to be aware of the common law, and where a statute uses a term that has a well-recognized meaning in the law, the presumption is that the General Assembly intended to use the term in that sense." (internal citation omitted)). Therefore, without using any limiting

---

of one person, legislator, or commentator. These are only non-binding considerations pursuant to our duty under article V of the South Carolina Constitution: "When this Court is called to interpret our Constitution, it is *guided* by the principle that both the citizenry and the General Assembly have worked to create the governing law." *State v. Long*, 406 S.C. 511, 514, 753 S.E.2d 425, 426 (2014) (emphasis added).

[28] The notion that the West Study Committee was a "close cousin" to a constitutional convention is an overstatement at best. Although both bodies considered revisions or amendments to a constitution, the two are very different in organization and authority. A constitutional convention assembles at the behest of the voting public (after approval of the legislature) and must consist of a number equal to the largest body in the General Assembly, which, today, would be 124. S.C. Const. art. XVI, § 3. Its constitutional revisions or amendments are put before the electorate unchanged. The West Study Committee was formed by the legislature to study the constitution and consisted of less than 10 members including several legislators. Its recommendations could be, and in some instances were, ignored by the legislature.

language, the General Assembly understood the broad context of privacy when it passed the provision.

We interpret our constitution to ensure South Carolinians retain the rights it guarantees. "It is well settled that the interpretation of the state's constitution is a matter for the courts." *Baddourah v. McMaster*, 433 S.C. 89, 103, 856 S.E.2d 561, 568 (2021). "State courts may afford more expansive rights under state constitutional provisions than the rights which are conferred by the Federal Constitution." *State v. Easler*, 327 S.C. 121, 131 n.13, 489 S.E.2d 617, 622 n.13 (1997), *overruled on other grounds by State v. Greene*, 423 S.C. 263, 814 S.E.2d 496 (2018). "This relationship is often described as a recognition that the federal Constitution sets the floor for individual rights while the state constitution establishes the ceiling." *Forrester*, 343 S.C. at 643, 541 S.E.2d at 840.

Because the process to amend our constitution involves the General Assembly and the public, we have stated that we will look to the ordinary and plain meaning of the terms and employ rules similar to statutory construction:

> When this Court is called to interpret our Constitution, it is guided by the principle that both the citizenry and the General Assembly have worked to create the governing law. Therefore, the Court will look at the "ordinary and popular meaning of the words used," keeping in mind that amendments to our Constitution become effective largely through the legislative process. For this reason, "the Court applies rules similar to those relating to the construction of statutes" to arrive at the ultimate goal of deriving the intent of those who adopted it.

*City of Rock Hill v. Harris*, 391 S.C. 149, 153, 705 S.E.2d 53, 54–55 (2011) (internal citations omitted).

At the outset, the presentation of the right of privacy in the text of article I, section 10 is instructive because it reveals the General Assembly clearly and expressly delineated the right of privacy from the search and seizure context. The title of section 10 in our Declaration of Rights reads, "SECTION 10. Searches and seizures; invasions of privacy." S.C. Const. art. I, § 10. Notably, a semicolon separates the two, independent clauses. *Manual on Usage & Style* § 1.13 (Tex. L. Rev. ed., 14th ed. 2017). Further, the text of the constitutional provision separates "unreasonable searches and seizures" from "unreasonable invasions of privacy" using the word "and," thus indicating the connection of separate and precise meanings. *See Conjunctive/Disjunctive Canon*, *Black's Law Dictionary* (11th ed. 2019) ("[*A*]*nd* joins a conjunctive list to combine items."). With this in mind, I begin

my analysis by outlining how our appellate courts have interpreted the right to privacy. While some of these cases considered the right to privacy in the search and seizure context, it is evident that we have recognized that this right is not limited to searches and seizures. Rather, it is a discrete right established by our state constitution.

First, in *Singleton v. State*, we held that the state violates the right to privacy when it forces an inmate to take medication for purposes of facilitating execution. 313 S.C. 75, 89, 437 S.E.2d 53, 61 (1993). There, the state needed to treat Singleton's incompetence by medication before execution. *Id*. at 87, 437 S.E.2d at 60. Although an inmate has a limited privacy interest, the inmate must be free from unwarranted medical intrusions despite the state's penological interest. *Id*. Importantly, we recognized Singleton had a fundamental right in his medical care outside the search and seizure context for the first time. Any objective reading of *Singleton* requires a conclusion that the Court officially recognized a right to bodily autonomy encompassed in our right to privacy that is protected by article I, section 10. This right to bodily autonomy is not absolute and may be interfered with when to do so is in the best interest of the person and is reasonable.

In *Forrester*, we emphasized that this right to privacy did not protect South Carolinians only in the search and seizure context. *Forrester*, 343 S.C. at 644, 541 S.E.2d at 841 ("South Carolina and the other states with a right to privacy provision imbedded in the search and seizure provision of their constitutions have held such a provision creates a *distinct privacy right that applies both within and outside the search and seizure context*." (emphasis added)). I disagree with the notion that this statement is dicta. *Forrester* was specifically decided on the basis of the distinct right to privacy. *Id*. at 645, 541 S.E.2d at 841.

We premised our holding in *Forrester* on a survey of other states with similar provisions and the intent behind the adopting of our own provision. At the time, nine states and South Carolina had privacy provisions. *Id*. at 644 n.3, 541 S.E.2d at 84 n.3. Now, that number has grown to ten states and South Carolina.[29] We again relied on other states' interpretations of their privacy provisions in recognizing our

---

[29] New Hampshire's provision was added in November 2018. N.H. Const. art. 2-b; Pam Greenberg, *New Hampshire Voters Approve Constitutional Amendment on Privacy*, The NCSL Blog (Nov. 14, 2018), https://www.ncsl.org/blog/2018/11/14/new-hampshire-voters-approve-constitutional-amendment-on-privacy.aspx.

own extends beyond the search and seizure context.[30]  *See, e.g.*, *State v. Perry*, 610 So. 2d 746, 755 (La. 1992) ("[T]he right to decide what is to be done with one's brain and body; the right to control one's mind and thoughts; and the freedom from unwarranted physical interference with one's person."), *cited with approval in Singleton*, 313 S.C. at 88, 437 S.E.2d at 60–61.

Turning to the instant case, I conclude a law regulating or banning abortion implicates the right against unreasonable invasions of privacy[31] in article I, section 10.[32]  Under *Singleton* and *Forrester*, our touchstones, the right to privacy extends

---

[30] Similarly, the Supreme Court of Alaska held their privacy clause extended well beyond the search and seizure context.  *State v. Planned Parenthood of Alaska*, 35 P.3d 30 (Alaska 2001).  Relying on decades of caselaw development, the court found, "With or without legislative action, this guarantee has the usual attributes of a constitutional provision: its broad contours and particular applications fall within the judiciary's province and are subject to definition, interpretation, and refinement through the traditional course of adjudication, case by case."  *Id.* at 38–39.  The court subsequently held a "Parental Consent Act" did not "strike the proper constitutional balance between the State's compelling interests and a minor's fundamental right to privacy."  *State v. Planned Parenthood of Alaska*, 171 P.3d 577, 579, 581 (Alaska 2007) ("Because this right to privacy is explicit, its protections are necessarily more robust and 'broader in scope' than those of the implied federal right to privacy.").

[31] *See Am. Acad. of Pediatrics v. Lungren*, 940 P.2d 797, 813 (Cal. 1997) ("[T]he interest in autonomy privacy protected by [the privacy] clause includes a pregnant woman's right to choose whether or not to continue her pregnancy."); *Women of the State of Minn. v. Gomez*, 542 N.W.2d 17, 19 (Minn. 1995) (interpreting the right against unreasonable searches and seizures to include a fundamental right of privacy, including a right to pre-viability abortion); *Armstrong v. State*, 989 P.2d 364, 377 (Mont. 1999) (holding the right of individual privacy protects a woman's right to have a pre-viability abortion); *Right to Choose v. Byrne*, 450 A.2d 925, 933–94 (N.J. 1982) (holding the right to life, liberty, and pursuit of happiness includes privacy and the right to choose to have an abortion).  *But see, e.g.*, *Hope Clinic for Women, Ltd. v. Flores*, 991 N.E.2d 745 (Ill. 2013) (finding no right to an abortion in the state's privacy clause but finding that the state due process clause provides abortion protections).

[32] We are not alone in finding a right to bodily autonomy in our state constitution. In *Hodes & Nauser, MDs, P.A. v. Schmidt*, the Supreme Court of Kansas concluded

outside of the search and seizure context and encompasses "unwarranted medical intrusions." *Singleton*, 313 S.C. at 89, 437 S.E.2d at 61. When the General Assembly enters into the decision-making process in reproductive and medical care, it necessarily determines "matters so fundamentally affecting a person as the decision whether to bear or beget a child."[33] *Eisenstadt*, 405 U.S. at 453.

Because the right against unreasonable invasions of privacy is expressly enumerated in our constitution, it guarantees a fundamental right. When legislation restricts or impairs a fundamental right under the federal constitution,[34] we review its constitutionality under a strict scrutiny standard. *In re Treatment & Care of Luckabaugh*, 351 S.C. 122, 140, 568 S.E.2d 338, 347 (2002); *see also Lane v. Gilbert Constr. Co.*, 383 S.C. 590, 600, 681 S.E.2d 879, 884 (2009) ("The right to trial by jury is a fundamental right. As such, any abridgement of that right is subject to strict scrutiny." (internal citation omitted)). Additionally, other jurisdictions have

---

women have a right to "make decisions about her body" as a natural consequence of "equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness" in Kansas's Bill of Rights. 440 P.3d 461, 466 (Kan. 2019). There, the court compared its Bill of Rights with the federal Fourteenth Amendment. *Id*. at 471. Finding its provision broader than "liberty" in the Fourteenth Amendment, the court concluded, "Among the rights is the right of personal autonomy." *Id*. The court also employed a strict scrutiny analysis when reviewing if the state infringed on those state constitutional rights. *Id*. at 493; *see also id*. at 495 ("In short, although there are no Kansas cases applying strict scrutiny to natural rights, [] cases suggest the standard is available."). As a first step, the court held that the natural right of personal autonomy is fundamental. *Id*. at 499. The court, however, remanded the case to the trial court for a full determination of the strict scrutiny analysis. *Id*. at 503.

[33] *See also State v. Planned Parenthood of Alaska*, 171 P.3d 577, 581–82 (Alaska 2007) ("Included within the broad scope of the Alaska Constitution's privacy clause is the fundamental right to reproductive choice. As we have stated in the past, 'few things are more personal than a woman's control of her body, including the choice of whether and when to have children,' and that choice is therefore necessarily protected by the right to privacy.").

[34] Specifically, courts use this standard when laws affect unenumerated rights in the Due Process Clause of the Fourteenth Amendment.

employed a strict scrutiny review when a law implicates a fundamental right to privacy, as shall be discussed below.[35]

The state, at some point, has a legitimate interest in protecting fetal life. *See, e.g.*, *Roe*, 410 U.S. at 163 ("State regulation protective of fetal life after viability thus has both logical and biological justifications."), *overruled by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022). The state's interest must be balanced against the fundamental right to privacy guaranteed by the South Carolina Constitution. The *Dobbs* Court said that "*Roe* and *Casey* each struck a particular balance between the interests of a woman who wants an abortion and the interests

---

[35] Finding Florida's fundamental right to privacy implicated by the imposition of a waiting period to obtain an abortion, the Supreme Court of Florida applied strict scrutiny to the regulation. *Gainesville Woman Care, LLC v. State*, 210 So. 3d 1243, 1253 (Fla. 2017). The court quoted a previous Florida case:

> Florida's privacy provision is clearly implicated in a woman's decision of whether or not to continue her pregnancy. We can conceive of few more personal or private decisions concerning one's body that one can make in the course of a lifetime, except perhaps the decision of the terminally ill in their choice of whether to discontinue necessary medical treatment.

*In re T.W.*, 551 So. 2d 1186, 1192 (Fla. 1989). The court in *Gainesville Woman Care* went on to say, "Florida's constitutional right of privacy encompasses a woman's right to choose to end her pregnancy. This right would have little substance if it did not also include the woman's right to effectuate her decision to end her pregnancy." *Gainesville Woman Care, LLC v. State*, 210 So. 3d 1243, 1254 (Fla. 2017). There, Florida's constitution provides for the right to "be let alone and free from governmental intrusion into [one's] private life." *Id*. at 1246 (quoting Fla. Const. art. I, § 23). Because the right is fundamental, the court recognized the law must be justified by a compelling interest through the least restrictive means. *Id*. The law required a woman to take two trips to a medical provider, one to a referring physician and one to an abortion provider at least twenty-four hours later. *Id*. at 1261. Because no other medical procedure required a twenty-four-hour waiting period—particularly where the waiting period could be even longer—the court concluded the law was not the least restrictive means to achieve the state's interests. *Id*. Regardless, the court reasoned the state had no compelling interest in requiring physicians to inform patients of social and moral concerns before terminating a pregnancy. *Id*. at 1262.

of what they termed 'potential life.'" *Dobbs*, 142 S. Ct. at 2257. In overruling *Roe*, the *Dobbs* Court challenged the *Roe* Court's basis for acting, not its core analysis. The Court found that there was no explicit right to privacy in the federal constitution. Therefore, I mirror that analysis today when I weigh the state's interest with a person's right to be free from unreasonable invasions of privacy.

"To survive strict scrutiny the Act must meet a compelling state interest and be narrowly tailored to effectuate that interest." *Luckabaugh*, 351 S.C at 140–41, 568 S.E.2d at 347. The point at which a state has had a compelling interest in regulating and banning abortions has been identified as viability. *Roe*, 410 U.S. at 163, *overruled by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022). The United States Supreme Court previously relied on this because after viability a state has an interest in preserving fetal life possible outside of the womb. *Id.* Additionally, quickening has been a historical basis at which the state may ban or criminalize abortion procedures. *See, e.g.*, *Dobbs*, 142 S. Ct. at 2249 ("We begin with the common law, under which abortion was a crime at least after 'quickening.'"). Therefore, the state does not always have a compelling interest at every stage of pregnancy. Although the *Dobbs* Court abandoned the need to consider this balancing analysis under the federal constitution, the Court's reasoning does not apply to South Carolina's constitution. There must be an inflection point for a balancing analysis under the South Carolina Constitution.

In the instant case, the Act prohibits an abortion after a "fetal heartbeat" has been detected. S.C. Code Ann. § 44-41-680(A) (Supp. 2022). The Act defines a fetal heartbeat broadly, as any "cardiac activity." *Id.* § 44-41-610(3). As discussed, this activity can be present as early as six weeks into a pregnancy.

The Act does not logically draw a line at which the state can regulate, and it effectively bans all abortions. Banning abortions at the stage of detectable embryonic "cardiac activity," presumably at the six-week gestation period, unreasonably exceeds the point at which the state has a compelling interest. It is unreasonable for the state to assert that it has a compelling interest in the protection of a quarter-inch-long amorphous collection of cells. As evidence of this, the rape and incest exceptions provide for a cutoff at twenty weeks. Furthermore, defining "fetal heartbeat" as any "cardiac activity" is clearly overbroad and not narrowly tailored. The arbitrariness of this six-week restriction, without the consultation and expertise of the medical provider, solidifies the fact that the Act is not narrowly tailored.

Moreover, in *Singleton*, we recognized, "An inmate in South Carolina has a very limited privacy interest when weighed against the State's penological interest; however, the inmate must be free from unwarranted medical intrusions." 313 S.C. at 89, 437 S.E.2d at 61. The balancing there is helpful to us because, even when a large state interest was weighed against an inmate's right, the personal right pertaining to medical care, treatments, and decisions could not be overcome. Similarly, here, the state's limited interest in regulating embryos does not trump an individual's bodily integrity.

While a strict scrutiny analysis aids in balancing competing interests, our constitution provides that only *unreasonable* invasions of privacy are unlawful. Therefore, reasonableness provides a limiting principal, and the right to privacy in article I, section 10 is not absolute. The constitution protects against only unreasonable invasions of privacy.

I conclude banning abortions after the detection of embryonic "cardiac activity" is an unreasonable intrusion into a person's private reproductive health decisions. The detection of embryonic "cardiac activity" frequently occurs before a woman knows she is pregnant. Because the Act often prevents a medical decision before a woman knows she is pregnant, it unreasonably attempts to further the state's interests in private health decisions.

The reasonableness analysis here looks like a rational-basis review.[36] "A classification will survive rational basis review when it bears a reasonable relation to the legislative purpose sought to be achieved, members of the class are treated alike under similar circumstances, and the classification rests on a rational basis." *Bodman v. State*, 403 S.C. 60, 69, 742 S.E.2d 363, 367 (2013). Further, "those who challenge the validity of one under rational basis review must 'negate every conceivable basis which might support it.'" *Id*. at 69–70, 742 S.E.2d at 368 (quoting *Lee v. S.C. Dep't of Nat. Res.,* 339 S.C. 463, 470 n. 4, 530 S.E.2d 112, 115 n. 4 (2000)).

Even giving deference to the General Assembly, whether by a reasonableness analysis or, here, rational-basis review, the Act fails to survive scrutiny. First, as discussed, the Act effectively prevents women from making a health decision before they even are aware of their pregnancies. Second, by its terms, the Act does not

---

[36] When a law does not differentiate a suspect class or infringe upon a fundamental right, this Court will employ a rational-basis review. *Bodman v. State*, 403 S.C. 60, 69, 742 S.E.2d 363, 367 (2013).

allow a woman to make an informed choice. In passing the Act, the General Assembly found, "in order to make an informed choice about whether to continue a pregnancy, a pregnant woman has a legitimate interest in knowing the likelihood of the human fetus surviving to full-term birth based upon the presence of a fetal heartbeat." South Carolina Fetal Heartbeat and Protection from Abortion Act, Act No. 1, 2021 S.C. Acts 2, 3 § 2(8). The General Assembly set out with the goal to facilitate women's decisions over their own bodies. Because women cannot definitively know about an unexpected pregnancy before any embryonic cellular "cardiac activity" is detectable, there is no reasonable relation to the legislative purpose expressed in subsection 2(3). Therefore, even though the constitution does not mandate rational-basis review, the Act nevertheless fails that low-threshold scrutiny.

Because the Act in its present form does not pass constitutional review, I find it violates our state constitution beyond a reasonable doubt. I pass no judgment on the constitutionality of future acts and legislative attempts to regulate abortion. Today, this finding is limited to declaring the so-called "heartbeat" law to be an unreasonable invasion of privacy.

**D.     Equal Protection**

Petitioners argue the Act violates equal protection under the South Carolina Constitution. Specifically, Petitioners contend the Act discriminates against three classifications of individuals: (1) women who seek abortions for the enumerated exceptions as opposed to any other reason, (2) women who seek abortion versus those who decide to carry their pregnancies to term, and (3) women as opposed to men. Further, Petitioners argue the Act fails to survive all levels of scrutiny, regardless of which this Court applies.

Conversely, Respondents argue the Act—and any regulations relating to pregnancy—are not impermissible classifications based on sex. Additionally, Respondents cite to the *Dobbs* decision to support the proposition that an equal protection claim is foreclosed by federal precedent. Respondents nevertheless assert that the Act classifies based on gender and pregnancy permissibly under South Carolina caselaw. Finally, Respondents contend the Act survives even heightened scrutiny.

Fundamentally, the Act treats pregnant women who are victims of rape and incest and those who suffer grave health emergencies differently from all remaining pregnant women. For example, the Act affords rape and incest victims *twenty weeks* to consider their options. S.C. Code Ann. § 44-41-680(B)(1)–(4) (Supp. 2022). In

contrast, all remaining pregnant women must make the weighty decision whether to continue the pregnancy within, in most cases, *six weeks*, according to the medical authorities previously discussed. *Id.* § 44-41-680(A).

Turning to the substance of equal protection jurisprudence, our constitution provides, "[N]or shall any person be denied the equal protection of the laws." S.C. Const. art. I, § 3. "Equal protection 'requires that all persons be treated alike under like circumstances and conditions, both in privileges conferred and liabilities imposed.'" *Doe v. State*, 421 S.C. 490, 504, 808 S.E.2d 807, 814 (2017) (quoting *GTE Sprint Commc'ns Corp. v. Pub. Serv. Comm'n of S.C.*, 288 S.C. 174, 181, 341 S.E.2d 126, 129 (1986)). To succeed, an equal protection claim must have a showing that similarly situated persons receive disparate treatment. *Grant v. S.C. Coastal Council*, 319 S.C. 348, 354, 461 S.E.2d 388, 391 (1995). Once a classification is identified, "[c]ourts generally analyze equal protection challenges under one of three standards: (1) rational basis; (2) intermediate scrutiny; or, (3) strict scrutiny." *Denene, Inc. v. City of Charleston*, 359 S.C. 85, 91, 596 S.E.2d 917, 920 (2004).

"The equal protection clause prevents only irrational and unjustified classifications, not all classifications." *State v. Wright*, 349 S.C. 310, 312, 563 S.E.2d 311, 312 (2002). "Gender-based classifications are not inherently suspect so as to be subject to strict scrutiny and will be upheld if they bear a fair and substantial relationship to legitimate state ends." *In re Joseph T.,* 312 S.C. 15, 16, 430 S.E.2d 523, 524 (1993). "For a gender-based classification to pass constitutional muster, it must serve an important governmental objective and be substantially related to the achievement of that objective." *Wright,* 349 S.C. at 313, 563 S.E.2d at 312 (citing *Craig v. Boren,* 429 U.S. 190 (1976)). "A law will be upheld where the gender classification realistically reflects the fact that the sexes are not similarly situated in certain circumstances." *Id*. "The relevant inquiry . . . is not whether the statute is drawn as precisely as it might have been, but whether the line chosen by the [General Assembly] is within constitutional limitations." *Michael M. v. Super. Ct. of Sonoma Cnty.*, 450 U.S. 464, 473 (1981) (cited by *Wright*, 349 S.C. at 313, 563 S.E.2d at 312). As we have recognized, equal protection requires, "all persons to be treated alike under like circumstances and conditions, both in privileges conferred and liabilities imposed." *GTE Sprint Commc'ns*, 288 S.C. at 181, 341 S.E.2d at 129–30 (quoting *Marley v. Kirby*, 271 S.C. 122, 123–24, 245 S.E.2d 604, 605 (1978)).

Petitioners have identified three ways by which the Act classifies pregnant women. Two characteristics of the Act violates equal protection.[37] The Act violates equal protection guaranteed by our constitution, first, when it regulates pregnant women seeking medical care as opposed to women who decide to carry their pregnancies to term. Second, it prohibits all abortions sought except those in limited situations. Particularly, the Act's rape and incest exceptions require a physician to report the alleged rape or incest to the county sheriff. That report must include the name and contact information of the victim. S.C. Code Ann. § 44-41-680(C) (Supp. 2022). The provision requires notification of the requirement to the victim, inherently making it a bar to medical treatment. Further, the Act limitedly allows the procedure when the life and health of the mother is at stake. *Id*. at § 44-41-690.

Again, I return to bodily autonomy in considering these classifications. Women's futures are profoundly affected by pregnancy, especially when unplanned. While men have the freedom to walk away from reproductive consequences, women must bear the burden of reproduction. Notwithstanding the fact that the Act burdens women and not men, I do not find a gender-based violation. However, a *real* interest in bodily autonomy and health care are more important than the state's ostensible interest in *potential* embryonic life in the early stages of pregnancy. Therefore, the Act abridges a fundamental right: the right to bodily autonomy implicit in privacy. *Supra* Part II(C); *cf. Denene*, 359 S.C. at 91, 596 S.E.2d at 920 ("If the classification does not implicate a suspect class or abridge a fundamental right, the rational basis test is used."). Consequently, I again will employ a strict-scrutiny review.

Although the United States Supreme Court has not identified an impermissible classification which violates the federal Equal Protection Clause, there have been compelling arguments made to the contrary: "[L]egal challenges to undue restrictions on abortion procedures do not seek to vindicate some generalized

---

[37] Other jurisdictions have found a legitimate, state equal-protection claim based on similar classifications of pregnant women. For example, the Supreme Court of Arizona struck down a law denying Medicaid funding to abortions necessary to preserve the mother's health, but not to her life. *Simat Corp. v. Ariz. Health Care Cost Containment Sys.*, 56 P.3d 28 (Ariz. 2002); *see also Alaska Dep't of Health & Soc. Servs. v. Planned Parenthood of Alaska, Inc.*, 28 P.3d 904 (Alaska 2001) (concluding the state had not shown a compelling justification to deny Medicaid assistance for medically necessary abortions). There, the court recognized that the law under consideration treated different classes of pregnant women differently. *Id*. at 32. The Arizona court applied strict scrutiny in its equal protection analysis. *Id*.

notion of privacy; rather, they center on a woman's autonomy to determine her life's course, and thus to enjoy equal citizenship stature." *Gonzales v. Carhart*, 550 U.S. 124, 172 (2007) (Ginsburg, J., dissenting). In the instant case, I am not constrained by federal precedent in interpreting our state equal protection clause. *See, e.g.*, *Easler*, 327 S.C. at 131 n.13, 489 S.E.2d at 625 n.13 ("State courts may afford more expansive rights under state constitutional provisions than the rights which are conferred by the Federal Constitution.").

As discussed in Part II(C) of this opinion, the Act does not pass strict scrutiny for several reasons. Particularly, here, the state's interest interferes with bodily autonomy and medical decisions. The Act does not violate equal protection because it regulates women based on biological differences from men; rather, it denies women the fundamental freedom of self-determination and health-care decisions. Put differently, the state's interest in embryonic life at six weeks is not compelling when compared to this freedom so inherent in our constitutional existence. In fact, the General Assembly has indicated in its findings that the Act "has legitimate interests from the outset of a pregnancy in *protecting the health* of [1] the pregnant woman and [2] the life of the unborn child who may be born[.]" South Carolina Fetal Heartbeat and Protection from Abortion Act, Act No. 1, 2021 S.C. Acts 2, 3 § 2(7) (emphasis added). The General Assembly denies equal protection when it identifies an interest in a classification of people and unreasonably infringes upon it.

Moreover, the Act's reported rape exception does not pass strict scrutiny because it does not advance the Act's stated health-care goals. The Act illegitimately places a burden on women seeking medical care as a result of a rape or incest. The state may have an interest in furthering criminal prosecution; however, making a condition of abortion mandatory reporting is not narrowly tailored to that end. Further, the Act only subjects women seeking abortion to its restrictions. Women who are raped and choose to continue their pregnancies do not have their autonomy and decisions regulated by the Act. Because the Act only restricts one choice—and inherently favors another—it is not narrowly tailored to the state's interests.

Notwithstanding the above-noted defects, there is the glaring defect of disparate treatment of pregnant women seeking an abortion. The six-week or detectable "cardiac activity" limitation does not apply to women where pregnancy results from rape or incest but it applies to women who seek an abortion for other reasons. Abortion in both situations is still an abortion. It begs the question, why does the state abandon its professed primary compelling interest, the protection of fetal life, in rape or incest cases? It cannot be to protect the emotional or mental health of the mother because the abortion statutory scheme already prohibits abortion on that basis. The only logical explanation is arbitrary sympathy.

Pregnancy is the status of both women regardless of the source of the sperm.  The rape and incest exceptions evince the state's abandonment of its professed compelling interest to protect fetal life.  Thereby, making the Act an unconstitutional violation of equal protection guaranteed by our state constitution.

In balancing these interests, I do not impose a policy determination.  Instead, I analyze whether the General Assembly's chosen policy, as stated in the Act, violates fundamental, constitutional rights guaranteed to all South Carolinians.  For the foregoing reasons, the Act violates the equal protection guaranteed to all South Carolinians in article I, section 3 of our state constitution.

## E.    Due Process

Petitioners next assert the Act violates their right to due process under the South Carolina Constitution.  *See* S.C. Const. art. I, § 3 (ensuring no person "shall . . . be deprived of life, liberty, or property without due process of law").  Petitioners raise issues regarding the deprivation of both procedural and substantive due process.

### (1)    Procedural Due Process

Petitioners assert the Act violates procedural due process because it is unconstitutionally vague.  They contend the Act's parameters are unclear because they conflict with multiple layers of existing South Carolina law, leaving no discernible standard for implementation.  In addition, the resulting uncertainty regarding the controlling standards makes the Act subject to arbitrary and discriminatory enforcement.

Procedural due process is violated when a provision of law is deemed unconstitutionally vague. *See State v. Houey*, 375 S.C. 106, 113, 651 S.E.2d 314, 318 (2007) ("The void-for-vagueness doctrine rests on the constitutional principle that procedural due process requires [1] fair notice and [2] proper standards for adjudication.").  Under this doctrine, "[a] statute can be impermissibly vague for either of two independent reasons."  *Id.* at 119, 651 S.E.2d at 321 (Waller, J., concurring in result).  "First, it may fail to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits."  *Id.*  "Or, second, it may authorize or encourage arbitrary and discriminatory enforcement."  *Id.*

A statute is not immune from constitutional challenge simply because some conduct could arguably fall within its reach.  In 2015, the United States Supreme Court clarified this point, explaining that, despite some statements to the contrary,

its holdings "squarely contradict" any notion that a statute is not unconstitutionally vague simply because some conduct can fall within its ambit:

> [A]lthough statements in some of our opinions could be read to suggest otherwise, our *holdings* squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp. For instance, we have deemed a law prohibiting grocers from charging an "unjust or unreasonable rate" void for vagueness—even though charging someone a thousand dollars for a pound of sugar would surely be unjust and unreasonable. *L. Cohen Grocery Co.,* 255 U.S., at 89, 41 S.Ct. 298 [*United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 89 (1921)]. We have similarly deemed void for vagueness a law prohibiting people on sidewalks from "conduct[ing] themselves in a manner annoying to persons passing by"— even though spitting in someone's face would surely be annoying. *Coates v. Cincinnati,* 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971).

*Johnson v. United States*, 576 U.S. 591, 602–03 (2015) (first and second alterations added).

In addition, this Court and the United States Supreme Court have recognized that a more stringent test for vagueness applies to criminal statutes because the consequences of imprecision in such cases can be more severe. *See, e.g., Houey*, 375 S.C. at 113, 651 S.E.2d at 318 ("As to civil standards, there appears [to be] a less stringent test than that applied in criminal contexts."); *see also Village of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498-99 (1982) ("The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment. . . . The Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe."), *cited with approval in Houey*, 375 S.C. at 113, 651 S.E.2d at 318.

As has been noted, the Act makes the violation of its terms a felony carrying a criminal penalty of up to two years in prison and fines of $10,000. S.C. Code Ann. §§ 44-41-650(B), -680(D) (Supp. 2022). Because the Act authorizes the extreme sanction of the deprivation of an individual's liberty, the Court must exercise the

utmost care in ensuring due process is properly afforded to avoid the improper criminalization of an individual's conduct. *See generally Carey v. Piphus,* 435 U.S. 247, 262 (1978) (stating one "purpose of procedural due process is to convey to the individual a feeling that the government has dealt with him fairly, as well as to minimize the risk of mistaken deprivations of protected interests").

Petitioners note that when the Act became effective in February 2021, it banned most abortions upon the detection of embryonic "cardiac activity," generally said to occur at approximately six weeks, with narrow exceptions. However, the Act expressly confirmed the continuation of existing South Carolina law, including prior statutes that codified *Roe v. Wade*, 410 U.S. 113 (1973) in South Carolina in 1974.[38] They argue this complex layering of competing and conflicting provisions renders the Act unconstitutionally vague, as those subject to its terms, such as physicians and others, will not know precisely what conduct is prohibited. Respondents, in contrast, contend the Act is not vague because if an abortion is illegal under any provision of the Act or prior—yet coexisting—law, then the conduct is illegal, and if there is any doubt as to which law should control, then an individual should *presume* that the most recent legislative act controls the legality of the individual's conduct.

A review of South Carolina law shows there are several layers of statutory provisions that have been enacted regarding abortion, despite their apparent conflict with existing provisions. In 1974, South Carolina enacted section 44-41-20, which established a trimester framework that effectively mirrored the trimester framework of *Roe*. *See* S.C. Code Ann. § 44-41-20(a)–(c) (2018) (establishing trimester guidelines). Under the 1974 law, (a) during the first trimester, abortions may be performed with the pregnant woman's consent by her attending physician according to the physician's professional judgment; (b) during the second trimester, abortions may be performed with the pregnant woman's consent by her attending physician in a hospital or clinic certified by the South Carolina Department of Health and Environmental Control ("DHEC"); and (c) in the third trimester, abortions may be performed in a certified hospital, with appropriate consent, and when, in the attending physician's judgment, the abortion is necessary to preserve the life or health, including the mental and physical health, of the woman. *Id.*

---

[38] This is the same basis on which the Court enjoined the enforcement of the Act prior to oral argument.

Changes by the General Assembly in 2016 altered this framework to prohibit abortion where "the probable post-fertilization age" of the fetus "is twenty or more weeks, except in the case of fetal anomaly, or in reasonable medical judgment, she has a condition which so complicates her medical condition as to necessitate the abortion of her pregnancy to avert her death or to avert serious risk of substantial and irreversible physical impairment of a major bodily function, *not including psychological or emotional conditions*." *Id.* § 44-41-450(A) (emphasis added). The 2016 Act expressly provides a physician cannot find a greater risk exists to the pregnant woman based on a diagnosis that she could cause substantial harm or even death to herself. *See id.* ("No such greater risk must be considered to exist if it is based on a claim or diagnosis that the woman will engage in conduct which she intends to result in her death or in substantial and irreversible physical impairment of a major bodily function.").

Petitioners point out that, although the 2016 Act conflicted with the prior codification of abortion law because, for example, it expressly prohibited a physician from considering a woman's psychological or emotional condition as part of the physician's judgment regarding the woman's health condition, the General Assembly nevertheless expressly stated it was not repealing any provision of prior law, including South Carolina's codification of *Roe* in section 44-41-20. *See id.* § 44-41-480 ("This article must not be construed to repeal, by implication or otherwise, Section 44-41-20 *or any otherwise applicable provision of South Carolina law* regulating or restricting abortion." (emphasis added)).

The Act's subsequent imposition of what is effectively a six-week ban in 2021 contains a similar provision expressly stating that it "must not be construed to repeal, by implication or otherwise, Section 44-41-20 *or any otherwise applicable provision of South Carolina law* regulating or restricting abortion." *Id.* § 44-41-710 (Supp. 2022) (emphasis added). As a result, the addition of the Act added yet another layer of conflicting provisions to the laws governing abortion in South Carolina. Apparently recognizing the inevitable confusion that could arise, section 44-41-710 also contains a lengthy disclaimer of sorts, purporting to resolve these conflicts. For example, it states that if an abortion complies with the Act but violates prior—yet still effective—provisions to the contrary, then it "must be considered unlawful as provided in such provision." *Id.* Simultaneously, however, section 44-41-710 states that an abortion that complies with other existing statutes but violates the Act "must be considered unlawful as provided in this article." *Id.*

I disagree with Respondents' suggestion that this provision somehow remediates any resulting confusion arising from the simultaneous application of several layers of facially conflicting laws. When this Court temporarily enjoined the enforcement of the Act we said that the Act has conflicting provisions. How can it be presumed that people untrained in law know what is and is not permitted? The addition of the Act in 2021, which bans most abortions with narrow exceptions, is not compatible with the existing law spanning nearly five decades after South Carolina's legislature chose to codify the parameters of *Roe* into state law. The efficacy of this existing body of state law protecting a woman's right to make her own reproductive health decisions was not automatically impacted by the overturn of the *Roe* decision *under federal law* by *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022).

This unusual layering of state law provisions has created inconsistencies that make it difficult for medical professionals and others affected by the Act to know how to follow the applicable law in treating their patients. When there are at least three competing standards governing abortion in this state (i.e., 1974 law, the 2016 Act, and the Act from 2021), an impossible situation has been created for physicians, medical providers, and others, who cannot ascertain, short of obtaining court orders, what conduct is permitted and what conduct is not under such a mix of directives. I reject Respondents' suggestion that physicians and other individuals who may be affected by the Act can make an intelligent decision as to what conduct is prohibited by attempting to unilaterally resolve conflicts in the law or to somehow settle any doubt that has been created in the Act by resorting to reliance on a presumption. This creates an unreasonable and untenable situation that does not afford procedural due process.

The timing of care can be an essential factor in a physician's advice and course of treatment. A medical provider cannot reasonably be expected to obtain a legal opinion or pursue an appeal to translate the conflicting landscape of abortion law in the course of advising a patient and providing treatment, particularly in cases of medical emergency. For nearly five decades, medical providers operated under reasonably stable laws governing abortion, and they could act in conformance with an understanding of the laws governing their conduct. The Act creates uncertainty in the law.

Based on the foregoing, I find the Act is unconstitutionally vague because it does not establish clear parameters of proscribed conduct that will enable reasonable compliance. I further find that, because medical providers would be forced to operate in circumstances of extreme uncertainty, enforcement of the Act would

inevitably authorize or encourage arbitrary and discriminatory enforcement. For these reasons, I find the Act does not afford procedural due process.

## (2) Substantive Due Process

Petitioners further assert the Act is unconstitutional because it deprives pregnant women of their substantive due process rights to life and liberty under any level of scrutiny. Petitioners argue the Act usurps the ability of women to make their own decisions regarding their reproductive health. Specifically, it expropriates a woman's decision whether to remain pregnant and have a child, which they observe is a decision with extensive and potentially life-long physical, mental, and financial consequences, and places these decisions in the hands of the state. Petitioners contend the Act also interferes with the ability of women to obtain timely medical care and to make decisions in accordance with the expert advice of their medical providers.

As stated above, South Carolina's due process clause provides no person "shall . . . be deprived of life, liberty, or property without due process of law." S.C. Const. art. I, § 3. "The purpose of the substantive due process clause is to prohibit government from engaging in arbitrary or wrongful acts 'regardless of the fairness of the procedures used to implement them.'" *In re Treatment & Care of Luckabaugh*, 351 S.C. 122, 140, 568 S.E.2d 338, 347 (2002) (citation omitted).

Legislation restricting or impairing a fundamental right or implicating a suspect class is subject to "strict scrutiny" to determine its constitutionality. *Id.*; *see also id.* at 140–41, 568 S.E.2d at 347 (stating under the strict scrutiny test, a law "must meet a compelling state interest and be narrowly tailored to effectuate that interest"). Legislation that does not infringe on fundamental rights or impact a suspected class is subject to a rational basis test, i.e., it must be reasonably designed to accomplish its purposes. *Id.* at 140, 568 S.E.2d at 347; *see also R.L. Jordan Co. v. Boardman Petroleum, Inc.*, 338 S.C. 475, 478, 527 S.E.2d 763, 765 (2000) (explaining that, under the rational basis test, the Court considers "[w]hether it [the legislation] bears a reasonable relationship to any legitimate interest of government"). "Under either type of analysis, the one who attacks the law bears the burden of showing it is unconstitutional." *Luckabaugh*, 351 S.C. at 140, 568 S.E.2d at 347.

Petitioners maintain reproductive decisions and bodily integrity are, inherently, personal and fundamental human rights, so a state's extreme restrictions on abortion access at such an early stage of pregnancy and its corresponding dominion over a woman's body and her reproductive health choices is a subject that

should be evaluated with strict scrutiny. Petitioners argue the Act does not survive strict scrutiny review because it is not narrowly tailored to achieve a legitimate state interest. At a minimum, however, Petitioners assert the Act, which effectively imposes almost a total ban, is not a reasonable means of supporting any state interest when the Act's enforcement actually endangers the lives of pregnant women, rather than safeguarding their health. As a result, they maintain the Act does not satisfy even the rational basis test.

Respondents, in contrast, argue abortion is not a fundamental right because the South Carolina Constitution of 1895 makes no reference to abortion, this state has previously imposed restrictions, there are differences of opinion as to whether women should be entitled to manage their reproductive health decisions, and control over those decisions have been left to the states after *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022). Citing *Dobbs*, *id.* at 2258, Respondents contend abortion is not a deeply rooted right in our nation's history and maintain the assertion of a woman's bodily integrity, "taken to its logical conclusion," would "open[] the door to encompass things such as 'illicit drug use, prostitution, and the like.'"[39] Consequently, they argue, the Act is subject to rational basis review, and it meets this test.

As an initial matter, I reject Respondents' assertion that the right of a woman to choose whether to become and stay pregnant and have a child is a matter that cannot be deemed a fundamental right because this state has a history of placing restrictions on abortion. Respondents contend that, because abortion was "*generally* prohibited" when South Carolina's due process clause was enacted in the Constitution of 1895, the framers and the public at that time "could not have contemplated" that due process implicitly included a right to abortion, and they note the word "abortion" does not appear in our state constitution.

Respondents' use of the phrase "generally prohibited" is an acknowledgement that abortions were not prohibited. It is important to recognize that, for much of our state's history, abortion was not prohibited until a woman was at the stage of quickening, which has been variously stated to be between approximately four and five months of pregnancy; it is based on a woman's self-reported detection of fetal movement.

---

[39] I disagree with the implication that a woman's right to reproductive freedom or bodily integrity is somehow equivalent to, or a gateway for, recognizing the right of an individual to engage in criminal activities such as prostitution or drug use. Such assertions are patently spurious.

In addition, the fact that the word "abortion" does not appear in our state constitution is not determinative. As some commentators have noted, there are many procedures affecting bodily integrity and medical care that are also not specifically named in our constitution, such as organ transplants, blood transfusions, mental health treatment, and the like. While these practices have been banned by some religions, no one would seriously argue that an individual's right to make health-care decisions regarding these practices is subject to a government ban because they are not specifically enumerated in our state constitution—or because some religions find them objectionable.

To the extent Respondents are asking this Court to ignore the facts and to focus on the historical understanding of fundamental rights and due process at the time of the 1895 Constitution, they are asking this Court to rely on a time in our state's history when women were not full participants in the public and legal affairs of this state, including formulation of the meaning of the term "due process." Notably, women did not participate in the state's 1895 constitutional convention creating the state's laws and policies. Rather, only males were eligible to vote for— and to become—a convention delegate. *See* Act No. 542, 1894 S.C. Acts 802, 804 § 4 ("Every male citizen of the United States and of this State of the age of twenty-one years . . . duly qualified to vote under the existing laws of the State . . . shall be entitled to vote for delegates to said Convention"); *id.* § 5 ("Every person entitled to vote for delegates to said Convention shall be eligible to a seat therein."); *Journal of the Constitutional Convention of the State of South Carolina* 2–8 (Charles A. Calvo, Jr. State Printer, Columbia, SC 1895) (publishing a roll call of around 160 convention delegates, which included no women).

In addition, the 1895 Constitution included a provision expressly prohibiting women from voting in public elections; it also focused on disenfranchising African Americans. *See* Cole Blease Graham Jr., *The Evolving South Carolina Constitution*, 24 J. Pol. Sci. 11, 21 (1996), https://digitalcommons.coastal.edu/jops/vol24/iss1/2 (stating the 1895 Constitution included a new suffrage clause that specifically limited the right to vote to all males who were paying taxes on property assessed at $300 or more and who passed literacy tests and observing "the 1895 [C]onstitution was adopted by a convention with the specific aim of excluding African Americans from politics").

Further, although Respondents reference the importance of knowing what the public thought was implicit in the meaning of due process in 1895, historians have remarked upon the fact that "[t]he 1895 Constitution was not submitted to a popular referendum." *Id.* at 22. In light of the foregoing, it is clear that the 1895 Constitution itself failed to afford due process in some of its provisions, so this nineteenth century document is not particularly useful in instructing this Court on the appropriate meaning of due process in the twenty-first century.

In view of its inherent weaknesses, many laws affecting women likewise did not afford due process following the adoption of the 1895 Constitution. For example, women were legally prohibited by the General Assembly from serving on juries in South Carolina until 1967. This begs the question, then, is it really correct to say that this state's prohibition on the full participation of women in the process of trial by jury means that the right of women to *be* on a jury is not a fundamental right that is deeply rooted in our nation's history? In other words, can the very act of depriving due process to an individual serve as a mechanism for the government to refuse to recognize a fundamental right? The answer must be no. Extending this analogy, if a state has a history of depriving women of the right to make their own intimate and private decisions about their reproductive health at various times, this should not prevent the inherent right of women to make reproductive health decisions and to control their own bodies from being "deeply rooted." This state was also one of the last to retain laws prohibiting women (and men) from entering into an interracial marriage until a unanimous United States Supreme Court struck down as unconstitutional these anti-miscegenation statutes in *Loving v. Virginia*, 388 U.S. 1 (1967) on the basis they violated the Due Process and Equal Protection Clauses of the Fourteenth Amendment. The historical status of anti-miscegenation laws in this state and others did not prevent them from being deemed an infringement on an individual's fundamental right to marry that violated due process.

For nearly half a century in this nation's most recent history, it has been recognized that women have a federal constitutional right to obtain abortion care. This position was upheld—repeatedly—by numerous justices on the United States Supreme Court, until it was overturned by the *Dobbs* Court in 2022. As one Georgia court has recently commented: "The *Dobbs* majority is not somehow 'more correct' than the majority that birthed *Roe* or *Casey*. Despite its frothy language disparaging the views espoused by previous Justices [over nearly five decades], the magic of *Dobbs* is not its special insight into historical 'facts' or its monopoly on constitutional hermeneutics. It is simply numbers." *SisterSong Women of Color Reprod. Justice Collective v. State*, Civ. Action No. 2022CV367796, Order at 4 n.5 (Ga. Super. Ct. Fulton Cnty. dated Nov. 15, 2022), injunction granted, Order in Case No. S23M0358

(Ga. Sup. Ct. dated Nov. 23, 2022) (granting the State of Georgia's Emergency Petition for Supersedeas for a stay of the order of the Superior Court of Fulton County pending appeal).

I reject the notion that a woman's right to make her own reproductive health decisions and control her own body is a novel right based only on *Roe* and, therefore, cannot be a deeply rooted right. Some authorities have observed that the right of reproductive choice is contained in the panoply of unenumerated rights that is protected by due process provisions that trace their development back to the Magna Carta. *See Planned Parenthood of the Heartland, Inc. v. Reynolds ex rel. State*, 975 N.W.2d 710, 768 (Iowa 2022) (Appel, J., dissenting) ("Despite what some might suggest, *Roe* did not suddenly emerge from the obscure primordial depths. Instead, it was a result of a steady and logical progression of caselaw development, going as far back as the Magna Carta."); *id.* at 768–69 ("The substantive due process doctrine that provided the underpinning for *Roe* has a long heritage. Justices and scholars have traced substantive due process back to the Magna Carta. It is believed that the Due Process Clause of the Fifth Amendment to the United States Constitution at the time of the drafting encompassed judicial recognition that unenumerated substantive rights served to limit congressional power, and the concept of due process posed substantive limitation on governments." (footnotes omitted)).

For example, early Supreme Court cases recognized that there were unenumerated rights that were not specifically described but that could be protected under the liberty provision of the Due Process Clause of the United States Constitution. In *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923), the United States Supreme Court acknowledged that it had never attempted to define the term "liberty" with exactness. However, the Supreme Court invalidated a state law prohibiting the teaching of foreign languages to children, holding there are rights that are not specifically mentioned in the Constitution, such as "the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children" that are "essential to the orderly pursuit of happiness by free men" and, therefore, are entitled to constitutional protection within the scope of the "liberty" provision. *Id.* The Court stated liberty cannot be interfered with by a state under the guise of protecting the public interest, and a legislature's determination "of what constitutes proper exercise of police power is not final or conclusive but is subject to supervision by the courts." *Id.* at 399–400.

In *Pierce v. Society of Sisters*, 268 U.S. 510, 534–35 (1925), the United States Supreme Court found that, although the United States Constitution contains no

specific textual mention of a parent's right to bring up and educate children, the right was protected under the general term "liberty" used in the Fourteenth Amendment.

The reasoning in early cases such as the foregoing are the precursors of decisions finding protection for the intimate spheres of life that predate *Roe* and that support the existence of reproductive autonomy.

> Decision after decision involving intimate spheres of life such as the decisions related to family, education of children, *whether to beget children*, and whether to use contraception *were found to be entitled to substantive due process protection*. The great judicial conservative of the Warren years, Justice Harlan, embraced substantive due process in his famous dissent in [*Roe v. Wade*]. Prior to *Roe*, there was a rich body of caselaw for the court to draw upon in considering application of substantive due process and privacy interests in the context of reproductive autonomy.

*Planned Parenthood of the Heartland, Inc.*, 975 N.W.2d at 773 (Appel, J., dissenting) (emphasis added).

In light of the foregoing, I find that a woman's right to make informed decisions about her reproductive health and whether to have a child is a fundamental right, the restriction of which by the government is subject to strict scrutiny. I find persuasive Petitioners' assertion that the Act's early ban violates the fundamental right of each woman "to decide what is to be done medically with one's brain and body . . . and the freedom from unwarranted physical interference with one's person," citing *Singleton v. State*, 313 S.C. 75, 88, 437 S.E.2d 53, 60 (1993) (quoting *State v. Perry*, 610 So. 2d 746, 755 (La. 1992)).

## III. CONCLUSION

I conclude, first, that the Act, as passed, is void ab initio. Second, the Act violates the right against unreasonable invasion of privacy. Third, the Act violates equal protection. Fourth and finally, the Act denies both the procedural and substantive guarantees of due process. Therefore, the Act violates the South Carolina Constitution beyond a reasonable doubt.

Like the United States Supreme Court, the members of this Court recognize that many sides of this profound debate passionately argue their cause. Most commonly, people divide themselves into "pro-life" and "pro-choice" camps. The

decision today is not so limited.  Our decision today is neither "pro-choice" nor "pro-life"; it merely recognizes that our state constitution grants every South Carolinian a right to privacy, equal protection, and due process of laws. This fundamental, constitutional mandate transcends politics and opinion.

**JUSTICE FEW:** Today we confront purely legal questions arising from Planned Parenthood's challenge to the 2021 "South Carolina Fetal Heartbeat and Protection from Abortion Act." I will spend a great deal of time in this opinion attempting to frame these legal questions correctly. To begin that effort, I point out that these legal questions are related to—but not the same as—political questions before the 124th General Assembly in 2021. The political questions may generally be stated as, "To what extent should the General Assembly restrict the opportunity of South Carolina women to have an abortion?" or, more specifically, "Should the General Assembly alter South Carolina's 2016 'Pain-Capable Unborn Child Protection Act'[40]— commonly referred to as the 'Pain-Capable Act' or 'twenty-week bill'—and impose the 'Fetal Heartbeat Act'[41]—also commonly referred to as the 'six-week bill?'"[42] The State correctly stresses there are important separation of powers concerns in framing the legal questions before us, and this Court must not allow itself to be drawn into a political inquiry over whether we agree with the policy judgments the General Assembly made in addressing the political questions described above. The State's admonition is justified because most participants in this debate at the intersection of law and abortion have succumbed to an insidious tendency—many doing so with aggressive partisan enthusiasm—to frame their legal views of abortion restrictions with what are actually their political views. The firm resolve of each Justice of this Court, however, is to avoid that tendency, narrow our focus to the purely legal questions before the Court, and answer only those legal questions. *See Smith v. Tiffany*, 419 S.C. 548, 565, 799 S.E.2d 479, 488 (2017) (explaining "the policy decision belongs to the legislature"); *Abbeville Cnty. Sch. Dist. v. State* (*Abbeville*

---

[40] Act No. 183, 2016 S.C. Acts 1406 (codified as amended at S.C. Code Ann. §§ 44-41-410 to -480 (2018 & Supp. 2022)).

[41] Act No. 1, 2021 S.C. Acts 2 (codified at S.C. Code Ann. §§ 44-41-610 to -740 (Supp. 2022)).

[42] The Fetal Heartbeat Act is referred to as the "six-week bill" because cardiac activity "can be detected by transvaginal ultrasound by 6-7 weeks post [last menstrual period] or 4-5 weeks post-conception." (J.A. at 305 & n.6). The State contends this cardiac activity—the "fetal heartbeat"—can be detected at approximately six weeks. (Resp't Att'y General Br. 6). If the time period on which the common name "six-week bill" is based were measured from conception—as is the name twenty-week bill—the common name would be the "four-week bill." This becomes important to my analysis in subsections V.B. and V.D. of this opinion.

*II*), 410 S.C. 619, 664, 767 S.E.2d 157, 181 (2014) (Kittredge, J., dissenting) ("While judges have a duty to strike down legislation in violation of the constitution, . . . judges must demonstrate restraint in the enforcement of our duty, particularly when it comes to *creating* law. Courts should not interpret the constitution in a manner that creates rights and duties out of thin air, such that one's policy preference is accorded constitutional status.").[43] As our five separate opinions indicate, we do not agree on the answers to the legal questions we confront, or even as to the principles of law we believe lead to those answers. But I respect the positions my colleagues have taken, and I am confident each of us has done our best to honor the separation of powers by setting aside our policy preferences and focusing only on the law.

I divide this opinion into seven numbered sections. In section I, I provide short answers to each of the legal questions necessarily before us. In section II, I analyze the scope of the "unreasonable invasions of privacy" provision in article I, section 10 of our constitution. In section III, I explain the privacy interests implicated when the State regulates abortion. In section IV, I frame the legal question we face as to article I, section 10. In section V, I turn to the Fetal Heartbeat Act and analyze its constitutionality. The two central points of my analysis—set forth in subsections V.D. and V.E., respectively—are (1) the constitutionality of the Fetal Heartbeat Act turns on one particular factual question, and (2) the General Assembly's failure even to consider this necessary factual question was arbitrary and renders the Fetal Heartbeat Act unconstitutional. In section VI, I clarify my position on several other issues the parties raised. Section VII is a conclusion section.

# I.

Petitioners' arguments under the Equal Protection Clause and Due Process Clause are without merit. Also, there is no legal significance in the fact the Fetal Heartbeat Act was enacted before the Supreme Court decided *Dobbs v. Jackson Women's Health Organization*, 597 U.S. ___, 142 S. Ct. 2228, 213 L. Ed. 2d 545 (2022),

---

[43] This *Abbeville II* decision—which I will distinguish from this case below—is relied on forcefully by the Governor, (Resp't Br. 4, 21), and the House Speaker and Senate President, (Obj. to the Court's Inquiry about Potential Receipt of Irrelevant Subjective Information, at 2). As the House Speaker and Senate President point out, this statement from Justice Kittredge's dissent in *Abbeville II* became the majority position of this Court in a subsequent order in that case. *Abbeville II*, S.C. Sup. Ct. Order dated Nov. 17, 2017, at 1-2.

overruling *Roe v. Wade*, 410 U.S. 113, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973), and *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992). As I will explain, the Fetal Heartbeat Act violates the article I, section 10 prohibition against "unreasonable invasions of privacy." S.C. Const. art. I, § 10. While I do not concur in Justice Hearn's or Chief Justice Beatty's analysis of the article I, section 10 question, I concur with them in result. Thus, this Court holds the Fetal Heartbeat Act is unconstitutional.

## II.

Article I, section 10 of the South Carolina Constitution—entitled, "Search and seizures; invasions of privacy"—provides, "The right of the people to be secure in their persons . . . against . . . unreasonable invasions of privacy shall not be violated . . . ." The State argues our "unreasonable invasions of privacy" provision should be limited to search and seizure cases and to electronic surveillance, and thus is inapplicable in this case. I disagree.

First, the word "privacy"—though broad—is clear as to its scope: it includes all forms of privacy. When a constitutional provision is clear, we must discern the intent behind the provision only from its text, and should not resort to other evidence of intent. *See J.K. Constr., Inc. v. W. Carolina Reg'l Sewer Auth.*, 336 S.C. 162, 170, 519 S.E.2d 561, 565 (1999) ("In construing a . . . constitutional provision, the Court must give clear and unambiguous terms their plain and ordinary meaning without resorting to subtle or forced construction to limit or expand the provision's operation."). Thus, when used without limitation in article I, section 10, the term "privacy" means the full panoply of privacy rights Americans have come to enjoy over the history of our Nation. The only way a broad but clear term like "privacy" in this constitutional provision may be reasonably read as limited to only some of its forms is when the limitations appear in the text of the provision.[44]

---

[44] *See Ansel v. Means*, 171 S.C. 432, 438, 172 S.E. 434, 436 (1934) ("It would not be practicable, if possible, in a written constitution to specify in detail all of its objects and purposes, or the means by which they are to be carried into effect. Such prolixity in a code designed as a frame of government has never been considered necessary or desirable; therefore constitutional powers are often granted or restrained in general terms . . . ." (quoting 12 *Corpus Juris* 719, § 73 (1917) (footnote omitted))); *see also McKenzie v. McLeod*, 251 S.C. 226, 231, 161 S.E.2d 659, 661 (1968) ("Hence, when construing a constitutional amendment, the Court applies rules similar to those relating to the construction of statutes, in its effort to determine the intent of its framers and of the people who adopted it." (quoting *Miller v. Farr*,

The absence of any limitations in the text of article I, section 10 answers the State's argument and there should be no need for further discussion of the point. Because there is so much further discussion, however, I will continue to address the State's argument.

Second, the State's position is inconsistent with this Court's prior applications of the article I, section 10 "unreasonable invasions of privacy" provision. In *Singleton v. State*, 313 S.C. 75, 437 S.E.2d 53 (1993), for example, we addressed "whether the State can administer, by force, medication to treat Singleton's incompetence in preparation for execution." 313 S.C. at 87, 437 S.E.2d at 60. Despite recognizing that other courts addressed this issue as one of substantive due process, 313 S.C. at 87-88, 437 S.E.2d at 60, this Court addressed it as a "state constitutional question," 313 S.C. at 88, 437 S.E.2d at 60. We concluded, "We hold that the South Carolina Constitutional right of privacy would be violated if the State were to sanction forced medication solely to facilitate execution." 313 S.C. at 89, 437 S.E.2d at 61; *see also State v. Blackwell*, 420 S.C. 127, 151, 801 S.E.2d 713, 725 (2017) (discussing "a witness's state constitutional right to privacy" relating to "confidential mental health records" (footnote omitted)); *State v. Forrester*, 343 S.C. 637, 644, 541 S.E.2d 837, 841 (2001) (stating the article I, section 10 "provision creates a distinct privacy right that applies both within and outside the search and seizure context").[45] In the twenty-

_____

243 S.E. 342, 346-47, 133 S.E.2d 838, 841 (1963))); *Smith*, 419 S.C. at 555, 799 S.E.2d at 483 ("If a statute is clear and explicit in its language, then there is no need to resort to statutory interpretation or legislative intent to determine its meaning." (quoting *Timmons v. S.C. Tricentennial Comm'n*, 254 S.C. 378, 401, 175 S.E.2d 805, 817 (1970))); *Smith*, 419 S.C. at 556, 799 S.E.2d at 483 ("Absent an ambiguity, there is nothing for a court to construe, that is, a court should not look beyond the statutory text to discern its meaning."); *Hodges v. Rainey*, 341 S.C. 79, 85, 533 S.E.2d 578, 581 (2000) ("Where the statute's language is plain and unambiguous, and conveys a clear and definite meaning, the rules of statutory interpretation are not needed and the court has no right to impose another meaning." (citation omitted)).

[45] The discussions of article I, section 10 in *Blackwell* and *Forrester* are dicta. The point, however, is that when this Court said what it said in those cases—2001 and 2017—no Justice on this Court thought the "unreasonable invasions of privacy" provision was limited as the State now argues. *See infra* note 7. In other cases— not dicta—this Court has balanced article I, section 10 privacy interests in contexts beyond the limitation suggested by the State and concluded the State's interests

nine years following *Singleton*, not one suggestion has been made—by the State or otherwise—that we erred in *Singleton* by applying the "unreasonable invasions of privacy" provision beyond search and seizure and electronic surveillance.[46]

Third, the State's limitations to the scope of the "unreasonable invasions of privacy" provision were never presented to the voters who approved the provision in the 1970 general election. This is important, because, as we have previously recognized, "When this Court is called to interpret our Constitution, it is guided by the principle that both the citizenry and the General Assembly have worked to create the governing law." *City of Rock Hill v. Harris*, 391 S.C. 149, 153, 705 S.E.2d 53, 54

---

outweighed the privacy interest and thus, the "invasion of privacy" at issue was not unreasonable. *See, e.g.*, *Hooper v. Rockwell*, 334 S.C. 281, 293-95, 513 S.E.2d 358, 364-66 (1999) (discussing a parent's article I, section 10 privacy rights and other liberty interests in the context of child rearing and holding those interests are "not absolute" and are outweighed by the State's interest in protecting the child from abuse).

[46] The State has never argued the article I, section 10 "unreasonable invasions of privacy" provision is limited to search and seizure or electronic surveillance. My law clerks and I reviewed every brief the State filed in every article I, section 10 privacy case this Court has heard, and the argument has never been made. In *Forrester*—a case that had nothing to do with electronic surveillance—the State passed up the perfect opportunity. The petitioner in that case argued the article I, section 10 "unreasonable invasions of privacy" provision required a law enforcement officer to inform a suspect she may refuse his request to inspect the inside of her handbag. 343 S.C. at 641, 541 S.E.2d at 839. Even after citing in its brief a decision from the Supreme Court of Hawaii finding "added language" to the Hawaii Constitution "about 'invasions of privacy' concerned [only] electronic surveillance techniques," the State argued only that the "added language" on privacy in our constitution did not require the officer to make a specific statement to the suspect as to her rights; the State did not argue the "unreasonable invasions of privacy" provision applies only to electronic surveillance. *See* Br. of Resp't at 11-12, *Forrester*, 343 S.C. 637, 541 S.E.2d 837 (No. 1999-010787) (citing *State v. Roy*, 510 P.2d 1066, 1068-69 (Haw. 1973)) (arguing only "the provision within the Declaration of Rights of the South Carolina Constitution protecting the people from unreasonable invasions of privacy did not require Officer Rhodes to tell Petitioner that she could refuse consent to search her purse").

(2011); *see also McKenzie*, 251 S.C. at 231, 161 S.E.2d at 661 (stating that "when construing a constitutional amendment, the Court . . . determine[s] the intent of its framers and of the people who adopted it" (quoting *Miller*, 243 S.E. at 346-47, 133 S.E.2d at 841)). The legislation placing the proposed constitutional amendments on the ballot required that the entire text of article I—including the "unreasonable invasions of privacy" provision—be placed on the ballot and thus presented to the voters. J. Res. No. 1268, 1970 S.C. Acts 2684, 2684-88. There was no mention on the ballot of any limitations on that language. Thus, the "citizenry" who voted to approve the "unreasonable invasions of privacy" provision were given the broad language of privacy with no indication it was limited to only some of its forms.[47]

Fourth, we have previously stated the framers of the article I, section 10 "unreasonable invasions of privacy" provision "were depending upon the state judiciary to construct a precise meaning of this phrase." *State v. Counts*, 413 S.C. 153, 167, 776 S.E.2d 59, 67 (2015) (quoting Jaclyn L. McAndrew, Note, *Who Has More Privacy?: State v. Brown and Its Effect on South Carolina Criminal Defendants,* 62 S.C. L. Rev. 671, 694 (2011)). Under this well-accepted premise, it is the task of this Court to determine what the phrase "unreasonable invasions of privacy" means in the various forms in which privacy exists; it is not the privilege of this Court to determine which forms of privacy we prefer and which we do not prefer. Our statement from *Counts* does not become invalid simply because we now address a politically controversial issue.

---

[47] The House Speaker and Senate President make much in their brief of summary language also included on the ballot that did not include the word "privacy." (Resp't Br. 14-15) (quoting 1970 S.C. Acts at 2687-88). Under this theory, the State suggests we are to find limitations on the broad term "privacy" by virtue of the fact that voters were not provided any such limitations, but rather were given the entire text of the proposed "unreasonable invasions of privacy" provision along with a "summary" that does not contain the entire text of article I, section 10. Under the same theory, the article I, section 2 right of freedom of the press is limited to situations involving religion because the summary language does not contain the word "press." 1970 S.C. Acts at 2688. In fact, of the nine sections of article I that contain multiple rights, seven set forth rights not mentioned in the summary language included on the ballot. The fact the summary language does not contain the word "privacy" is of no significance. It was a "summary."

Finally, the State's specific arguments that there are limitations on the "unreasonable invasions of privacy" provision do not withstand careful analysis. The State makes two broad arguments to support these limitations. One argument is based on the placement of the "unreasonable invasions of privacy" provision in the same section of article I of our constitution as our "search and seizure" provision. The other argument relies on the work of the 1966-69 "West Committee."[48] I will address both arguments in turn.

---

[48] "In 1966, the West Committee engaged in a three-year study of the South Carolina Constitution and recommended revisions in its 1969 Final Report." *Adams v. McMaster*, 432 S.C. 225, 240, 851 S.E.2d 703, 710-11 (2020). The official name of the West Committee is "Committee to Make a Study of the Constitution of South Carolina of 1895." We have considered the work of the West Committee in prior cases to assist us in understanding the intent behind the 1971 amendments to our constitution, but only when the language of the constitutional provision at issue was ambiguous. *See J.K. Constr.*, 336 S.C. at 170, 519 S.E.2d at 565 ("In construing a . . . constitutional provision, the Court must give clear and unambiguous terms their plain and ordinary meaning . . . ."). We actually considered the work of the West Committee as a part of our analysis in four cases. *See Adams*, 432 S.C. at 240-41, 851 S.E.2d at 710-11 (considering the Governor's argument the West Committee report supports his interpretation of the ambiguous terms "public funds" and "direct benefit" in article XI, section 4, but rejecting the argument); *Sloan v. Sanford*, 357 S.C. 431, 435-37, 593 S.E.2d 470, 472-73 (2004) (analyzing the ambiguous term "militia" in article IV, section 2 and thus resorting to the West Committee minutes to "confirm the dual-office holding purpose of the provision" and its "underlying separation of powers rationale" (citation omitted)); *Diamonds v. Greenville Cnty.*, 325 S.C. 154, 158, 480 S.E.2d 718, 720 (1997) (using the West Committee Final Report to analyze the meaning of the ambiguous "set aside" provision of article VIII, section 14); *Williams v. Morris*, 320 S.C. 196, 199, 203, 464 S.E.2d 97, 98, 100 (1995) (analyzing competing interpretations of article IV, section 21, stating "there is some merit to both positions," and citing West Committee Final Report to support our conclusion). In seven other cases, we mentioned the West Committee without considering it as part of our analysis. *See S.C. Ambulatory Surgery Ctr. Ass'n v. S.C. Workers' Comp. Comm'n*, 389 S.C. 380, 391, 699 S.E.2d 146, 152 (2010) (noting we cited the West Committee in *Ross*, *infra*); *Forrester*, 343 S.C. at 647, 541 S.E.2d at 842 (stating the West Committee "recognized" that article I, section 10 "would have an impact beyond just the area of electronic surveillance"); *Joytime Distribs.*

The fact the "unreasonable invasions of privacy" provision is contained in the same section of the constitution as our search and seizure provision has no significance. First, the title to article I, section 10—"Searches and seizures; invasions of privacy"—does not support the State's argument, but indicates the section contains two separate, independent rights. Second, eight other sections of article I of our constitution—"Declaration of Rights"—set forth separate, independent rights. In article I, section 2, for example, the constitution sets forth the rights of freedom of religion, freedom of speech, freedom of the press, and the rights of assembly and petition. No one would argue with a straight face that because the right of assembly is contained in the section setting forth the right of freedom of religion that our constitution guarantees the right to assemble only for purposes of religion. *See also* S.C. Const. art. I, § 3 (setting forth three separate, independent rights); art. I, § 4 (setting forth five separate, independent rights); art. I, § 12 (setting forth two separate, independent rights); art. I, § 13 (setting forth three separate, independent rights); art. I, § 14 (setting forth six separate, independent rights); art. I, § 15 (setting

---

*& Amusement Co. v. State*, 338 S.C. 634, 643, 528 S.E.2d 647, 651-52 (1999) (citing West Committee minutes only to demonstrate there is not a direct legislation clause in our constitution); *Ross v. Med. Univ. of S.C.*, 328 S.C. 51, 68, 492 S.E.2d 62, 71 (1997) (citing West Committee Final Report only to indicate when article I, section 22 was added to the constitution); *Hosp. Ass'n of S.C., Inc. v. Cnty. of Charleston*, 320 S.C. 219, 225, 464 S.E.2d 113, 117 (1995) (citing West Committee Final Report as background for how the "home rule" provisions of article VIII, sections 7 and 9, and article VII, section 17 came to be enacted); *State ex rel. Riley v. Martin*, 274 S.C. 106, 110-12, 262 S.E.2d 404, 406-07 (1980) (concluding article V, section 1 clearly does not preclude a statutory court of appeals, then citing the West Committee for legislative history); *Moye v. Caughman*, 265 S.C. 140, 143 n.1, 217 S.E.2d 36, 38 n.1 (1975) (citing West Committee Final Report regarding our discussion of article XI, section 1, which was not at issue in the case); *Knight v. Salisbury*, 262 S.C. 565, 570, 206 S.E.2d 875, 877 (1974) (lead opinion of only one Justice citing West Committee Final Report as background for article VIII, section 7). I am not impugning the work of the West Committee, which will certainly be important in future cases as it has been in the past. In this case, however, for the reasons discussed in note 10 and its associated text, the work of the West Committee should not be a part of our analysis.

forth four separate, independent rights); art. I, § 20 (setting forth at least two separate, independent rights); art. I, § 22 (setting forth at least three separate, independent rights). Nine sections of article I contain multiple rights. The fact our "unreasonable invasions of privacy" provision of article I, section 10 is one of them is of no significance.

The State also argues the work of the West Committee indicates the article I, section 10 "unreasonable invasions of privacy" provision is limited to invasions of privacy related to electronic surveillance in the context of search and seizure. The most important point to note about the work of the West Committee on the question of privacy is the General Assembly did not adopt the committee's recommendation for the language of the privacy provision. *Compare* S.C. Const. art. I, § 10, *with* Committee to Make a Study of the Constitution of South Carolina of 1895, *Final Report* 14 (1969). We have no indication why the General Assembly made that choice. To find the General Assembly adopted limitations supposedly suggested by the West Committee based on the General Assembly's decision *not* to adopt the committee's recommended text would be speculation.

Nevertheless, turning to the State's argument, the State relies on a statement in the West Committee's Final Report that the privacy provision "is designed to protect the citizen from improper use of electronic devices, computer data banks, etc." West Committee Final Report at 15. The statement is of no significance. It would have been inconceivable to write a privacy guarantee in 1969 that was not in part "designed to protect the citizen from improper use of electronic devices" that were becoming so prevalent at that time. There is nothing in this statement, however, or anywhere else in the proceedings of the West Committee, that indicates electronic surveillance was the *only* privacy concern intended to be addressed by the provision. *See Forrester*, 343 S.C. at 647, 541 S.E.2d at 842 (stating "the [West] committee also recognized that the [unreasonable invasions of privacy] provision would have an impact beyond just the area of electronic surveillance").[49]

---

[49] To be clear, the work of the West Committee is irrelevant to an analysis of the meaning of the article I, section 10 "unreasonable invasions of privacy" provision. *See supra* note 5 (citing *McKenzie*, 251 S.C. at 231, 161 S.E.2d at 661; *Smith*, 419 S.C. at 555, 556, 799 S.E.2d at 483; *Hodges*, 341 S.C. at 85, 533 S.E.2d at 581). But the State and Justice James put so much emphasis on the work of the West Committee that I feel I must address it. If we are to consider the West Committee's work, we should consider it carefully and in its entirety. Such careful and complete consideration—as opposed to cherry-picking out-of-context language that appears

to support the result one wants—leads, for example, to an October 6, 1967 West Committee meeting in which the Committee debated the privacy provision. In one particularly interesting dialogue, "Staff Consultant" Robert H. Stoudemire offered an illustration of how the privacy provision would work, "See what [Attorney General Daniel R. McLeod is] getting at here is that, I think, if the Tax Commission gives a tape to the computer center and they release information from this . . . , then I think this would give me the right to have some type of court action that they have violated my privacy . . . ." Committee to Make a Study of the Constitution of South Carolina of 1895, West Committee Meeting Minutes 7 (Oct. 6, 1967); (J.A. at 952). Committee member W.D. Workman Jr.—a longtime Republican activist and 1962 Republican U.S. Senate candidate—responded, "What our goal is, is to insert into the Constitution that which would give an aggrieved individual a cause for action [sic] if the authorities get out of hand in invasion of privacy *by whatever means*." *Id.* (emphasis added). This dialogue supports a broader interpretation of the "unreasonable invasions of privacy" provision than the State proposes.

Here I concede I am doing my own "cherry-picking." This is intentional. But I am not using the passages I cite to argue the work of the West Committee supports my interpretation of article I, section 10. Rather, I am responding to the State's and Justice James' recitation of language that appears to support a limited interpretation by pointing out there is also language supporting a broader interpretation. A careful and complete consideration of the work of the West Committee leads to ample support for a broader interpretation, such as an October 2, 1967 letter from Attorney General McLeod to Mr. Stoudemire recommending several additional forms of privacy be protected beyond "interception of communication . . . by electronic means," such as privacy protection "in such matters as income tax, health and public welfare." Letter from Daniel R. McLeod, Att'y Gen. of S.C., to Committee to Make a Study of the Constitution of South Carolina of 1895, at 1 (Oct. 2, 1967); (J.A. at 947). Attorney General McLeod continued, "The need to formulate a decision as to what information should or should not be made available under a multitude of circumstances is clearly dictated if privacy is to fulfill its function in our democratic society." *Id.*

A careful and complete consideration of the work of the West Committee leads to even more support for a broader interpretation, such as the transcript of a November 19, 1968 meeting in which the Chairman brought up the topic, "Secure from unreasonable invasions of privacy -- shall not be violated." West Committee Meeting Minutes 8 (Nov. 19, 1968); (J.A. at 972). Mr. Stoudemire then referenced the committee's previous discussions of "mass computer data" and "electronic stuff,"

It is clear, therefore, that the "unreasonable invasions of privacy" provision in article I, section 10 of our constitution is broad and applies to the full panoply of privacy rights Americans have come to enjoy over the history of our Nation. There was no need when article I, section 10 was adopted to identify which forms of privacy are included. As we said in *Ansel*, "It would not be practicable, if possible, in a written constitution to specify in detail all of its objects and purposes, or the means by which they are to be carried into effect. Such prolixity in a code designed as a frame of government has never been considered necessary or desirable; therefore constitutional powers are often granted or restrained in general terms . . . ." 171 S.C. at 438, 172 S.E. at 436. Article I, section 10 protects all privacy interests from unreasonable invasion.

---

and stated, "As you recall, gentlemen, we got into long discussions on this and decided that there was no way that we could find language to foresee what was going to be an unreasonable invasion in 1980 and the agreement of the Committee was that we would strike a general statement that people could rely on, rather than trying to itemize." West Committee Meeting Minutes 9 (Nov. 19, 1968); (J.A. at 973). Mr. Stoudemire then summarized what he called "the agreement of the Committee," stating, "The people shall be secure from unreasonable invasion of privacy period." *Id*. In fact, in the same paragraph of the Final Report as the language the State relies on, the Committee stated "the Committee recommends only a broad statement on policy, leaving the details to be regulated by law and court decisions." West Committee Final Report at 15; (J.A. at 266); *see also Forrester*, 343 S.C. at 647, 541 S.E.2d at 842 (2001) (quoting West Committee member and Charleston lawyer Huger Sinkler who stated, "I think this is an area that, really, should develop and should not be confined to the intent of those who sit around this table"); West Committee Meeting Minutes 8 (Oct. 6, 1967); (J.A. at 953) (committee member Sinkler stating, "We don't want to just blindly assume that we're going to have a bunch of idiots on the Supreme Court for the rest of time. Maybe there is some hope there somewhere."). A careful and complete consideration of the West Committee's work as to the article I, section 10 "unreasonable invasions of privacy" provision— as opposed to cherry-picking—yields evidence supporting every possible competing position, and leads inescapably to the conclusion that the West Committee's work, while it has been useful to us in other cases, *see supra* note 9, is irrelevant to this case.

## III.

I turn now to the specific privacy interests implicated when the State pursues its important and legitimate interest in protecting the lives of unborn children by regulating a woman's opportunity to have an abortion.[50] *See Roe*, 410 U.S. at 162, 93 S. Ct. at 731, 35 L. Ed. 2d at 182 (explaining "the State does have . . . still another important and legitimate interest in protecting the potentiality of human life"). Those privacy interests arise initially in the process of deliberation and prayer a woman may go through immediately upon learning she is pregnant. The privacy interests also arise in conversations a pregnant woman might have with her husband or boyfriend, her minister or other professional counselor, her doctor, and other loved ones and friends she might turn to for guidance and advice in making an informed choice about whether to continue the pregnancy. As to conversations she has with her husband, doctors, ministers, and other counselors, there are legal and ethical privileges that require her privacy be honored.[51] There are additional privacy

---

[50] The word "opportunity" was carefully chosen. *See infra* note 26. As I will explain in sections IV and VI, I deny there is a constitutional "right" to abortion.

[51] *See* S.C. Code Ann. § 19-11-30 (2014) (providing "no husband or wife may be required to disclose any confidential . . . communication made by one to the other during their marriage"); *McCormick v. England*, 328 S.C. 627, 635, 494 S.E.2d 431, 435 (Ct. App. 1997) ("The belief that physicians should respect the confidences revealed by their patients in the course of treatment is a concept that has its genesis in the Hippocratic Oath, which states in pertinent part: 'Whatever, in connection with my professional practice, or not in connection with it, I see or hear, in the life of men, which ought not to be spoken of abroad, I will not divulge as reckoning that all such should be kept secret.'" (quoting *Taber's Cyclopedic Medical Dictionary* 902 (17th ed. 1993))); S.C. Code Ann. Regs. 81-60(D) (2012) ("A physician shall respect the rights of patients . . . and shall safeguard patient confidence within the constraints of the law."); S.C. Code Ann. § 19-11-90 (2014) (providing "no regular or duly ordained minister, priest or rabbi shall be required, in giving testimony, to disclose any confidential communication properly entrusted to him in his professional capacity and necessary and proper to enable him to discharge the functions of his office according to the usual course of practice or discipline of his church or religious body"); *S.C. State Highway Dep't v. Booker*, 260 S.C. 245, 254, 195 S.E.2d 615, 619 (1973) ("South Carolina recognizes privilege in civil matters in . . . husband-wife relations, and priest-penitent relations."); S.C. Code Ann. § 19-11-95(B)(1) (2014)

considerations in her family planning and autonomy over her own medical decisions. *See Singleton*, 313 S.C. at 89, 437 S.E.2d at 61 (recognizing the State cannot commit "unwarranted medical intrusions"). Finally, any medical procedures a pregnant woman chooses to have—including an abortion—or chooses not to have—implicate her privacy interests.

In addition, as I will explain in subsection V.B. of this opinion, our General Assembly specifically recognized in the six-week bill the importance of "informed choice about whether to continue a pregnancy." 2021 S.C. Acts at 3. That choice is a private choice.

## IV.

These privacy interests, however, are not absolute. *See Hooper*, 334 S.C. at 293-95, 513 S.E.2d at 364-66 (explaining article I, section 10 privacy interests are "not absolute" but must be balanced against the State's interests). Thus, the existence of these privacy interests does not give rise to a "right" to abortion, nor do these interests alone render the Fetal Heartbeat Act unconstitutional. The terms of article I, section 10 itself—"unreasonable invasions of privacy"—contemplate the State may intrude upon *any* privacy interest, so long as doing so is not unreasonable. I turn, therefore, to the heart of any article I, section 10 "unreasonable invasions of privacy" inquiry—whether the State's action is an *unreasonable* invasion of privacy.

The extent to which abortion *should be* regulated is a legislative—or political—question. The difference between that political question and the legal questions we address in this case is critical to a true separation of powers. *See* S.C. Const. art. I, § 8. On the legislative side, the General Assembly considers the evidence it finds important to the issue before it and then decides on a policy basis whether any restrictions it seeks to place on a woman's opportunity for an abortion are reasonable, balancing the State interests at issue with the privacy and other interests implicated. Courts, however, must defer to the legislative judgment unless—as counsel for Planned Parenthood put it during oral argument—the legislative judgment is

---

(stating "a provider knowingly may not reveal a confidence of his patient"); S.C. Code Ann. § 19-11-95(A)(1) (2014) ("'Provider' means a person licensed . . . and who enters into a relationship with a patient to provide . . . counseling . . . .").

"unreasonable per se,"[52] or as I would put it, unreasonable as a matter of law. *See Doe v. State*, 421 S.C. 490, 501, 808 S.E.2d 807, 813 (2017) (explaining "our scope of review is limited in cases involving a constitutional challenge to a statute"); *Abbeville II*, 410 S.C. at 664, 767 S.E.2d at 181 (Kittredge, J., dissenting) (stating "judges must demonstrate restraint").

To illustrate this point—that courts must defer to the legislative judgment unless it is unreasonable as a matter of law—I turn to prior legislation restricting a woman's opportunity for an abortion. The 1974 "Act to Provide for Legal Abortions," for example, provided that no pregnant woman may have an abortion during the third trimester of pregnancy unless "the attending physician and one additional consulting physician . . . certify in writing . . . that the abortion is necessary . . . to preserve the life or health of the woman." Act No. 1215, 1974 S.C. Acts 2837, 2838-39. That provision—still the law of South Carolina codified at subsection 44-41-20(c) of the South Carolina Code (2018)—was and remains a noncontroversial, indisputably reasonable "invasion" of the privacy interests discussed in Section III of this opinion. Despite the fact a woman's privacy interests are restricted by subsection 44-41-20(c), the restriction is valid because it does not *unreasonably* invade her privacy. Subsection 44-41-20(c) illustrates the difference between the political and legal questions because even if someone were to disagree with the legislative determination that the restriction is reasonable, no one could argue the law provides a basis for overriding that legislative determination. *See Smith*, 419 S.C. at 565, 799 S.E.2d at 488 ("We are a court, not a legislative body. That a court may disagree with a legislative body's policy decisions or believe a perceived 'more fair' outcome exists is of no moment."). In other words, no one could argue the subsection 44-41-20(c) "invasion of privacy" is unreasonable as a matter of law.

The 2016 "Pain-Capable Act" also illustrates the point. As the common name "twenty-week bill" implies, the 2016 Act provided, "No person shall perform . . . an abortion upon a woman when it has been determined . . . that the probable post-fertilization age of the woman's unborn child is twenty or more weeks," with certain exceptions. Act No. 183, 2016 Acts 1406, 1410 (codified at S.C. Code Ann. § 44-

[52] "Per se" is an old Latin term that means, "Of, in, or by itself; standing alone, without reference to additional facts." *Per se*, BLACK'S LAW DICTIONARY (11th ed. 2019). In modern English usage in the context in which counsel used the term, the better phrase is "as a matter of law." Counsel's use of the term "per se," however, is consistent with my use of the phrase "as a matter of law."

41-450(A) (2018)).  As justification for this restriction on a woman's opportunity to have an abortion, *Roe* itself—as referenced above—recognized a state's "important and legitimate interest in protecting the potentiality of human life."  410 U.S. at 162, 93 S. Ct. at 731, 35 L. Ed. 2d at 182.  The twenty-week bill specifically recites this interest as a "compelling state interest in protecting the lives of unborn children from the stage of viability."  S.C. Code Ann. § 44-41-420(13) (2018).  Separate from and in addition to that interest, the twenty-week bill also recites "a compelling state interest in protecting the lives of unborn children from the stage at which . . . they are capable of feeling pain."  § 44-41-420(12).  In pursuit of these interests, the General Assembly imposed the twenty-week ban on abortion.

Unlike the 1974 Act, however, the "twenty-week bill" was highly controversial. Many South Carolina citizens contended then and contend now that the restrictions the 2016 Act placed on a woman's opportunity to have an abortion are unreasonable. Nevertheless, from a legal standpoint, even though we recognize the political views of others may be different, this Court recognizes that the law provides no basis for overriding the legislative policy determination underlying the "twenty-week bill." In other words, the twenty-week restriction on a woman's opportunity to have an abortion is not—as a matter of law—an unreasonable invasion of privacy.

As these examples illustrate, we may not find the Fetal Heartbeat Act violates article I, section 10 unless we find its restrictions on a pregnant woman's opportunity to have an abortion are—as a matter of law—an unreasonable invasion of her privacy.

**V.**

This brings me to the 2021 Fetal Heartbeat Act, or "six-week bill."  In enacting the legislation, the 124th General Assembly necessarily considered the evidence it deemed important and balanced the State's important interests against any countervailing interests that may exist.

**A.  State Interests**

First, it is important to stress what is not a State interest that justifies the "six-week bill."  For years, a minority of the General Assembly attempted to enact legislation banning abortion altogether. *See, e.g.*, S. 129, 121st Gen. Assemb., Reg. Sess. (S.C. 2015).  Those "personhood bills"—based on what would have become a legislative finding that human life begins at conception[53]—consistently failed to gain majority

---

[53] S. 129 of 2015, for example, would have added a new section to Title 1 of the Code—"Administration of the Government"—providing, "The right to life for each

support.[54]   This year, the House of Representatives passed a near-total ban on abortion.  *See* H. 5399, H.R. Journal, 124th Leg. Sess., at ____ (S.C. Aug. 30, 2022). Like its predecessors, H. 5399—had it passed the Senate—would have been based on the finding, "It is undisputed that the life of every human being begins at

born and preborn human being vests at fertilization."  S. 129, 121st Gen. Assemb., Reg. Sess. (S.C. 2015).

[54] *See, e.g.*, S. 1335, 124th Gen. Assemb., Reg. Sess. (S.C. 2022) (proposed but not adopted legislation adding a new section to Title 16—"Criminal Code"—providing, "The right to life for each born and preborn human being is inherent and unalienable beginning at fertilization"); H. 5401, 124th Gen. Assemb., Reg. Sess. (S.C. 2022) (proposed but not adopted legislation adding a new section to Title 16—Criminal Code—providing, "The General Assembly finds that a human being is a person at fertilization"); S. 381, 124th Gen. Assemb., Reg. Sess. (S.C. 2021) (proposed but not adopted legislation adding a new section to Title 1 providing, "The General Assembly finds that a human being is a person at fertilization"); H. 3568, 124th Gen. Assemb., Reg. Sess. (2021) (proposed but not adopted legislation adding a new section to Title 1 providing, "The General Assembly finds that a human being is a person at fertilization"); H. 3289, 123rd Gen. Assemb., Reg. Sess. (S.C. 2019) (proposed but not adopted legislation adding a new section to Title 1 providing, "The General Assembly finds that a human being is a unique person, a distinct person . . . from fertilization forward, and therefore asserts a compelling state interest in the protection of the rights to life, due process, and equal protection, from fertilization forward"); H. 3920, 123rd Gen. Assemb., Reg. Sess. (S.C. 2019) (proposed but not adopted legislation adding a new section to Title 1 providing, "The General Assembly finds that a human being is a person at fertilization"); S. 485, 123rd Gen. Assemb., Reg. Sess. (S.C. 2019) (proposed but not adopted legislation adding a new section to Title 1 providing, "The General Assembly finds that a human being is a person at fertilization, and . . . asserts a compelling state interest in the protection of the rights to life, due process and equal protection, from fertilization forward"); S. 217, 122nd Gen. Assemb., Reg. Sess. (S.C. 2017) (proposed but not adopted legislation adding a new section to Title 1 providing, "The General Assembly finds that a human being is a person at fertilization"); H. 3530, 122nd Gen. Assemb., Reg. Sess. (S.C. 2017) (proposed but not adopted legislation adding a new section to Title 1 providing, "The right to life for each born and preborn human being vests at fertilization").

conception."  H. 5399, § 2(4).  Had H. 5399 become law, the State may have had a good argument there is no countervailing interest that could render unreasonable the State's use of a total ban on abortion to protect human life from the point of conception.  In other words, if the State were to pass a total ban on abortion—despite a complete invasion of a pregnant woman's right to privacy—the privacy invasion might be reasonable under article I, section 10, because "human life" has no countervailing interest; human life simply must be preserved.  But the General Assembly failed to pass the personhood bills, and this year the Senate refused to pass H. 5399.  S. Journal, 124th Leg. Sess., at ____ (S.C. Oct. 18, 2022).  Thus, despite consistent efforts, there is no legislative policy determination that human life— "personhood"—begins at conception, and there is no such State interest that justifies enacting the six-week bill.

There are—of course—other important State interests advanced by the six-week bill.  Certainly, the restrictions on a woman's opportunity for an abortion contained in the six-week bill advance the State's legitimate interest—as acknowledged in *Roe*—in "protecting the potentiality of human life."  410 U.S. at 162, 93 S. Ct. at 731, 35 L. Ed. 2d at 182.  As it did in the 2016 twenty-week bill, the General Assembly specifically recited this interest in the six-week bill, stating, "South Carolina has legitimate interests from the outset of a pregnancy in protecting . . . the life of the unborn child who may be born."  Fetal Heartbeat Act, sec. 2(7), 2021 S.C. Acts at 3.  These interests are advanced by the simple fact that—given the shorter time frame for choosing to continue a pregnancy under the six-week bill—fewer women will make the choice to not continue a pregnancy.[55]  By reducing the number of women who choose to have an abortion, the six-week bill advances these legitimate State interests.

## B.  Countervailing Interests

The State interests advanced by the six-week bill, however—unlike the State interest that might have justified a total ban—are not absolute.  Rather, they necessarily contemplate countervailing interests, such as a woman's right to privacy.  The six-

---

[55] *See* Margot Sanger-Katz & Claire Cain Miller, *Legal Abortions Fell Around 6 Percent in Two Months After End of Roe*, N.Y. TIMES: THE UPSHOT (Oct. 30, 2022), https://www.nytimes.com/2022/10/30/upshot/legal-abortions-fall-roe.html  ("In states with bans and restrictions, there were about 22,000 fewer abortions in July and August, compared with the baseline of April, before the decision.").

week bill itself identifies another countervailing interest: "informed choice." The General Assembly provided the following in the "legislative findings" section of the bill,

> The General Assembly hereby finds, according to contemporary medical research, . . . :
>
> . . .
>
> (8) in order to make an informed choice about whether to continue a pregnancy, a pregnant woman has a legitimate interest in knowing the likelihood of the human fetus surviving to full-term birth based upon the presence of a fetal heartbeat.

2021 S.C. Acts at 3.[56]

With the General Assembly's codification of a woman's right "to make an informed choice about whether to continue a pregnancy" as a countervailing interest, the six-week ban on abortion raises several concerns. First, in an apparent effort to advance this interest of "informed choice," the General Assembly included in the six-week bill what is now codified at section 44-41-640 of the South Carolina Code (Supp. 2022), which provides,

> If a pregnancy is at least eight weeks after fertilization, then the abortion provider who is to perform or induce an abortion . . . shall tell the woman that it may be possible to make the embryonic or fetal heartbeat of the unborn child audible for the pregnant woman to hear and shall ask the woman if she would like to hear the heartbeat. If the woman would like to hear the heartbeat, then the abortion provider shall . . . make the fetal heartbeat of the unborn child audible for the pregnant woman to hear.

---

[56] The legislative findings section of the 2021 six-week bill was not codified, unlike the legislative findings of the 2016 Pain-Capable Act, which are codified at section 44-41-420 of the South Carolina Code (2018). The 2021 findings are included in an "Editor's Note" to the codification of the Fetal Heartbeat Act. S.C. Code Ann., tit. 44, ch. 41, art. 6 editor's note (Supp. 2022).

This requirement that the abortion provider give the pregnant woman an opportunity to hear the fetal heartbeat makes no apparent sense because if the pregnant woman can hear the fetal heartbeat, then her opportunity to "make an informed choice" has already expired. Thus, it is difficult to understand how the General Assembly's recited interest of "informed choice" is advanced by the six-week bill.

The second concern is how much time a woman actually has to make such a choice. This concern is heightened by the fact the common name "six-week bill" can be misleading. The 2016 "Pain-Capable Act"—twenty-week bill—prohibits an abortion at the point in time the General Assembly found an unborn child is capable of feeling pain. This point in time is generally thought to be twenty weeks "post-fertilization." *See* § 44-41-420(11) (finding "there is substantial medical evidence that an unborn child is capable of experiencing pain by twenty weeks after fertilization"). Thus, the operative section of the twenty-week bill provides, "No person shall perform . . . an abortion upon a woman when it has been determined . . . that the probable post-fertilization age of the woman's unborn child is twenty or more weeks." § 44-41-450(A). The important point is the line in the twenty-week bill after which no abortion may take place is drawn from fertilization.

In the so-called six-week bill, however, the actual line is not drawn from fertilization but is determined according to "whether the human fetus the pregnant woman is carrying has a detectable fetal heartbeat." S.C. Code Ann. § 44-41-650(A) (Supp. 2022).[57] Because this point in time is generally thought to be six weeks after a woman's last menstrual period, the Fetal Heartbeat Act has been commonly referred to as the "six-week bill." If the common name of the Fetal Heartbeat Act were constructed in the same way as the common name "twenty-week bill"—by length of time post-fertilization—the Fetal Heartbeat Act would be named the "four-week bill," as it is generally thought there is a detectable heartbeat at four weeks post-

---

[57] Justice Hearn and Chief Justice Beatty address what they contend is a misuse of terms in the Fetal Heartbeat Act, particularly the term "fetal heartbeat." This does not concern me. Regardless of the term used, the Fetal Heartbeat Act—particularly subsection 44-41-610(3)—identifies a circumstance that medical professionals can recognize with certainty. The disagreement over what to call that circumstance is not significant.

fertilization.  *See* (Resp't Att'y General Br. 6).[58]  In considering the General Assembly's focus on "informed choice about whether to continue a pregnancy," therefore, *and* in considering a woman's right of privacy, it is important to understand that under the six-week bill, a pregnant woman's choice must be made—and carried out—within *four* weeks of the time she becomes pregnant.

Although the Fetal Heartbeat Act recognizes the interest of "informed choice," a woman's interest in choice is not dependent on this portion of the Act.  The choice of whether to continue a pregnancy or to have an abortion is an inherently private matter that implicates article I, section 10.  The General Assembly's codification of "informed choice" as an interest to be valued here simply recognizes this obvious fact that abortion is a private choice.  The article I, section 10 right of privacy, therefore, in this context, includes choice.

## C.  Balancing of Interests

Once the competing interests have been identified, they must be balanced.  *See Hooper*, 334 S.C. at 293-95, 513 S.E.2d at 364-66 (explaining article I, section 10 privacy interests are "not absolute" but must be balanced against the State's interests).  This necessity of balancing interests may shed light on a comment I made in subsection V.A., which might otherwise have seemed counterintuitive.  I remarked that "if the State were to pass a total ban on abortion—despite a complete invasion of a pregnant woman's right to privacy—the privacy invasion might be reasonable under article I, section 10."  Justice Kittredge explains this well in his dissent when he points out that when the State criminalizes rape and child abuse—crimes which usually occur in private—the associated invasion of privacy is reasonable, and thus, there is no article I, section 10 issue.  This is true because when the applicable privacy interests are balanced against the State's compelling interest in preventing crime, the balancing clearly supports the criminalization of private actions.  Similarly, if the General Assembly were to make the policy determination that human life begins at conception—that a newly-conceived fetus is in fact a person entitled to all the rights due to persons already born—then the hypothetical

---

[58] The Attorney General's brief states the six-week bill "allows an abortion prior to the detection of a fetal heartbeat (which can be detected at approximately six weeks) to occur."  To support this point, the Attorney General cites an affidavit from its expert stating, "Cardiac activity . . . can be detected . . . 4-5 weeks post-conception." (J.A. at 305).

balancing of that compelling interest against the privacy interests implicated by a total ban on abortion may come out in favor of the State's action. In this case, however, the interests to be balanced are different, and the balancing is not hypothetical. The State's interest in "protecting . . . the life of the unborn child" must be balanced against the countervailing interests of privacy and meaningful choice. This balancing should begin in the General Assembly. *See S.C. Dep't of Soc. Servs. v. Gamble*, 337 S.C. 428, 434-35, 523 S.E.2d 477, 480 (Ct. App. 1999) (studying the constitutionality of a statute, reciting the competing interests, and finding the statute constitutional because, "The statute at issue balances these rights").[59]

## D. Fact-Dependent Policy

I now turn to a somewhat unique circumstance we face in the analysis of the constitutionality of the Fetal Heartbeat Act. Whether a pregnant woman is given an opportunity to make a meaningful choice and whether the invasion of her privacy by restricting her opportunity for an abortion is unreasonable each depend on the answer to one particular factual question: Can a pregnant woman even know she is pregnant in time to engage in a meaningful decision-making process and—if her choice is to not continue the pregnancy—make the necessary arrangements to carry out an abortion? On one hand, it would be difficult to argue the Fetal Heartbeat Act is an unreasonable invasion of a pregnant woman's privacy if almost all women know they are pregnant in time to give the question sufficient deliberation and prayer necessary to making a meaningful choice; to have meaningful discussions with family,

---

[59] I appreciate Justice Kittredge's affirmation of our privacy rights, but he misses a key point. His analysis is applicable only to an unwritten privacy interest arising through substantive due process, as was the issue in the federal cases he discusses. He overlooks the fact the State constitution has a written privacy right. He incorrectly contends the mere existence of legitimate State interests automatically overrides any countervailing interest unless a countervailing interest is a "deeply rooted" right "implicit in the concept of ordered liberty." While his contention is valid under the theory of substantive due process, it is incorrect under article I, section 10. Thus, the majority of Justice Kittridge's discussion really has nothing to do with this case. Under article I, section 10, the competing interests must be balanced, and if the State interest does not justify denying the countervailing interest, the privacy invasion is unreasonable. Of course, the article I, section 10 balancing must begin in the General Assembly, and we may reject its policy judgment only if we find the invasion of privacy is unreasonable as a matter of law.

ministers, and others; and then to make necessary arrangements to carry out that choice before the Fetal Heartbeat Act makes the abortion illegal. This is true because knowledge of a pregnancy is a predicate for informed choice. With knowledge of her pregnancy, and sufficient time to choose, a restriction on the timing of an abortion is clearly reasonable. Without knowledge, however, the "choice" is an illusion—it is no choice at all. Thus, if a substantial percentage of pregnant women cannot know of their pregnancy in time to have meaningful discussions, engage in sufficient deliberation and prayer, and then make timely arrangements to carry out an abortion, then I cannot envision a winning argument that meaningful choice exists or that the denial of that choice is not an unreasonable invasion of privacy. Whether a pregnant woman can know of her pregnancy in a manner that is timely under the Fetal Heartbeat Act is a purely factual determination.

That the legislative policy judgment in this case depends so heavily on one fact— whether the ban on abortion four weeks from fertilization prevents a substantial percentage of women from making a meaningful choice because they cannot know in time they are pregnant—is one of the central points of my analysis, and it makes this case somewhat unique in our recent constitutional jurisprudence. In 1955 in *Richards v. City of Columbia*, 227 S.C. 538, 88 S.E.2d 683 (1955), we confronted a similarly fact-dependent legislative policy determination in considering the constitutionality of an ordinance—enacted pursuant to state enabling legislation— "providing for the repair, alteration, improvement, vacation, closing or demolition of dwellings or dwelling units unfit for habitation." 227 S.C. at 543, 88 S.E.2d at 685. We stated, "Upon careful consideration of the evidence we find no error in the conclusion of the [trial] court that the findings of the Legislature and City Council, . . . that sub-standard housing evils exist, were well-grounded in fact." 227 S.C. at 560, 88 S.E.2d at 694. In 1978 in *Bauer v. South Carolina State Housing Authority*, 271 S.C. 219, 246 S.E.2d 869 (1978), we also confronted a fact-dependent legislative policy determination in considering the constitutionality of an "attempt by the Legislature to enact constitutional legislation designed to alleviate what it has found to be a serious shortage of sanitary and safe residential housing which is affordable by certain segments of South Carolina's population." 271 S.C. at 223, 246 S.E.2d at 871. We upheld the legislation, finding there were "no facts of which we may take judicial notice which tend to negate these findings and being unable to say from their face that they are 'clearly wrong.'" 271 S.C. at 230, 246 S.E.2d at 875 (citation omitted).

Other than in *Richards* and *Bauer*, however, we have not often recently dealt with a constitutional challenge to a statute where the legislative policy determination is as fact-dependent as in this case. Rather, in almost all other recent challenges to the

constitutionality of a statute, we dealt with legislative policy determinations that were not dependent on factual findings. *See, e.g.*, *Doe v. State*, 421 S.C. 490, 495-96, 808 S.E.2d 807, 809-10 (2017) (analyzing whether the statutory definition of "household member" includes unmarried, same-sex couples); *Segars-Andrews v. Jud. Merit Selection Comm'n*, 387 S.C. 109, 116, 130, 691 S.E.2d 453, 457, 464 (2010) (resolving purely legal questions regarding the Judicial Merit Selection Commission); *State v. Bolin*, 378 S.C. 96, 100, 662 S.E.2d 38, 39-40 (2008) (analyzing whether article XVII, section 14 permits the State to ban possession of a handgun while under the age of twenty-one); *Joytime Distribs. & Amusement Co. v. State*, 338 S.C. 634, 638, 528 S.E.2d 647, 649 (1999) (analyzing whether direct legislation by referendum is constitutional under article III, section 1).

This, therefore, is one of the first fact-dependent legislative policy determinations we have faced in a constitutional challenge to a statute in over forty years. This circumstance affects the standard by which we review the constitutionality of the Fetal Heartbeat Act. If the General Assembly's fact-dependent policy judgments— and the factual determinations upon which they are based—are "well-grounded in fact," they will be upheld. *Richards*, 227 S.C. at 560-61, 88 S.E.2d at 694. However, if the General Assembly's factual determinations are clearly erroneous, or if there is no evidence to support them, then the policy determinations and statutory enactments based on those factual determinations are not entitled to the deference we ordinarily give them. *Id.*;[60] *see* Henry Wolf Biklé, *Judicial Determination of*

---

[60] In *Richards*, we stated,

> Legislative findings of fact, while not binding upon the court, will not be overturned except by convincing evidence to the contrary. There is a strong presumption in favor of the validity of them. . . . [T]here are many instances where the constitutionality of an act depends upon pertinent facts and in such a case it is presumed from the mere passage of the act that there was a finding of such facts as were necessary to authorize the enactment. However, by the better rule, such implied or express finding is subject to judicial review, and the court may consider extrinsic evidence for this purpose, although the statute will not be held unconstitutional unless such (legislative) finding is clearly erroneous.

227 S.C. at 560-61, 88 S.E.2d at 694 (citations omitted); *see also Poulnot v. Cantwell*, 129 S.C. 171, 178-79, 123 S.E. 651, 654 (1924) ("The determination of questions of fact upon which the constitutionality of statutes may depend is primarily

*Questions of Fact Affecting the Constitutional Validity of Legislative Action*, 38 Harv. L. Rev. 6, 19 (1924) ("It is clear that the legislative finding as to the fact upon which the validity of the legislation depends cannot be allowed to be binding upon the courts, since this would furnish a simple means of preventing judicial review of such legislation in this class of cases.").

Accordingly, this Court's focus is on the factual question just mentioned: "Can a pregnant woman even know she is pregnant in time to engage in a meaningful decision-making process and—if her choice is to not continue the pregnancy—make the necessary arrangements to have an abortion?" The record before us contains ample evidence that the majority of women who have abortions in South Carolina do so more than six weeks post-fertilization. *See, e.g.*, (J.A. at 165-66 & nn. 18-19) (citing S.C. Dep't of Health & Env't Control, *A Public Report Providing Statistics Compiled from All Abortions Reported to DHEC* 3 tbl. 1 (2020), https://scdhec.gov/sites/default/files/media/document/2020-Abortion_SC-Report .pdf). This data indicates that in the years 2018 through 2020 in South Carolina, 54.5 to 58.3% of women who had abortions did so more than six weeks post-fertilization. *Id.* But this can be misleading here because six weeks after fertilization is eight weeks after a woman's last menstrual period, which is approximately two weeks after the Fetal Heartbeat Act prevents an abortion. This data can be misleading for another reason, because it reflects when the abortion actually took place, not how early the pregnant woman knew of her pregnancy. There is no data before us as to the percentage of pregnant women who do not learn they are pregnant, and thus have inadequate time for meaningful choice, within four weeks of fertilization.

During oral argument, I pressed counsel for Planned Parenthood for data to support its argument "the majority of patients who seek abortions in South Carolina are more than six weeks pregnant, as many patients do not even know they are pregnant at six weeks."[61] As I framed the question to counsel—for both sides—I wanted to know what the General Assembly knew when enacting the six-week bill, what Planned

for the Legislature, and the general rule is that the courts will acquiesce in the legislative decision, unless it is clearly erroneous." (citation omitted)).

[61] The quote is from Planned Parenthood's brief, and the reference is to six weeks from the woman's last menstrual period, which would be roughly four weeks post-fertilization. (Pet'r Br. 4).

Parenthood knew when it filed this lawsuit, and what medical and scientific research shows about the percentage of women who cannot know of their pregnancy in time to make an "informed choice"—and then make the necessary arrangements to obtain an abortion—within four weeks of fertilization.

After oral argument, the Court directed our clerk to inquire whether the parties had any objections if the Court were to "ask the parties to file supplemental briefs, together with any statistical studies that are relevant to the issue of the gestational time when women realize they are pregnant, paying particular attention to any difference to intended or unintended pregnancies." The Governor, House Speaker and Senate President, and Attorney General objected. The State's objection to our receiving this information is surprising to me for two primary reasons.

First, as I discussed above, it is indisputable that whether a pregnant woman can know she is pregnant in a timely manner is important to the interests of privacy and informed choice. In their "Objection to the Court's Inquiry about Its Potential Receipt of Irrelevant Subjective Information," the House Speaker and Senate President acknowledge "such 'studies' could . . . have value in establishing policy decisions regarding abortions." The information, therefore, is necessarily important to this Court's constitutional analysis because we must determine whether the "policy decisions" are "well-grounded in fact." *Richards*, 227 S.C. at 560, 88 S.E.2d at 694.

The State has been careful to stress that the separation of powers under article I, section 8 of our constitution requires this Court to respect the political judgments made by the General Assembly. That respect requires the Court to uphold a factual premise for a legislative policy judgment unless the factual premise is clearly erroneous or based on no evidence. *Richards*, 227 S.C. at 560-61, 88 S.E.2d at 694. Separation of powers, however, does not require—indeed does not permit—the Court to blindly accept such a factual premise. *See Bauer*, 271 S.C. at 229, 246 S.E.2d at 875 ("Legislative findings and declarations have no magical quality to make valid that which is invalid but they are entitled to weight." (cleaned up) (citation omitted)). If this Court is to fulfill its duty to analyze the constitutionality of legislation on the basis of law, and not blindly accept the General Assembly's policy judgments as our legal conclusions, we must have the evidence before us to conduct a proper constitutional analysis.

The second reason I am surprised by the State's objection is because I assumed the information was known to the General Assembly at the time it enacted the six-week bill. Making the determination of whether a pregnant woman can know she is pregnant in a timely manner—a fact-finding exercise—is important to both the interests of informed choice—codified in the Act—and privacy—a constitutionally

protected right.  And yet, the State essentially boasts to this Court that the General Assembly did not even consider the question.[62]  In other words—having identified "informed choice" as a countervailing interest to the State's interest in protecting unborn life—the State cannot point to a single fact the General Assembly considered that could support a factual determination that such a choice meaningfully exists under the Fetal Heartbeat Act.

### E.  Law and Analysis

All statutes are presumed to be constitutional.  *Doe*, 421 S.C. at 501, 808 S.E.2d at 813 (citation omitted); *Joytime*, 338 S.C. at 640, 528 S.E.2d at 650 (citation omitted).  We have consistently stated the party challenging the constitutionality of a statute bears the burden of demonstrating the constitutional violation.  *E.g.*, *Powell v. Keel*, 433 S.C. 457, 461, 860 S.E.2d 344, 346 (2021); *In re Treatment & Care of Luckabaugh*, 351 S.C. 122, 135, 568 S.E.2d 338, 344 (2002).  In this case, therefore, Planned Parenthood was required to prove the Fetal Heartbeat Act violates the article I, section 10 "unreasonable invasions of privacy" provision.  It was Planned Parenthood who argued "many patients do not even know they are pregnant at six weeks," but as noted above, Planned Parenthood failed to present any evidence on this factual question.  Planned Parenthood's failure could be fatal to its constitutional challenge.

---

[62] Several Senators raised the question during the Senate's deliberations on the Fetal Heartbeat Act.  *See, e.g.*, S. 1, S. Journal, 124th Leg. Sess., at 992 (S.C. Jan. 27, 2021) (Senator McElveen stating "my primary concern is the fact that at six weeks of pregnancy, most women are not yet aware that they are pregnant"); S. 1, S. Journal, 124th Leg. Sess., at 1016 (S.C. Jan. 28, 2021) (Senator Matthews reciting the same concern at "eight weeks" based on personal experience).  In their objection to the Court receiving this information, however, the House Speaker and Senate President concede they know of no evidence whether the Senators were correct.  In fact, the House Speaker and Senate President contend the evidence is irrelevant, stating "such evidence (if it even exists) does not inform in any way the facial constitutional challenge presented in this case."  (Legislative Leadership's Obj. 2).  They also label the information as "impossible-to-verify" and "impossible-to-test."  (Legislative Leadership's Obj. 3).

As already explained, however, the legislative policy determination in this case is uniquely fact-dependent. Turning to what the record in this case indicates about the General Assembly's fact-finding process and factual findings, the Fetal Heartbeat Act sets forth the General Assembly's factual findings in section 2 of the Act. *See supra* note 17. The findings indicate they were made "according to contemporary medical research," 2021 S.C. Acts at 3, but they do not contain any findings on the key question of whether a substantial percentage of women cannot know they are pregnant in time to engage in sufficient deliberation and prayer, have meaningful discussions, and then make timely arrangements to have an abortion.

This salient omission would not ordinarily affect our analysis. We would simply assume the General Assembly made the necessary findings but did not list them in the text of the act. *See Richards*, 227 S.C. at 561, 88 S.E.2d at 694 (stating it is "presumed from the mere passage of the act that there was a finding of such facts as were necessary to authorize the enactment"). Here, however, we know the General Assembly did not consider this necessary factual question. The Fetal Heartbeat Act imposes a ban on all abortions after approximately four weeks of pregnancy without the General Assembly having made any inquiry as to whether a substantial percentage of women even know they are pregnant by that time. Such an action by the General Assembly is known in the law as "arbitrary." *See Arbitrary*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("of, relating to, or involving a determination made without consideration of or regard for facts").

That the General Assembly's failure to consider this necessary factual question is arbitrary under the law is the second central point of my analysis. In many cases, we have held arbitrary State action violates the constitution. *See, e.g.*, *Luckabaugh*, 351 S.C. at 140, 568 S.E.2d at 347 ("The purpose of the substantive due process clause is to prohibit government from engaging in arbitrary . . . acts . . . ."); *Samson v. Greenville Hosp. Sys.*, 295 S.C. 359, 363, 368 S.E.2d 665, 667 (1988) (stating "a legislatively created classification" must be "not plainly arbitrary"). *Luckabaugh*, *Samson*, and most other cases dealing with the arbitrary actions of government arise under the Equal Protection Clause or Due Process Clause. Nevertheless, the concept prohibiting the State from arbitrary action invading a constitutional right is plainly applicable in cases where the constitutional standard is "unreasonableness," as it is here. *See Town of Hilton Head Island v. Fine Liquors, Ltd.*, 302 S.C. 550, 554, 397 S.E.2d 662, 664 (1990) (stating the "exercise of police power is subject to judicial correction . . . if the action is arbitrary"). This derives from the principle that government must have some basis to justify the invasion of any constitutional right. Arbitrary government action has no justification—it is arbitrary—and thus it is necessarily unreasonable. In particular, under article I, section 10, the denial of

meaningful choice to women arising from the arbitrary failure to even consider the extent to which that choice is denied is unreasonable.[63]  For this reason, I find the Fetal Heartbeat Act imposes an unreasonable invasion of privacy on pregnant women.

That ends my analysis.  I vote to find the Fetal Heartbeat Act unconstitutional because the General Assembly's failure to consider the necessary factual question as a predicate to its policy judgment was arbitrary, as I have explained.  However, because my colleagues base their votes—both to strike down the Fetal Heartbeat Act and to uphold it—on a different point, I will briefly discuss how the Court would proceed if we did not know the General Assembly failed to consider the necessary factual question.  In that circumstance, we would consider whether there is evidence to support the General Assembly's "presumed . . . finding of such facts as were necessary to authorize the enactment."  *Richards*, 227 S.C. at 561, 88 S.E.2d at 694.  Here, however, because the General Assembly did not consider the question, there is nothing for the Court to consider.  I am nevertheless tempted to address whether there could be any evidence to support such a "presumed finding" and find the Fetal Heartbeat Act in violation of article I, section 10 for the additional reason it is impossible for the General Assembly to reach any conclusion other than a substantial percentage of pregnant women cannot learn of their pregnancy, have time for sufficient deliberation and prayer, and if the choice is made to not continue the pregnancy, then carry out an abortion before the legality of doing so expires under the Act.  I am tempted for the obvious reason that it is plainly obvious a substantial percentage of women cannot learn of their pregnancy in time to make and carry out a meaningful choice under the Fetal Heartbeat Act.

I resist this temptation, however, because what is "obvious" to a court is not ordinarily part of the court's constitutional analysis. *But see Brown v. Piper*, 91 U.S. 37, 42, 23 L. Ed. 200, 201 (1875) ("But there are many things of which judicial cognizance may be taken.  'To require proof of every fact, as that Calais is beyond the jurisdiction of the court, would be utterly and absolutely absurd.'" (quoting Richard Newcombe Gresley, *A Treatise on the Law of Evidence in the Courts of*

---

[63] The State's pursuit of its important and legitimate interest in protecting unborn life is not at all arbitrary.  It is important and legitimate.  The State's arbitrary action here is its failure to even consider the countervailing interest of choice, primarily as it arises under the article I, section 10 "unreasonable invasions of privacy" provision, but also as codified in the Fetal Heartbeat Act.

*Equity* 294 (Philadelphia, Nicklin & Johnson 1837))).[64]  Also, it is not initially for a court to determine what in this context is "substantial."  It is not for a court to assess the difference between when women who are trying to get pregnant learn of their pregnancy compared to women who are not trying.  It is not for a court to decide whether such a difference even matters, as it may be true—not for a court to decide— that sexually active couples who do not want to bear a child should more closely monitor whether their sexual activity leads to pregnancy.  These and other inquiries of fact and policy judgments must begin—and should end—in the political process of the General Assembly.  Thus, despite the obvious fact a substantial percentage of women cannot learn of their pregnancy in time to make and carry out a meaningful choice under the Fetal Heartbeat Act, now is not the time for this Court to address the constitutional significance of that fact.

## VI.

There are several other points argued by the parties that I will address.  First, Planned Parenthood argues this Court should analyze the constitutionality of the Fetal Heartbeat Act using the "strict scrutiny" standard.  I disagree.  The strict scrutiny standard is applicable in an equal protection or substantive due process analysis where the State action at issue creates a "suspect class" or implicates a "fundamental right."  *Luckabaugh*, 351 S.C. at 140, 148, 568 S.E.2d at 347, 351 (citations omitted).  Neither circumstance is present here.  Under article I, section 10, the State may not unreasonably invade a person's privacy rights.  Our standard for reviewing the constitutionality of a statute under this provision is whether the privacy restriction is unreasonable as a matter of law.  While this "unreasonableness" standard may be

---

[64] The *Brown* Court continued,

> Facts of universal notoriety need not be proved.  . . . Courts will take notice of whatever is generally known within the limits of their jurisdiction; and, if the judge's memory is at fault, he may refresh it by resorting to any means for that purpose which he may deem safe and proper.  This extends to such matters of science as are involved in the cases brought before him.

91 U.S. at 42, 23 L. Ed. at 201-02.

more strict than a rational relationship test, *see Luckabaugh*, 351 S.C. at 139-40, 148, 568 S.E.2d at 346-47, 351, it is certainly not a "strict scrutiny" analysis.

Second, the State and the dissenting Justices argue the article I, section 10, "unreasonable invasions of privacy" provision does not encompass a "right to abortion." I wholeheartedly agree. With my vote the argument holds a majority position. However, the argument is not on point. The question before us is whether the Fetal Heartbeat Act violates a pregnant woman's right to "privacy." By not enacting a total ban on abortion, the State thereby preserved its longstanding statutory "opportunity" for abortion.[65] When the State seeks to regulate or restrict that opportunity—as it is undoubtedly entitled to do—the restrictions implicate a pregnant woman's privacy interests. Under article I, section 10, the State may not unreasonably invade those privacy interests. The right at issue here is "privacy."[66]

---

[65] The State argues that until 1970 all abortion was illegal in South Carolina—a common law and then statutory total ban. Justices Kittredge and Hearn contend abortion was illegal historically only after "quickening." Regardless of who is correct, it was the General Assembly that enacted a statutory right to abortion in 1970, although in very limited circumstances. Act No. 821, 1970 S.C. Acts 1892, 1892-93. In 1974—in response to *Roe*—the General Assembly enacted an expansive statutory right to abortion, making any abortion legal up to the end of the second trimester of pregnancy. Act No. 1215, 1974 S.C. Acts 2837, 2838-39. That statutory right to—or opportunity for—abortion is actually still the law. *See* § 44-41-20(a)-(b).

[66] As I explained in section II, article I, section 10 is clear that it includes all forms of privacy. The dissent's suggestion in this case—that Justice Black's dissent in *Griswold v. Connecticut*, 381 U.S. 479, 85 S. Ct. 1678, 14 L. Ed. 2d 510 (1965), informs us on the scope of the right of privacy under article I, section 10—takes Justice Black's comments largely out of context. To the extent they do relate to this case, however, Justice Black's comments support my position the term privacy is "broad but clear." Justice Black's argument was that by substituting the word "privacy" for the words actually used in the Bill of Rights, the Court could (1) limit, as he hypothesizes, the Fourth Amendment to instances in which "property . . . [is] seized privately and by stealth," 381 U.S. at 509, 85 S. Ct. at 1695, 14 L. Ed. 2d at 530 (Black, J., dissenting), or (2) expand, as he accuses the *Griswold* majority of doing, the freedom of speech protection of the First Amendment to all forms of privacy. The root of Justice Black's criticism of the *Griswold* majority is that by defining the scope of First Amendment protections according to what the *Griswold* majority calls "the zone of privacy created by several fundamental constitutional

While those privacy rights guarantee that pregnant women—once choice is secured to them under the Fetal Heartbeat Act—must have a meaningful opportunity to exercise that choice, there is no constitutional right to an abortion.[67]

---

guarantees," 381 U.S. at 485, 85 S. Ct. at 1682, 14 L. Ed. 2d at 515, the Court expanded the First Amendment beyond its original intent. *See* 381 U.S. at 508-11, 85 S. Ct. at 1695-96, 14 L. Ed. 2d at 529-31 (Black, J., dissenting) (explaining that his previously stated "view" that "First Amendment freedoms . . . have suffered from a failure of the courts to stick to the simple language of the First Amendment" results—in *Griswold*—in an unwarranted expansion of freedom of speech, and stating, "My disagreement with the Court's opinion holding that there is such a violation here is a narrow one, relating to the application of the First Amendment to the facts and circumstances of this particular case"). Justice Black called privacy "ambiguous" in the context of his argument because using it to define the protections of the Bill of Rights changes the original meaning of those protections, either expanding them or limiting them as the case may be. He called privacy "broad" because privacy reaches all areas of our lives—the full panoply—just as I contend article I, section 10 was intended to do.

[67] Similarly, the Supreme Court of the United States did not create a new constitutional right to a cell phone when it held the "unreasonable searches and seizures" provision of the Fourth Amendment prohibits the State from obtaining the contents of a cell phone without meeting the constitutionally-mandated standard. *Riley v. California*, 573 U.S. 373, 403, 134 S. Ct. 2473, 2495, 189 L. Ed. 2d 430, 452 (2014). Despite *Riley*, Congress has the power to ban cell phones, or the State could prohibit certain criminals, for example, from accessing them. Once any citizen secures a cell phone, however, government may not enter it except as provided in the Fourth Amendment, nor may the State of South Carolina unreasonably invade the cell phone user's right of privacy. While this analogy may not be a perfect one, it illustrates that generally stated constitutional rights like those set forth in the Fourth Amendment and in article I, section 10 extend to areas of our lives the Framers may never have anticipated, and that by recognizing the Fourth Amendment and article I, section 10 do reach those areas, courts do not create new constitutional rights.

Third, the State makes too much of Justice Kittredge's dissent in *Abbeville II*, as though that case and this case bear any resemblance whatsoever. I was not on the Court when we decided *Abbeville II*, but as I have stated, I agree with Justice Kittredge's central position in that dissent, and his central position has been subsequently adopted by a majority of this Court. *See supra* note 4. In the *Abbeville* cases, the Court took a general provision in our constitution requiring the General Assembly to "provide for the maintenance and support of a system of free public schools open to all children," S.C. Const. art. XI, § 3; read into that provision the unwritten right of a "minimally adequate education" and defined the right in some detail, *Abbeville Cnty. Sch. Dist. v. State*, 335 S.C. 58, 68, 515 S.E.2d 535, 540 (1999); and then directed the General Assembly to take political action according to judicial standards and subject to judicial review, *Abbeville II*, 410 S.C. at 661, 767 S.E.2d at 179. That sort of judicial overstepping is a far cry from our decision in this case. The question we address in this case is legal—whether the Fetal Heartbeat Act violates the specific article I, section 10 prohibition on unreasonable invasions of privacy. The "right" we address in this case is written in the constitution—privacy. That we are interpreting and applying a specific, written right—privacy—is what distinguishes this case from the *Abbeville* cases. While I respect the State's effort to keep this Court focused on its proper role under the separation of powers set forth in article I, section 8, the *Abbeville* cases have nothing to do with this case.

## VII.

Political questions surrounding abortion have produced as much impassioned disagreement as any issue of our time. When those political questions intersect with questions of law, advocates on both sides of the political questions seem to believe that the more fervently they hold their political views, the more likely those views will become someone else's legal views. We have been asked in this case to ignore well-established principles of law in order to uphold the Fetal Heartbeat Act, and to create new and novel principles of law to strike down the Act. The parties who made these requests derive their positions not from sound legal reasoning, but from fervent political advocacy. These well-intentioned parties act on the basis of their politics. The Court must act on the basis of law. The article I, section 10 prohibition on "unreasonable invasions of privacy" is a principle of law. The six-week ban in the Fetal Heartbeat Act violates the provision because—as a matter of law—it is an unreasonable intrusion into a pregnant woman's right of privacy. The Fetal Heartbeat Act is, therefore, unconstitutional.

**JUSTICE KITTREDGE:** I respectfully dissent.[68] I would hold the Fetal Heartbeat and Protection from Abortion Act (the Act) is constitutional. The policy decision of the South Carolina General Assembly does not violate the South Carolina Constitution, including the provision in article I, section 10 to be free from unreasonable invasions of privacy. I would further dismiss the complaint and rescind the temporary injunction staying enforcement of the law.

My colleagues and I fully appreciate the profundity of the emotion surrounding the abortion debate. The subject of abortion is a divisive and contentious issue in our society. As United States Supreme Court Justice Kavanaugh observed:

> Abortion is a profoundly difficult and contentious issue because it presents an *irreconcilable conflict* between the interests of a pregnant woman who seeks an abortion and the interests in protecting fetal life. The interests on both sides of the abortion issue are extraordinarily weighty.

*Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2304 (2022) (Kavanaugh, J., concurring) (emphasis added).

Justice Kavanaugh may be correct that the subject of abortion presents what appears to be an "irreconcilable conflict," but the conflict must be settled, for the rule of law and the necessity for order in our civil society demand a resolution. Beyond the recognition in *Dobbs* of the emotion and difficulty surrounding the abortion debate, it was acknowledged decades ago in *Planned Parenthood of Southeastern Pennsylvania v. Casey* that "[m]en and women of good conscience can disagree . . . about the profound moral and spiritual implications of terminating a pregnancy, even in its earliest stage." 505 U.S. 833, 850 (1992), *overruled by Dobbs*, 142 S. Ct. at 2242, 2284.

Whichever way a state reconciles the competing interests will inevitably result in strong support and strong opposition.[69] In this post-*Dobbs* world, do we look to

---

[68] Justice James and I agree on all counts, except the potential reach of the privacy provision in article I, section 10 of the South Carolina Constitution. Save this one difference of opinion, I join Justice James's excellent dissent.

[69] I recall a prior decision of this Court where the majority decided the Court should take over the operation of the South Carolina public school system, although our state constitution expressly assigned that duty and authority to the legislature. *Abbeville Cnty. Sch. Dist. v. State* (*Abbeville II*), 410 S.C. 619, 767 S.E.2d 157

judges to resolve the "irreconcilable conflict," or do we allow the citizens of each state to make the decision in a democratic process through their elected representatives? The majority of the Court has opted for a judicial resolution of this policy dispute. I do not hesitate in answering that question otherwise: because the constitution does not mandate a particular outcome, the people of South Carolina, through their elected representatives, make the decision.

United States Supreme Court Justice Scalia repeatedly advanced a view in favor of allowing the people to decide the abortion issue:

> The States may, if they wish, permit abortion on demand, but the Constitution does not *require* them to do so. The permissibility of abortion, and the limitations upon it, are to be resolved like most important questions in our democracy: by citizens trying to persuade one another and then voting. As the Court acknowledges, "where reasonable people disagree[,] the government can adopt one position or the other."

*Id.* at 979 (Scalia, J., concurring in part and dissenting in part) (quoting *id.* at 851 (majority opinion)). Justice Scalia, of course, was considering only the federal Constitution. The federal Constitution, as interpreted by the United States Supreme Court, provides for personal autonomy in many areas, which the majority opinions here rely on. However, as Justice Scalia and, later, the Supreme Court as a whole recognized, abortion is different from the widely accepted general right to privacy. What makes abortion different is the presence of the unborn child. *See Dobbs*, 142 S. Ct. at 2243.

Giving short shrift to that distinction, Chief Justice Beatty, Justice Hearn, and Justice Few conclude the Act is unconstitutional and find the South Carolina Constitution's grant of a privacy interest includes the right to an abortion. Their majority consists of three opinions: the lead opinion authored by Justice Hearn, a concurrence by Chief Justice Beatty, and a concurrence by Justice Few. Aside from the result reached, the majority opinions are notably similar in one particular way: all reject any reliance

_____

(2014). I dissented. In my dissent, I wrote that the Court's educational "policy mandate to the South Carolina General Assembly will be embraced and applauded." *Id.* at 663, 767 S.E.2d at 180 (Kittredge, J., dissenting). I was correct then, and I am equally confident that today's decision will be similarly received and applauded in some circles. This will reflect political agreement with the Court's policy decision concerning abortion, not the Court's faithfulness to the rule of law.

on the West Committee or legislative history to determine the meaning and reach of the privacy provision in article I, section 10—a stunning departure from settled law.

I, however, interpret the ambiguous phrase "unreasonable invasions of privacy" in the manner in which its constitutional framers intended it to be read. In doing so, I conclude the Act does not violate the South Carolina Constitution. After setting forth the legal case that is before the Court, I will explain my reasoning below.

## I.

We accepted this case in our original jurisdiction to address Petitioners' challenge to the Act. Petitioners include Planned Parenthood and other abortion providers. Respondents and Respondents-Intervenors (collectively, Respondents) represent various state officers in their official capacities.

The debate surrounding the abortion issue is longstanding, originating long before the 1970s and the United States Supreme Court's decision in *Roe v. Wade*, 410 U.S. 113 (1973), *overruled by Dobbs*, 142 S. Ct. at 2242, 2284. *Roe* did not resolve the matter, for since that decision was issued, the public divide over the abortion issue has continued to be persistent, unrelenting, and vitriolic, resulting in continual lawsuits and state legislative efforts to regulate abortion separately from the federal framework. After several decades of litigation, in *Dobbs*, the Supreme Court returned the issue of abortion to the states for the people to determine where to draw the line between the interest of the pregnant mother and the life of the unborn child. 142 S. Ct. at 2243. The South Carolina legislature, on behalf of the citizens of this state, sets policy, or at least that is the constitutional design. I remain firmly anchored to my unwavering commitment to the principle of judicial restraint. Thus, absent a proper constitutional challenge, the authority of the legislature to make policy determinations must be honored. Our legislature has made a policy determination regulating abortions in South Carolina. The legislative policy determination, as contained in the Act, gives priority to protecting the life of the unborn child.

Under guiding principles, we must presume legislative enactments reflect the will of the citizens. Ultimately, as Justice Scalia repeatedly observed, the issue of abortion must be resolved through the democratic and legislative process. Justice Scalia's view has now been adopted by the Supreme Court, and pursuant to *Dobbs*, we know the United States Constitution does not mandate a right to abortion. Therefore, the dispositive question before us is whether there is a state constitutional right to abortion that precludes the citizens of South Carolina, through their elected representatives, from prohibiting most abortions after the detection of the fetal

heartbeat. Petitioners have succeeded in convincing a majority of this Court to intervene and strike down the Act as unconstitutional. For this Court to strike down the Act, the majority must conclude that Petitioners have overcome the heavy presumption of the Act's constitutionality. More to the point, a finding of the Act's unconstitutionality must be predicated on a state constitutional right to abortion.[70] In my firm judgment, Petitioners have failed to establish that the state constitution mandates a right to abortion.

## II.

### A.

The legal disposition of this case turns on whether there is a constitutional right to privacy which expressly or impliedly encompasses a right to abortion in South Carolina. Thus, I must first address whether the citizens of our state enjoy a constitutional right to privacy. The answer, of course, is "yes": the citizens of South Carolina, and all citizens of the United States, are constitutionally guaranteed a right of privacy.

The parties have primarily looked to the search and seizure section of the South Carolina Constitution—found in article I, section 10—to answer whether our citizens have a right to privacy to include a right to abortion. As I will explain, the general, broadest right to privacy finds its expression in the Bill of Rights, especially the guarantee of due process. The Fourteenth Amendment to the United States Constitution provides that no state shall deprive any "person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The South Carolina Constitution mirrors this guarantee of due process in article I, section 3.

---

[70] Justice Hearn's lead opinion unambiguously finds a right to abortion in our state constitution. Justice Few's concurrence is less clear, at least to me. The thrust of his opinion indicates that the state constitutional privacy provision includes abortion. For example, he writes that the "unreasonable invasion of privacy provision" in the state constitution "is broad and applies to the full panoply of privacy rights Americans have come to enjoy over the history of our Nation." Shortly thereafter, he confirms his view that "any medical procedures a pregnant woman chooses to have—including an abortion—or chooses not to have—implicate her privacy interests." Nonetheless, Justice Few declares that "there is no constitutional right to an abortion," while ultimately concluding the Act is unconstitutional.

Flowing from natural law, privacy is inextricably woven into the very fabric of our nation. Freedom and liberty, terms which necessarily embrace privacy, are the cornerstones of our Constitution, laws, and civil society. Indeed, our Declaration of Independence was forged through the promise of "Life, Liberty, and the pursuit of Happiness." *The Declaration of Independence* para. 2 (U.S. 1776). The South Carolina Constitution places no less importance on the people's broad right to privacy, beginning with these words: "We, the people of the State of South Carolina, in Convention assembled, grateful to God for our liberties, do ordain and establish this Constitution for the preservation and perpetuation of the same." S.C. Const. pmbl.[71]

Unsurprisingly, the concept of the citizens' right to privacy has been recognized by the United States Supreme Court on many occasions. *See, e.g.*, *Olmstead v. United States*, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting) ("The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. . . . [The Founders] conferred, as against the government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men."), *majority overruled by Katz v. United States*, 389 U.S. 347 (1967), *and Berger v. New York*, 388 U.S. 41 (1967). As legal scholar Erwin Griswold succinctly stated, "[T]he right to be let alone is the underlying principle of the Constitution's Bill of Rights." Erwin Griswold, Dean, Harv. L. Sch., Address at Northwestern University Law School (June 11, 1960); *see also* Erwin Griswold, *The Right to be Let Alone*, 55 Nw. U. L. Rev. 216, 216–17 (1960).

For self-evident reasons, the Constitution of the United States makes no attempt to identify the boundaries of the broad privacy right. While the concept of privacy often finds its expression in our enumerated rights, under the federal Constitution, a right of privacy can exist beyond the enumerated rights. Privacy, after all, is a natural right. This is perhaps best understood by the decision of the Supreme Court in *Washington v. Glucksberg*, 521 U.S. 702 (1997). In *Glucksberg*, it was reaffirmed that the Due Process Clause of the Fourteenth Amendment guaranteed some rights not mentioned in the Constitution. *Id.* at 719–20 (collecting cases). The Supreme Court set forth a framework for determining whether an unenumerated asserted right is truly a constitutional right. *Id.* at 720–21. In short, to acquire the status of a constitutional right, "any such right must be 'deeply rooted in this [n]ation's history

---

[71] The concept of natural law has become important in this case, at least insofar as properly responding to the widely varying majority opinions.

and tradition' and 'implicit in the concept of ordered liberty.'" *Dobbs*, 142 S. Ct. at 2242 (quoting *Glucksberg*, 521 U.S. at 721).

The Supreme Court cautioned restraint in the recognition of unexpressed rights deemed fundamental in a constitutional sense. *Glucksberg*, 521 U.S. at 720. Once a claimed right is deemed a constitutional right, society through its citizenry loses the ability to debate the issue and effect change through the democratic and legislative process. *Id.* That was the consequence of the *Roe* decision, as for half a century, only the opinions of judges mattered in defining the scope of the right to an abortion. Excluding the people and leaving important societal policy issues in the hands of only judges is anathema to the design of our constitutional republic and the democratic process.[72] It is for this reason that *Glucksberg* cautioned that courts are to "exercise the utmost care whenever we are asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of members of the judiciary." *State v. Dykes*, 403 S.C. 499, 505–06, 744 S.E.2d 505, 509 (2013) (alteration marks omitted) (quoting *Glucksberg*, 521 U.S. at 720). I am concerned that what *Glucksberg* warned against—judges legislating based on personal policy preferences—has come to pass today.

The *Glucksberg* framework is a feature of separation of powers, for judges must refrain from creating law. Lawmaking is a function constitutionally reserved to the legislative branch. Beyond fundamental privacy interests, we need not decide today whether a *Glucksberg*-type framework applies generally to the Due Process Clause in the South Carolina Constitution. I would find that the Due Process Clause in the South Carolina Constitution does allow for the judicial recognition of an unenumerated right to the most basic forms of privacy, such as a person's medical

---

[72] In fact, article I, section 1 of our state constitution provides that "[a]ll political power is vested in and derived from the people only." Of course, the will of the people is expressed in the policy judgments of their elected representatives. We must never lose sight of this bedrock principle and its direct link to the familiar constitutional mantra that the South Carolina legislature has plenary authority unless our state constitution prohibits the exercise of that authority. *See City of Rock Hill v. Harris*, 391 S.C. 149, 154, 705 S.E.2d 53, 55 (2011) ("The power of our state legislature is plenary, and therefore, the authority given to the General Assembly by our Constitution is a limitation of legislative power, not a grant. This means that the General Assembly may enact any law not expressly, or by clear implication, prohibited by the State or Federal Constitutions." (cleaned up)).

autonomy.  Nonetheless, I would proceed cautiously in the judicial recognition of unenumerated constitutional rights, for fear of encroachment into a legislative role.

**B.**

While the recognition of a general right to privacy is straightforward, difficulty may arise in determining the scope of that right in a given setting.  No person may legitimately contend that he or she may do *whatever* he or she wants to do on the basis of privacy.  It depends entirely on what the person wants to do: **context matters**.  To be sure, virtually all laws infringe on the notion of privacy in the abstract.  However, in most every case, a legislative enactment's incidental invasion of privacy is patently reasonable and lawful.  The State's ability to prohibit or restrict conduct turns on whether the State has a legitimate interest in the matter, generally, where another person's interest is involved.  For example, no rational person would contend the State does not have the authority to enact laws criminalizing assault, rape, theft, child abuse, drug trafficking, and the like.  In these and so many other areas, the power of the State to regulate and prohibit conduct is unquestioned.  There is not the slightest prospect that a court would contravene the will of the people, as codified by their elected representatives, because the law amounts to an invasion of privacy.

The same could be said of many other actions that may be the subject of differing viewpoints, including bigamy, prostitution, gambling, and assisted suicide.  In these matters, a state may criminalize such conduct or legislatively permit it subject to regulations and restrictions.  However, no person has a constitutional right to engage in such conduct.  For example, *Glucksberg* involved a challenge to a law prohibiting assisted suicide. 521 U.S. at 705–06.  It was argued that the United States Constitution granted a fundamental liberty interest in assisted suicide.  *Id.* at 708.  The *Glucksberg* Court said "no": there was no federal constitutional right because assisted suicide was neither "deeply rooted" in the nation's history nor "implicit in the concept of ordered liberty."  *Id.* at 706, 710, 721–28 (recognizing states had an interest in "the protection and preservation of all human life").  Nevertheless, assisted suicide is legal in a number of states, not because of a constitutional right but because of the citizens of the states through legislative grace.

A second illustration may provide further understanding, particularly for the contrast in which it stands to *Glucksberg*.  In *Stanley v. Georgia*, the Supreme Court confronted a Georgia state law that criminalized "mere private possession of obscene matter."  394 U.S. 557, 558 n.1, 559 (1969).  Stanley was arrested following the discovery in his bedroom of three reels of eight-millimeter film, which depicted pornographic material deemed obscene.  *Id.* at 558.  He was charged and convicted

in state court of possession of obscene material. *Id.* at 558–59. The Supreme Court reversed, holding the effort to criminalize the mere possession of obscene material violated "the First Amendment, as made applicable to the states by the Fourteenth Amendment." *Id.* at 559. The supporting discussion is informative. The Supreme Court made the important distinction between decisions and conduct that are truly private and those that implicate other matters in which the state may have a legitimate interest in protecting. *Id.* at 560–64. To be sure, a state has an "important interest" in the "regulation of *commercial distribution* of obscene material." *Id.* at 563–64 (emphasis added). The Supreme Court recognized a number of precedents upholding convictions against constitutional challenges for the "public distribution of obscene materials." *Id.* at 567. However, Stanley's case was different, for Stanley's alleged crime presented no nexus to distribution, nor did it impact any other person or interest. *Id.* at 558, 567. Focusing on the invalidity of a state's claimed interest in regulating the "mere private possession" of obscene material, the Supreme Court referenced "traditional notions of individual liberty" and stated that citizens have a fundamental right "to be free, except in very limited circumstances, from unwanted governmental intrusions into one's privacy." *Id.* at 559, 560–61, 564–65, 568 (noting states do not have an interest in regulating obscenity when, in doing so, "they reach into the privacy of one's own home").

The contrast between *Glucksberg* and *Stanley* illustrates the interplay between privacy (or liberty) and the government's ability to regulate conduct. Where a state is unable to point to a legitimate interest permitting it to prohibit or regulate conduct, the privacy interest will prevail, as occurred in *Stanley*. Conversely, if a state is able to articulate a valid interest in regulating certain activities, an infringement on a person's privacy right may be permissible, as recognized in *Glucksberg*. In making that determination, we return to the *Glucksberg* framework and the inquiry into whether the purported privacy right is "deeply rooted" in our history and "implicit in the concept of ordered liberty." 521 U.S. at 720–21.

As I turn to and consider the issue of abortion, two points are irrefutable. First, the presence of the life of the unborn child is a legitimate state interest. Second, abortion has always been restricted and regulated in South Carolina; as such, abortion is not deeply rooted in our state's history. *Cf. Dobbs*, 142 S. Ct. at 2242–43, 2248–53 (observing similarly that abortion is not deeply rooted in the nation's history).

### III.

With this background on the general right to privacy juxtaposed to the state's legitimate interest to enact laws that regulate or restrict conduct where a legitimate state interest is present, I come to Petitioners' claim that abortion is a fundamental

right under the South Carolina Constitution.  Because Chief Justice Beatty relies on selected United States Supreme Court decisions for his interpretation of the meaning of the South Carolina Constitution privacy provision, I begin with a review of abortion under federal law, followed by a look at the history of abortion regulation in South Carolina.  I will then examine Petitioners' claim of a constitutional right to an abortion in the state constitution.

Prior to the 1970s, various Supreme Court decisions recognized a privacy interest in the ability to obtain contraceptives,[73] but no case had extended the concept of privacy to abortion.  Abortion stood by itself because it necessarily implicated a compelling state interest: the protection of the life of the unborn child.

Nonetheless, in 1973, although abortion had always been restricted and regulated in varying degrees among the states, the United States Supreme Court discovered a right to abortion in the United States Constitution.  *See Roe*, 410 U.S. at 153.  This alleged right to an abortion arose neither from some existing understanding of the Bill of Rights nor from the Fourteenth Amendment's due process guarantee.  Rather, *Roe* explained, this previously unknown right arose from a "penumbra," derived from Latin and meaning "almost a shadow."  *Id.* at 152–53; *Penumbra*, Black's Law Dictionary (11th ed. 2019).  The Supreme Court later described *Roe*'s analysis as "unfocused," creating a right to abortion out of whole cloth, with none of the objective guardrails that a due process framework ordinarily would require.  *See Dobbs*, 142 S. Ct. at 2245.  Perhaps unsurprisingly then, the *Roe* decision—and especially its nebulous formulation of a penumbral right to abortion—was the subject of much criticism.  *See id.* at 2270–71; *Casey*, 505 U.S. at 869.  In fact, the Supreme Court subsequently and pointedly remarked that *Roe* "was remarkably loose in its treatment of the constitutional text."  *Dobbs*, 142 S. Ct. at 2245.

Twenty years later, in *Casey*, the Supreme Court maintained the basic holding of *Roe* but abandoned the much-maligned *Roe* privacy right formulation, providing another rationale for the right to an abortion.  505 U.S. at 869, 874–79 (1992).  In doing so, "*Casey* threw out *Roe*'s trimester scheme and substituted a new rule of uncertain origin under which States were forbidden to adopt any regulation that imposed an 'undue burden' on a woman's right to have an abortion."  *Dobbs*, 142 S. Ct. at 2242.

---

[73] *See Griswold v. Connecticut*, 381 U.S. 479, 485 (1965) (finding a marital couple's right to privacy was violated by a state's contraceptive ban); *Eisenstadt v. Baird*, 405 U.S. 438, 453–55 (1972) (expanding *Griswold*'s reasoning to non-married people).

In the following years, and despite its fresh constitutional foundation, criticism of the newly reformulated right to an abortion persisted. Many states throughout the country, including South Carolina, continued to seek to impose limitations and restrictions on abortions alongside the federal constitutional right. Eventually, thirty years later, the United States Supreme Court agreed to revisit the issue in *Dobbs*. Anticipating the overruling of *Roe* and *Casey*, South Carolina was among a number of states that passed laws regulating abortions in a manner placing greater emphasis on protecting the life of the unborn child. Specifically, South Carolina's response was the passage of the Act, which is before us today.

Vindicating South Carolina's prescience, *Dobbs* in fact overruled *Roe* and *Casey*, focusing on *Casey*'s substantive due process rationale. 142 S. Ct. at 2242–43. Relying on the framework set forth in *Glucksberg*, the Supreme Court recognized that constitutional rights may exist "that are not mentioned in the Constitution, but any such right must be 'deeply rooted in this [n]ation's history and tradition' and 'implicit in the concept of ordered liberty.'" *Id.* at 2242 (quoting *Glucksberg*, 521 U.S. at 721)). In noting the obvious—abortion does not satisfy the *Glucksberg* due process standard—the *Dobbs* Court acknowledged that abortion is "fundamentally different" from true Fourteenth Amendment liberty interests because abortion involves an unborn human being. *Id.* at 2243. No one can rationally dispute the critically important fact that states have a real and legitimate interest in protecting the life of an unborn child. *Dobbs* held that "[i]t is time to heed the Constitution and return the issue of abortion to the people's elected representatives." *Id.*

## IV.

The South Carolina General Assembly seeks to protect the life of an unborn child in the Act. The law bans abortions after the detection of a fetal heartbeat, yet the law provides exceptions for rape, incest, fetal anomalies, and the life and physical health of the mother. *See generally* S.C. Code Ann. § 44-41-680 (Supp. 2022). According to data in the record, fetal heartbeat activity may be detected at approximately six to eight weeks into the pregnancy. In considering the Act, the legislature made findings in support of its policy decision to restrict most abortions at the time the fetal heartbeat is detected. Those legislative findings, based on medical information, include "a fetal heartbeat is a key medical predictor that an unborn human individual will reach live birth." Act. No. 1, 2021 S.C. Acts 2, 3. The legislature relied on medical data reflecting a greater than 95% likelihood of reaching live birth upon detection of the fetal heartbeat. Based on the information it relied on, the legislature expressed its policy judgment in noting that "the State of South Carolina has legitimate interests from the outset of a pregnancy in protecting the health of the pregnant woman and the life of the unborn child who may be born." *Id.*

This Court granted a temporary injunction on August 17, 2022, enjoining enforcement of the Act pending a resolution on the merits. We recognized the "plenary authority of the legislature to legislate and make public policy decisions." We further expressly "offer[ed] no opinion on the likelihood of success on the merits."[74]

**V.**

My analysis begins with three features of constitutional interpretation, which are referenced in the majority opinions but not honored. First, the General Assembly's authority to legislate is plenary: the South Carolina Constitution grants power to the legislature to "enact any act it desires to pass, if such legislation is not expressly prohibited by the Constitution of this state, or the Constitution of the United States." *Heslep v. State Highway Dep't*, 171 S.C. 186, 193, 171 S.E. 913, 915 (1933); *see also Hampton v. Haley*, 403 S.C. 395, 403, 743 S.E.2d 258, 262 (2013) ("[T]he General Assembly has plenary power over all legislative matters unless limited by some constitutional provision."); *Fripp v. Coburn*, 101 S.C. 312, 317, 85 S.E. 774, 775 (1915) ("[T]he Legislature may enact any law not prohibited by the Constitution.").

Second, statutes are presumed constitutional. That presumption is a weighty one and can be overcome only by a showing of unconstitutionality beyond a reasonable doubt. *See Joytime Distribs. & Amusement Co. v. State*, 338 S.C. 634, 640, 528 S.E.2d 647, 650 (1999) ("A legislative enactment will be declared unconstitutional

only when its invalidity appears so clearly as to leave no room for reasonable doubt that it violates a provision of the constitution.").

Third, Petitioners bring a facial challenge to the Act. With a facial challenge, Petitioners must demonstrate the Act is unconstitutional "in all its applications." *Richardson ex rel. 15th Cir. Drug Enf't Unit v. $20,771.00 in U.S. Currency*, 437 S.C. 290, 297, 878 S.E.2d 868, 871 (2022); *State v. Legg*, 416 S.C. 9, 13–14, 785 S.E.2d 369, 371 (2016) ("A facial challenge is 'the most difficult to mount

---

[74] It is important to recognize the Act was not in effect upon its passage, for section 44-41-620 provides if *Roe* is overruled or modified and states are authorized to regulate abortion, "then the Attorney General may apply to the pertinent state or federal court" for a declaration that the Act is constitutional and for a "lifting [of] an injunction against the enforcement of" the Act. S.C. Code Ann. § 44-41-620(B) (Supp. 2022).

successfully,' as it requires the challenger show the legislation at issue is unconstitutional in all its applications." (alteration marks omitted) (quoting *City of L.A. v. Patel*, 576 U.S. 409, 415 (2015)).

## A.

I begin with Petitioners' due process challenge, for I find that if there exists a right to abortion, that right must be established as a due process liberty interest in article I, section 3 of the South Carolina Constitution. Thus, applying the *Glucksberg* framework to our state constitution, Petitioners must establish that abortion is deeply rooted in South Carolina history and that abortion is implicit in the concept of ordered liberty.

South Carolina has long regulated the practice of abortions. Abortion was originally recognized in our state as a common law crime. The common law criminalized abortion at the point of quickening, that is, the moment when the mother detects movement of the fetus in the womb. As *Dobbs* stated,

> At that time, there were no scientific methods for detecting pregnancy in its early stages, and thus, as one court put it in 1872: "Until the period of quickening there is no *evidence* of life; and whatever may be said of the fœtus, the law has fixed upon this period of gestation as the time when the child is endowed with life" because "fœtal movements are the first clearly marked and well defined *evidences of life*."

142 S. Ct. at 2251–52 (cleaned up) (quoting *Evans v. People*, 49 N.Y. 86, 90 (1872)). And as *Dobbs* recognized, while the common law apparently did not criminalize pre-quickening abortions, "it does not follow . . . that abortion was a legal *right*." *Id.* at 2250.

Scientific knowledge, of course, has increased significantly through the years, for medical knowledge now establishes "evidences of life" early on in the pregnancy. The detection of a fetal heartbeat approximately six to eight weeks into the pregnancy is an example. That is the precise kind of information considered in the legislative fact-finding process that was relied on in crafting the Act. Nevertheless, the lead majority opinion relies on this Court's 1948 decision in *State v. Steadman* as the final word on when life begins, as if advances in medical science cannot be considered by subsequent legislatures. *See* 214 S.C. 1, 51 S.E.2d 91 (1948). *Steadman* noted that "[f]rom the earliest enactment of statutes designating the offense under discussion as 'abortion,' and *until the present day*, a distinction between the condition of the child before and after quickening has been

recognized . . . ." *Id.* at 8, 51 S.E.2d at 93 (emphasis added). The "present day" in *Steadman* was seventy-five years ago. Much has happened since 1948, and I know of no legal authority that forces our legislature to make policy decisions and pass legislation concerning abortion based on the universe of knowledge and understanding in 1948.[75]

Petitioners' due process claim fails. Abortion is not "deeply rooted" in our state's history, and it could not be reasonably suggested that abortion is "implicit in the concept of ordered liberty." To the contrary, it is the regulation and restriction of abortion that is deeply rooted in our state's history. Even during the past fifty years, under *Roe* and *Casey*, many state legislatures throughout the nation enacted laws placing limits and restriction on abortions. Granted, some of those state legislative efforts were struck down because of the then-existing federal constitutional right, yet those persistent legislative efforts foreclose any argument that abortion became deeply rooted in the American culture in recent decades. What is deeply rooted in our state and nation over the past half-century is the complete lack of consensus on the abortion issue. Following *Dobbs*, I would hold there is no due process privacy or liberty right to an abortion under the South Carolina Constitution.

**B.**

Petitioners' primary argument arises from our constitutional provision that prohibits "unreasonable invasions of privacy." The provision provides:

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures and unreasonable invasions of privacy shall not be violated, and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, the person or thing to be seized, and the information to be obtained.

S.C. Const. art. I, § 10.

---

[75] I find ironic the lead majority opinion's willingness to bind this Court to outdated opinions and concepts such as those espoused in *Steadman*. The incongruity is pointed when comparing the lead majority's reliance on the historic legal impact of quickening with its concurrent view that our state constitution must be interpreted in accordance with modern societal mores (rather than as it was intended at the time it was written).

The term "privacy" is ambiguous. *Cf. Griswold*, 381 U.S. at 509 (Black, J., dissenting) ("'Privacy' is a broad, abstract and ambiguous concept which can easily be shrunken in meaning but which can also, on the other hand, easily be interpreted as a constitutional ban against many things other than searches and seizures."). To be sure, it is not clear that the term "privacy" in article I, section 10 includes a right to abortion. Chief Justice Beatty acknowledges this ambiguity in the very first paragraph of his concurrence: "While all agree our government generally cannot search our homes—the pinnacle of privacy—without a warrant, *the outer bounds of privacy are still debated*." (Emphasis added). It should be clear from the five separate writings from every member of this Court that there is no unequivocal consensus on the meaning of the phrase "unreasonable invasions of privacy" in article I, section 10. I would not by judicial fiat foreclose the people, through their elected representatives, from the debate.

Certainly, this Court's various proposed interpretations of the phrase "unreasonable invasions of privacy" indicate there is some question—or ambiguity—as to the meaning of the privacy provision. In the face of such ambiguity, it is bedrock law that a court must examine the origins of a constitutional provision to ascertain and give effect to the intent of its framers. *Harris*, 391 S.C. at 153, 705 S.E.2d at 55 ("[T]he Court applies rules similar to those relating to the construction of statutes to arrive at the ultimate goal of deriving the intent of those who adopted [a constitutional amendment]." (cleaned up)); *Miller v. Farr*, 243 S.C. 342, 346–47, 133 S.E.2d 838, 841 (1963) ("Hence, when construing constitutional amendments, the Court applies rules similar to those relating to the construction of statutes, in its effort to determine the intent of its framers and of the people who adopted it."). Thus, we must determine the reach of the privacy provision by carefully examining the work of the amendment's framers. *See Harris*, 391 S.C. at 153, 705 S.E.2d at 54–55 ("When this Court is called to interpret our Constitution, it is guided by the principle that both the citizenry and the General Assembly have worked to create the governing law. Therefore, the Court will look at the ordinary and popular meaning of the words used, keeping in mind that amendments to our Constitution become effective largely through the legislative process." (cleaned up)).

It is Petitioners' position that the privacy provision is broad and extends beyond the search and seizure context to include a right to abortion. From the privacy provision, Petitioners extrapolate that a pregnant woman has a fundamental privacy right to abort her unborn child after detection of the fetal heartbeat without interference from the state. I disagree. As I explain further below, there is no language in article I, section 10 of the South Carolina Constitution that supports an interpretation of a privacy right that would encompass a right to abortion. The "unreasonable invasion

of privacy" language is part of the search and seizure clause and is not a standalone provision. Indeed, the privacy provision is combined with the "unreasonable searches and seizures" language with no comma, semicolon, or other break. This contextual placement of the privacy provision stands in contrast to other rights in our state constitution, which are standalone provisions or separated by, for example, commas or semicolons.[76] Moreover, there is *nothing* in our case law that construes the privacy provision so expansively that would permit a finding of a right to abortion.

The provision in article I, section 10 of the South Carolina Constitution prohibiting "unreasonable invasions of privacy" was the result of a 1971 amendment to our constitution. After carefully examining the history related to the adoption of the privacy-provision amendment, as well as case law, I am firmly convinced the privacy provision does not confer a right to an abortion.

More specifically, in 1971, the citizens of our state approved major changes to the South Carolina Constitution of 1895. Those amendments were the result of a lengthy process that was initiated by the General Assembly in the mid-1960s. At the time, the General Assembly commissioned a study and broad review of the 1895 Constitution. The study committee formed by the legislature became known as the West Committee. The work of the West Committee culminated in substantial revisions to the 1895 Constitution. One amendment to the state constitution was the addition of the privacy provision. While the work of the West Committee is certainly not dispositive in ascertaining the complete history and meaning of the constitutional amendments approved in 1971, until today, this Court has looked to the West Committee as some evidence of the meaning behind the 1971 constitutional amendments. *See, e.g.*, *Sloan v. Sanford*, 357 S.C. 431, 436–37, 593 S.E.2d 470, 473 (2004); *Diamonds v. Greenville Cnty.*, 325 S.C. 154, 158–59, 480 S.E.2d 718, 720 (1997); *Hosp. Ass'n of S.C., Inc. v. Cnty. of Charleston*, 320 S.C. 219, 224–25, 464 S.E.2d 113, 117 (1995). However, the majority opinions today cast aside as "irrelevant" the work of the West Committee.

---

[76] *See* S.C. Const. art. I, § 2 (setting forth multiple rights separated by semicolon); *id.* art. I, § 3 (same but using repeated commas and conjunctions); *id.* art. I, § 4 (same); *id.* art. I, § 12 (same, using commas); *id.* art. I, § 13 (same, using separate sentences and subsections); *id.* art. I, § 14 (same, using separate sentences or semicolons); *id.* art. I, § 15 (same, using separate sentences and repeated commas and conjunctions); *id.* art. I, § 20 (same, using separate sentences); *id.* art. I, § 22 (same, using semicolons, commas, and repeated conjunctions).

The lead majority opinion provides a history lesson of the discrimination women have endured in South Carolina. I take no exception to recounting the history of women's rights to vote and serve on juries in the state. My concern is with the majority's effort to link the history lesson to this case. The West Committee is disparaged because it was "initially composed of nine men and not a single woman." This attack on the West Committee is unfair. I do not believe the West Committee is maligned because of the lack of gender diversity in the committee's initial composition; I believe the West Committee's failure to provide Petitioners (and the majority) *any* evidence linking the privacy provision to abortion is the reason for the attack by the majority. If lack of gender diversity were the real reason, I point to the absence of similar criticism regarding the United States Supreme Court that decided *Roe*, which was also "composed of nine men and not a single woman."

Chief Justice Beatty similarly avoids the work of the West Committee. The Chief Justice states that the committee "notes, minutes of the committee meetings, [and] statements made during the meeting . . . are . . . unavailing in our interpretation of the breadth of the privacy rights addressed in article I, section 10." What is availing, according to the Chief Justice, in discovering the meaning of the *state* constitutional privacy provision are selected privacy and abortion cases from the United States Supreme Court, obviously interpreting the *federal* Constitution. The Chief Justice concludes that the work of the state-focused West Committee is irrelevant.

Likewise, Justice Few opines "the work of the West Committee is irrelevant to an analysis" of the meaning of the privacy provision. Justice Few asserts that it is necessary to consider the deliberative process leading to a constitutional amendment only when the language of the constitutional provision is "ambiguous." He believes the term "privacy" is "broad . . . [but] clear as to its scope." It is then suggested that there are no limits to privacy because "the State's limitations to the scope of the 'unreasonable invasions of privacy' provision were never presented to the voters who approved the provision in the 1970 general election." The same point is repeated: "There was no mention on the ballot of any limitations on that language." The implication is obvious: because abortion was not expressly *excluded* when the amendment was adopted, abortion is necessarily *included* in the privacy provision. This, we are told by Justice Few, was the intent of the "citizenry" who voted to adopt the privacy provision. That has never been the framework for determining the reach and extent of constitutional rights. I reject the notion that absent "limitations" in the constitutional text, there is no legislative authority to act. This proposed analytical approach turns upside down the South Carolina Constitution, which grants plenary authority to the legislature. Moreover, the case before the Court requires us to determine an answer to a discrete question: does the privacy provision *include* a right

to an abortion? The question is not whether the framers expressly *excluded* abortion from the reach of the privacy provision.

In answering the question before us, we must ascertain and give effect to the intention of those responsible for drafting the provision and the voters who adopted it. I know of no other example in the history of this Court where it has thumbed its nose at the rigid requirement that the Court must ascertain and give effect to the intent of those responsible for a constitutional provision or legislative enactment.

I will honor our precedents by considering the history underlying the adoption of the privacy provision. This review will shed light on what the "framers" intended and, significantly, whether one may reasonably conclude that a right to abortion is included as a privacy right. I will first review the work of the West Committee, and in turn, I will examine the consideration by the legislature of the committee's recommendations and then the manner of how the privacy provision was presented to the voters.[77]

## C.

It was in the context of the broad review of our constitution that the perceived need for an explicit privacy provision arose. The idea for a privacy provision was initially raised at the West Committee's working session in September 1967. The genesis of the privacy provision related solely to modern technology and the ever-increasing volume and acquisition of data and personal information. The record of the September 1967 meeting framed the issue as follows: "A democratic society is peculiarly receptive to the development of constitutional norms that will protect individual privacy from the omnipresent ear of modern surveillance equipment."[78]

The West Committee considered the privacy provision as an amendment to the South Carolina Constitution's search and seizure provision. The committee decided that the provision "should be revised to take care of the invasion of privacy through modern

---

[77] I commend the parties and amici for excellent briefs. I have borrowed from the briefs, especially as they concern the history surrounding the adoption of the privacy provision.

[78] Memorandum No. 2 from Robert H. Stoudemire, Staff Consultant, W. Comm., to the S.C. Const. Revision Comm. app. A (Sept. 1967), *in* 3 *Proceedings of the Committee to Make a Study of the Constitution of South Carolina (1895)* (1967) [hereinafter *Proceedings of the West Committee*].

electronic devices. All committee members agreed that this further protection was needed."[79]  Yet the record reveals the West Committee was concerned that adding a right to privacy "would impede the task of the law enforcement officers," so the committee sought input from then-Attorney General Daniel R. McLeod.[80]

Attorney General McLeod responded by letter to the committee.  The Attorney General favored adding a right to privacy to the constitutional section involving search and seizures, acknowledging that the committee's proposed revision "relate[d] to an interception of communication which [was] generally done by electronic means."[81]  Attorney General McLeod also expressed concern "that massive collection of data by governmental agencies may afford a basis for concluding that the citizens' right of privacy can be jeopardized."[82]  He further reported:

> We are considering now the establishment of a system of data processing which would make readily available vast amounts of information relating to the private affairs of citizens.  Unless thought is given to protection of the individual's privacy within the bank of information stored in the computers, there can be a potential invasion of that individual's right of privacy.[83]

The Attorney General concluded his remarks by noting that technology is everchanging: "Admittedly, the field is new and complex and the problems cannot definitely be foreseen, but there is a definite trend toward securing individual privacy in the field of data processing."[84]

The letter from Attorney General McLeod generated additional discussion from the

---

[79] Comm. to Make a Study of the Const. of S.C. of 1895, Minutes of Committee Meeting 6 (Sept. 15, 1967) [hereinafter West Committee Minutes], *in* 1 *Proceedings of the West Committee*.

[80] *Id.* at 6–7.

[81] Letter from Daniel R. McLeod, S.C. Att'y Gen., to Robert H. Stoudemire, Staff Consultant, W. Comm. (Oct. 2, 1967), 1967 WL 12658, at *1.

[82] *Id.*

[83] *Id.*

[84] *Id.*

West Committee. In studying the Attorney General's comments, the West Committee concluded that the Attorney General "agreed that this matter of secrecy is very grave, not only from electronic devices, but also he requests that [the] wording be wide enough to take care of data processing banks."[85] The work of the committee moved forward with additional meetings and detailed discussions related to a privacy-provision amendment.

The focus of the discussions regarding the privacy provision concerned matters of protection of personal information, circumstances that would allow law enforcement access to such information, probable cause, and search warrants. As the committee was concluding its work, one committee member remarked, "This is getting down to your mass computer data. It's getting to all electronic stuff."[86]

I state the obvious—the matter of abortion was never discussed or even mentioned by the West Committee. On one hand, it may seem plausible to suggest abortion was understandably not mentioned because the subject of abortion may not have been prominent in the public discourse at the time. Yet it is Petitioners who bring to our attention that:

> [I]n the years leading up to South Carolina's adoption of the privacy provision, efforts were well underway in other states to push for recognition of a privacy right that protected the abortion decision. As one national news article reported in 1969, there were ten ongoing challenges to abortion laws across the country at that time, including on grounds of limiting "the freedom of choice in a 'constitutionally protected area, the area of private morality.'"

Pet'rs' Br. at 15 (citations omitted). Petitioners go further and spotlight that the matter of abortion was front and center in South Carolina at that same time, as the legislature amended the abortion statutes in 1970. Given the presence of the abortion debate at the time of the debate and adoption of the privacy provision, the complete

---

[85] West Committee Minutes 3 (Oct. 6, 1967), *in* 1 *Proceedings of the West Committee*.

[86] West Committee Minutes 7 (Nov. 19, 1968), *in* 3 *Proceedings of the West Committee*.

absence of any consideration of abortion by the West Committee and legislature is significant.[87]

In April of 1969, the West Committee approved its final report and forwarded it to the General Assembly. The committee's report recommended adding a new, standalone sentence to the search and seizure provision of the state constitution: "The right of the people to be secure from unreasonable invasions of privacy shall not be violated."[88] It explained its reasoning:

> This additional statement is designed to protect the citizen from improper use of electronic devices, computer data banks, etc. Since it is almost impossible to describe all of the devices which exist or which may be perfected in the future, the Committee recommends only a broad statement on policy, leaving the details to be regulated by law and court decisions.[89]

## D.

I now turn to the General Assembly's consideration of the West Committee's recommendations. The legislature agreed in principle with the committee's privacy recommendation. But rather than adding a new sentence to our state constitution, as the committee proposed, the legislature merged the privacy provision into the existing constitutional provision:

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures *and unreasonable invasions of privacy* shall not be violated, and no warrants shall issue

---

[87] The committee members often engaged in free-flowing discussions. In the brainstorming discussions, there were occasional references to the concept of privacy beyond electronic surveillance. In an open discussion format, that is understandable. The deliberations and work of the committee, however, always returned to the electronic surveillance concern. That was the focus of the committee. I additionally note in none of the free-flowing discussions was the topic of abortion ever mentioned. Significantly, the topic of abortion appears nowhere in the final report of the West Committee. *See Final Report of the Committee to Make a Study of the South Carolina Constitution of 1895* (1969).

[88] *Id.* at 14.

[89] *Id.* at 15.

but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the person or thing to be seized, *and the information to be obtained.*

S.C. Const. art. I, § 10 (emphasis added to the 1970 additions).

The legislature's treatment of the issue is revealing. First, the legislature rejected the committee's recommendation for a standalone privacy provision. The legislature opted instead to fold the concept of privacy into the existing search and seizure clause. Second, to ensure that the privacy concept was linked to the situation that concerned the committee—that is, electronic surveillance—the legislature added the final phrase requiring warrants to identify "the information to be obtained" to ensure there was not an "unreasonable invasion of privacy" when the government sought to intercept an individual's electronic communications or review an individual's electronic data. As with the West Committee, there is no evidence even remotely linking consideration by the legislature of the privacy provision to abortion.

**E.**

I finally consider the manner in which the proposed privacy amendment was presented to the citizens of South Carolina. All proposed amendments to the 1895 Constitution were submitted to the voters and approved. The privacy-provision amendment was referenced by the legislature on the ballot as merely "searches and seizures." This characterization as "searches and seizures" refutes any suggestion that the voters had any reason to believe that the amendment to the searches and seizures clause included a right to abortion.

In reviewing the history leading to the adoption of the privacy provision, the critical point Respondents rely on, with which I agree, is that the intent behind the privacy-provision amendment never wavered. There was not the slightest hint that the contemplated privacy provision would have any application to the abortion issue. *See Miller*, 243 S.C. at 346–47, 133 S.E.2d at 841 (setting forth the well-established principle that when a court construes a constitutional amendment, it must determine the intent of both the amendment's framers and the citizens who adopted it). The laws of South Carolina restricted abortions at the time, and there was no suggestion that the privacy amendment would affect the state's abortion laws. In fact, as Petitioners point out, while the legislature was considering the West Committee's final report, it was simultaneously amending the abortion statutes. In short, none of the amendment's framers ever intended the privacy provision to affect the matter of abortion or the state's longstanding policy of regulating abortion.

**F.**

In terms of our judicial decisions issued around the time of adoption of the privacy provision, the case of *State v. Lawrence* is instructive. 261 S.C. 18, 198 S.E.2d 253 (1973). In 1972, Kenneth Lawrence, a South Carolina physician, was convicted of performing an abortion in violation of a state statute. *Id.* at 19, 198 S.E.2d at 254. On appeal in 1973, the same year *Roe* was decided, Dr. Lawrence argued the state statute was unconstitutional as a result of the *Roe* decision. This Court agreed, found the state statute unconstitutional, and vacated Dr. Lawrence's conviction. *Id.* at 22, 198 S.E.2d at 255. In *Lawrence*, there was no reference to or argument that the then-newly minted state constitutional privacy provision applied.

The following year, in 1974, the legislature codified the holding in *Roe*. *See* Act No. 1215, 1974 S.C. Acts 2837 (codified as amended in scattered sections of S.C. Code Ann. § 44-41-10 to -80 (2018 & Supp. 2022)). The codification of *Roe* commands the conclusion that the legislature harbored not the slightest belief that the privacy amendment granted a right to abortion. We must conclude that at the time of adoption of the privacy provision, and until at least 1974, the privacy provision did not grant a right to abortion. Yet today, a majority of this Court has discovered a right to abortion in the privacy provision.

**G.**

Does this review of the origins of the privacy provision necessarily mean that the provision has no potential applicability beyond electronic devices and the modern technology concern? I believe the answer is, "no." There can be no question that the word "privacy," when removed from its contextual setting, is broad. We must, however, ascertain the meaning of a constitutional provision in its proper context. What persuades me to allow for the privacy provision to have a reach beyond the search and seizure context is our case law. Our case law has not consistently interpreted the privacy provision so narrowly as to preclude application beyond the search and seizure context, although most of our cases concerning the privacy provision involved a nexus to searches and seizures.[90]

---

[90] *See State v. Counts*, 413 S.C. 153, 172, 776 S.E.2d 59, 69–70 (2015) (while acknowledging the propriety under the Fourth Amendment of the law enforcement "knock and talk" technique, the Court invoked the state constitutional privacy provision and concluded that "[b]ecause the privacy interests in one's home are the most sacrosanct, . . . law enforcement must have reasonable suspicion of illegal activity at a targeted residence prior to approaching the residence" and conducting a

*Singleton v. State* is the one case seized upon by the Court majority where this Court decided a non-search and seizure case in part on the basis of the constitutional privacy provision. 313 S.C. 75, 88–89, 437 S.E.2d 53, 60–61 (1993) (holding the federal Due Process Clause and the state constitutional right to privacy "would be violated if the State were to sanction forced medication solely to facilitate execution" of a death row inmate). Justice James would overrule *Singleton* in part and find the state constitutional privacy provision is limited to search and seizure cases. I do not lightly dismiss Justice James's view that the state constitutional privacy provision has no application beyond the search and seizure setting. My learned colleague's position is a defensible position.

---

knock and talk); *Dykes*, 403 S.C. at 503, 508 & n.7, 744 S.E.2d at 507, 510 & n.7 (while holding the "initial mandatory imposition of satellite monitoring" constitutional for certain sex offenders, the Court also found the "complete absence of any opportunity for judicial review to assess a risk of re-offending . . . [was] arbitrary and [could not] be deemed rationally related to the legislature's stated purpose of protecting the public from those with a high risk of re-offending," and cited to the state constitutional privacy provision as "additional[] support"); *State v. Weaver*, 374 S.C. 313, 321–22, 649 S.E.2d 479, 483 (2007) (holding the warrantless search of defendant's vehicle under the automobile exception did not violate the state constitutional privacy provision); *State v. Forrester*, 343 S.C. 637, 644, 541 S.E.2d 837, 841 (2001) (in a search and seizure case challenging the consent-to-search finding, the Court stated the "privacy provision imbedded in the search and seizure provision . . . creates a distinct privacy right that applies both within and outside the search and seizure context[,]" yet the Court rejected the argument that "our state's right to privacy provision [] require[d] police officers to inform citizens that they have the right to refuse consensual searches"). In my list of South Carolina cases concerning the privacy provision, I do not include the case of *State v. Blackwell*, 420 S.C. 127, 801 S.E.2d 713 (2017). Two of the three majority opinions here cite *Blackwell*. The parentheticals included in Justice Hearn's and Justice Few's opinions claim the case was decided on the basis of the privacy provision. This claim is not true. As Justice James points out, *Blackwell* contains no discussion of the state constitutional right to privacy, and the case was not decided on constitutional right to privacy grounds.

Nonetheless, while a close question is presented, I believe the better course is to leave our precedents intact.[91] I point out that in none of our cases have Respondents argued for the constrained view of the privacy provision they advance here. In fairness to Respondents, however, we have never been called on to address the privacy provision juxtaposed to a legislative enactment and in a setting so far removed from the search and seizure context. In short, we have never been asked to consider whether the privacy provision includes a right to abortion.

While I adhere to our precedents, that in no manner gives rise to a right to abortion. Given the history associated with the adoption of the privacy-provision amendment, I conclude the privacy provision does not include a right to abortion. Yet I acknowledge that Petitioners are correct in their overarching assertion that a person generally possesses a fundamental right of autonomy over his or her medical care. In this regard, a person is generally free to make his or her own healthcare decisions, as well as to choose what medicines and healthcare procedures will be accepted or rejected. These liberty or privacy interests most logically arise from the Due Process Clause in article I, section 3, not the privacy provision in article I, section 10. Of great importance, these personal decisions are made free from any countervailing interests.[92]

The majority opinions predictably seize on this deeply rooted and deeply understood principle of personal autonomy in healthcare decisions and immediately conflate abortion with those decisions. However, the law separates abortion from other healthcare decisions, as abortion presents an additional and critically important competing consideration, one that a state indisputably has a legitimate interest in advancing: protecting the life of the unborn child. *See Dobbs*, 142 S. Ct. at 2243. *Compare Stanley*, 394 U.S. at 559, 560–61, 564, 565, 568 (explaining when the state does not have a legitimate interest in regulating a particular course of action, citizens have a fundamental right to be free from unwarranted governmental intrusions into their privacy), *with Glucksberg*, 521 U.S. at 710, 721–28 (finding a state had a legitimate interest in protecting and preserving public life and that, therefore, a

---

[91] If nothing else, *Singleton* and the other cases mentioning article I, section 10 are distinguishable because they did not involve an interest in protecting the life of an unborn child.

[92] These personal decisions, completely removed from a countervailing state interest, are best understood as a privacy right flowing from natural law.

regulation restricting the availability of assisted suicide did not run afoul of the federal Due Process Clause).

For that reason, as made clear in *Dobbs*, "abortion is fundamentally different" from other rights recognized by the Supreme Court. 142 S. Ct. at 2243. The matter of abortion involves not only the pregnant mother, but the potential life of the unborn child. The State unquestionably has a legitimate interest in making policy determinations that affect both interests, and the General Assembly has done so in the Act. There is nothing in the privacy provision or its history, including our case law, that allows for the provision to be stretched so far as to grant a right to abortion.

It is wholly improper to excise the phrase "unreasonable invasions of privacy" from article I, section 10 and give it the boundless, amorphous meaning desired by Petitioners. More to the point, when reviewing a legislative enactment, rules of constitutional interpretation do not permit courts to cherry-pick broad language from its contextual moorings for the purpose of reaching a judicially preferred outcome. The expansive interpretation of the privacy clause urged by Petitioners would simply turn the members of this Court into super-legislators, as a judge's personal preferences would be elevated to having constitutional status.

The reach of the privacy provision is constrained by its history and our precedents. I return once again to the *Glucksberg* due process framework. If a proposed privacy right is not "deeply rooted" in our state's history and implicit in the concept of ordered liberty, then the Court should stay its hand and honor the policy decision made by the citizens through their duly elected representatives. That is my path today.

The South Carolina privacy provision does **not** grant a right to abortion free from the state's authority to impose restrictions designed to further the state's legitimate interest in protecting the lives of the unborn. Where the legislature has rendered a constitutional policy judgment, judicial power is constrained. Because the privacy provision in article I, section 10 does not grant a right of abortion, I would reject the privacy provision challenge.

Before moving to the next section, I respond to Justice Few's criticism that "the majority of [my] discussion really has nothing to do with this case." Respectfully, I do not believe that is true, and I certainly do not overlook the fact the state constitution has a privacy provision. It is Justice James and I who examine the actual history of the privacy provision. It is Justice James and I who are firmly convinced that the history of the privacy provision is a prerequisite to understanding the reach and meaning of the privacy provision. I believe that discussion, combined with an

understanding of the due process privacy interest, has a great deal to do with this case.

Justice Few and I have a fundamental difference of opinion on the reach and meaning of the state constitutional privacy provision. Justice Few views the privacy provision expansively; I view the privacy provision in line with its understood meaning at the time it was adopted, along with caselaw interpreting the provision. Yet Justice Few and I agree on a person's general privacy interest in his or her medical autonomy. It is the *source* of that privacy interest where we part company. Justice Few finds the source of the privacy interest in article I, section 10—the privacy provision. I believe this privacy interest in healthcare decisions is embedded in the due process concept of liberty from our nation's and state's foundings. That is why I find the source of that interest in article I, section 3—due process. This position aligns with my view that the most basic forms of privacy arise from natural law.

If Justice Few is correct and the source of a person's fundamental privacy interests comes from the article I, section 10 privacy provision, then presumably the citizens of our state had no such privacy rights before the adoption of article I, section 10 in 1971. Does anyone really believe the citizens of South Carolina had no fundamental privacy rights prior to 1971? Of course our citizens had such privacy rights long before 1971, and due process was (and is) the source of those deeply rooted privacy interests. The majority opinions take different routes, but they end up in the same place, with all giving an expansive and essentially boundless meaning to the article I, section 10 privacy provision. The impact of the majority opinions is to minimize the role of the legislature in making policy decisions, leaving those policy decisions to this Court.

It is because of my strong disagreement with the majority opinions on this central point that I have been required to discuss at length the history of privacy interests arising from natural law and the role of the liberty interest in the due process clause. Critically important, a due process framework serves as a check on judicial activism. A due process framework—if properly grounded in the notions of "deeply rooted" and "implicit in the concept of ordered liberty"—ensures objective guardrails, which in turn minimizes the prospect of a judge making a legislative policy decision disguised as law. With the majority's adoption of an expansive privacy provision, objective guardrails and judicial restraint are cast aside. Respectful of Justice Few's contrary opinion, I believe my analysis and discussion have a great deal to do with this case.

# VI.

## A.

In any event, were I to go further and test the Act against article I, section 10, Petitioners' claim would nevertheless fail. The touchstone for the privacy provision is reasonableness. The constitution protects against *unreasonable* invasions of privacy. In a host of circumstances—too numerous to mention—the State has a legitimate interest to legislate in ways that affect a person's privacy. In those situations, as here, we say the invasion of privacy is not unreasonable. Because there is no fundamental right to abortion and strict scrutiny review does not apply, a court may invalidate the legislation only if the legislative determination is found to be wholly arbitrary. Where the legislative policy determination is rationally related to its intended purpose, we must uphold that policy determination.

The majority opinions question the legitimacy and accuracy of the South Carolina General Assembly's fact-finding and evidence-gathering in support of the Act. I find this critical review of the legislative fact-finding process especially troubling and an affront to the rule of law. In *Gonzales v. Carhart*, the Supreme Court upheld the federal partial-birth abortion ban even where "[t]he evidence presented in the trial courts and before Congress demonstrate[d] both sides ha[d] medical support for their position." 550 U.S. 124, 161 (2007). The Supreme Court determined that disagreement in the medical community did not render a ban on partial-birth abortions facially invalid where the regulation was rational and in pursuit of legitimate ends. *Id.* at 161–64.

Our legislature was likewise presented with "evidence" from both sides of the debate. We, too, have been deluged with medical (and non-medical) opinions from both sides. Those who support Planned Parenthood characterize the significance of "embryonic cardiac activity" as a "scientifically arbitrary point in pregnancy."[93] Additionally, it is contended that "the idea of protecting embryonic development or fetuses from the onset of fetal cardiac activity [is] arbitrary [and] medically unjustified."[94] Conversely, others in the medical community corroborate the legislature's finding that "'contemporary medical research' reveal[s] that over 95%

---

[93] Br. for Am. Coll. of Obstetricians et al. as Amici Curiae Supp. Pet'rs at 12–13.

[94] *Id*. at 13.

of those with a detectable fetal heartbeat will eventually be born, absent some outside interference like abortion."[95]

Granted, amici on both sides quickly segue from their respective medical arguments to policy-based arguments. This resort to non-medical justifications should be an even stronger command to this Court that it not usurp the legislative prerogative. The Supreme Court has cautioned against judicial entanglement in the legislative policy-making process. *See Gonzales*, 550 U.S. at 163 ("The Court has given state and federal legislatures wide discretion to pass legislation in areas where there is medical and scientific uncertainty. . . . 'When Congress undertakes to act in areas fraught with medical and scientific uncertainties, legislative options must be especially broad . . . .'" (internal citations omitted) (quoting *Marshall v. United States*, 414 U.S. 417, 427 (1974))). A court should not turn its back on legislative deference merely because the issue is abortion, for "[m]edical uncertainty does not foreclose the exercise of legislative power in the abortion context any more than it does in other contexts." *Id.* at 164.

The information in the record (presented by Petitioners) shows that slightly less than half of abortions in South Carolina in 2020 and 2021 were performed prior to the six-week mark. Based on data compiled by the South Carolina Department of Health and Environmental Control (SCDHEC), 44.5% of "abortions by probable postfertilization age" were performed at "6 weeks or less." For 2021, 47.9% of "abortions by probable postfertilization age" were performed at "6 weeks or less." In terms of raw numbers, 2,434 unborn children were aborted in South Carolina in 2020 at six weeks or less in the pregnancy; the number of aborted unborn children at six weeks or less in the pregnancy for 2021 was 3,007. The evidence in the record demonstrates that many abortions will continue to be performed under the Act. Nevertheless, the Court majority repudiates the legislature and tells us the Act does not allow for an informed choice.

It was contended at oral argument that the "six week" data supplied by SCDHEC really should be considered as "eight week" data to account for the two weeks pre-fertilization in a woman's menstrual cycle. In other words, Petitioners argue the data actually shows slightly less than half of abortions occur before the *eighth* week in a pregnancy. If that is the case, then Petitioners have not provided any data on the

---

[95] Br. for Am. Ass'n of Pro-Life OBGYNs & Dr. Christine Hemphill as Amici Curiae Supp. Resp'ts at 2.

number or percentage of abortions occurring at or prior to the six-week mark. It is here where we see the majority opinions come to the rescue.

The majority opinions come to the same conclusion—the Act is unconstitutional—but through different paths. Justice Hearn's lead majority opinion includes quotations from a scientific study that is not part of the record of evidence presented by the parties, claiming she does so only because Chief Justice Roberts cited to (but did not quote) the study in *Dobbs*. Chief Justice Beatty follows Justice Hearn's lead in searching for favorable information outside the record. A reader of today's opinions who is interested in law and not politics should thoughtfully reflect on the significance of members of this Court embarking on a legislative fact-finding mission. I repeat: Justice Hearn's and Chief Justice Beatty's opinions contain the results of *their own research conducted after oral argument,* citing to online articles that they believe allow them to find the Act unconstitutional.

The parties in this case are represented by extremely skilled and competent counsel. They are responsible for creating the record of evidence, and they have done so. It is breathtaking that members of this Court would unilaterally do their own fact-finding and cite to "evidence" outside the record in an effort to bolster their desired result. Respondents will read our decision today and learn that a duly enacted law was struck down because supreme court justices resorted to their own legislative fact-finding.

On the other hand, Justice Few's concurring opinion deals directly with the failure of Petitioners to present evidence: "Planned Parenthood failed to present any evidence on this factual question." This is followed by a statement that should be the basis for the majority dismissing Planned Parenthood's complaint: "Planned Parenthood's failure could be fatal to its constitutional challenge." But of course, Petitioners are not held responsible for failing to present evidence on what the majority deems the key factual question. Although all parties refer to the Act as a "six-week ban," Justice Few recharacterizes the Act as a "four-week ban" and argues the "State cannot point to a single fact the General Assembly considered that could support a factual determination that such a choice meaningfully exists under the Fetal Heartbeat Act."[96] This makes a mockery of our law that legislative enactments

---

[96] Justice Few is critical of the Governor, House Speaker, Senate President, and Attorney General for objecting to the request made to provide more evidence after the case was already heard. The State officials objected primarily on separation of power grounds, as well as reminding this Court that Petitioners had the burden of proof to establish the unconstitutionality of the Act. Justice Few describes the State's

are presumed constitutional, and the opponent must establish unconstitutionality beyond a reasonable doubt.

## B.

If banning abortions after the detection of a fetal heartbeat is unconstitutional, where then would the majority of this Court draw the line? Although I disagree with Justice Hearn's lead majority opinion, it is clear and straightforward. The lead majority opinion refers approvingly to Chief Justice Roberts's concurring opinion in *Dobbs* in which "he would have upheld Mississippi's 15-week deadline." Opinion of Hearn, J., at n.13; *see Dobbs*, 142 S. Ct. at 2310–11 (Roberts, C.J., concurring). "Chief Justice Roberts acknowledged that fifteen weeks provides an 'adequate opportunity' to decide whether to have an abortion . . . ." Opinion of Hearn, J., at n.13 (citing *Dobbs*, 142 S. Ct. at 2315 (Roberts, C.J., concurring)). What is the significance of a fifteen-week ban? The answer comes from the evidence supplied by Petitioners. We learn from an affidavit in the record submitted by one of Petitioners' medical experts that in 2020, "more than 99 percent [of abortions] occurred before approximately 15 weeks." According to SCDHEC, 99.5 percent of all abortions in 2020 occurred at or before thirteen weeks of pregnancy.[97] We thus learn that a fifteen-week ban is not much of a ban. And if that is the case, then how is the State's declared interest in protecting the life of the unborn child honored? The answer is obvious: the policy of the legislature to protect the life of the unborn child means nothing.

Justice Few opines that "the twenty-week restriction on a woman's opportunity to have an abortion is not—as a matter of law—an unreasonable invasion of privacy." Yet we also learn from him that "a total ban on abortion—despite a complete invasion of a pregnant woman's right to privacy . . . [—]might be reasonable." If the six-week ban under the Act is unconstitutional, then how could a total ban possibly

---

response as "essentially boast[ing] to this Court that the General Assembly did not even consider the question" of when "a pregnant woman can know she is pregnant." This characterization of the response of these State officials is patently unfair. The State also cited to my dissent in *Abbeville II*, but Justice Few dismisses that argument, finding "the *Abbeville* cases have nothing to do with this case." I respectfully and strongly disagree.

[97] The very few non-elective abortions that are necessary to protect the life of the mother are exempted from the ban and may occur later in the pregnancy. *See* Act No. 1, 2021 S.C. Acts 2, 6–7 (codified at S.C. Code Ann. § 44-41-690 (Supp. 2022)).

be constitutional? The answer, we are told, lies in the suggestion that the State could simply find "that the life of every human being begins at conception"[98] and remove the feature of "informed choice," thereby removing a pregnant woman's constitutional privacy right. This is not how constitutional rights work. It is axiomatic that finding the Act unconstitutional in violation of the privacy provision requires, in the first instance, the presence of a constitutional right arising from article I, section 10. Simply put, constitutional rights arise from the constitution. Legislatures do not statutorily create or revoke constitutional rights. If Petitioners have established a constitutional right to privacy, which the Court majority finds they have, then the legislature could not remove that constitutional right with the legislative pen.

In a similar vein, the majority opinions make much of the fact that one of the legislative findings for the Act states, "[I]n order to make an informed choice about whether to continue a pregnancy, a pregnant woman has a legitimate interest in knowing the likelihood of the human fetus surviving to full-term birth based upon the presence of a fetal heartbeat." Act No. 1, 2021 S.C. Acts 2, 3. Justice Hearn's opinion and especially Justice Few's opinion seize upon the "informed choice" language and read it out of context. The majority opinions seemingly find that, because of the "informed choice" language, the legislature is powerless to ban abortions until it is established that all pregnant women know they are pregnant and additional time is provided for consideration of an abortion. Such a reading is highly flawed as it fails to give effect to the clear legislative intent underlying the Act and imposes a subjective standard on when, precisely, a pregnant woman has had the opportunity to make an "informed choice."[99]

---

[98] This life-begins-at-conception language essentially mirrors the legislature's stated policy in the Act: "the State of South Carolina has legitimate interests from the outset of a pregnancy in protecting the health of the pregnant woman and the life of the unborn child who may be born." Act No. 1, 2021 S.C. Acts 2, 3.

[99] Such a focus also fails to honor a foundational principle of constitutional interpretation. To mount a successful facial challenge of the Act, Petitioners must prove—and the Court must conclude—that the Act is unconstitutional "in *all* its applications." *See Richardson*, 437 S.C. at 297–98, 878 S.E.2d at 871–72 (emphasis added); *Legg*, 416 S.C. at 13–14, 785 S.E.2d at 371 (quoting *Patel*, 576 U.S. at 415). The majority opinions instead flip this analysis on its head, focusing on whether the Act unconstitutionally deprives *any* woman (or a significant portion of women) of her (their) right to make an informed choice. If *all* women are not deprived of their

No one may reasonably doubt the Act's manifest legislative intent is to give priority to preserving and protecting human life after the detection of a fetal heartbeat. The majority's seizing on part of the informed choice finding, and the interpretation it gives, essentially voids the purpose of the entire Act. I believe the legislature intended to ban abortion (save the exceptions provided for in the Act) upon the detection of a fetal heartbeat—an objective standard. However, assuming the majority's insistence of an ambiguity in the legislative findings is correct, the result is at worst a non-sequitur in an otherwise crystal-clear expression of legislative intent. Under such circumstances, the answer is not to seize upon part of the informed choice language and rush to gut what is widely conceded to be the purpose of the Act. *See Kiriakides v. United Artists Commc'ns, Inc.*, 312 S.C. 271, 275, 440 S.E.2d 364, 366 (1994) ("All rules of statutory construction are subservient to the one that the legislative intent must prevail if it can be reasonably discovered in the language used, and that language must be construed in the light of the intended purpose of the statute. However plain the ordinary meaning of the words used in a statute may be, the courts will reject that meaning when to accept it would lead to a result so plainly absurd that it could not possibly have been intended by the [l]egislature or would defeat the plain legislative intention. If possible, the court will construe the statute so as to escape the absurdity and carry the intention into effect." (internal citations omitted)).[100]

No one may properly dispute the legitimate interest of the State in protecting the life of the unborn child. It necessarily follows that the State may enact laws to recognize and protect that legitimate interest. The Act is rationally related to its legitimate end. The fact that the policy decision of the legislature in the Act is "fairly debatable" requires this Court to uphold the Act. *See Gonzales*, 550 U.S. at 163 (collecting cases). There is no *legal* basis to hold the Act is arbitrary and unlawful; a judicial determination to the contrary is merely a personal preference disguised as a legal judgment.

Consequently, were I to reach the "unreasonable invasion of privacy" step, I would hold the Act—drawing a line at the approximate six- to eight-week mark while

---

ability to make an informed choice, the Act necessarily must survive a facial challenge.

[100] I also note the fetal heartbeat law is not unique to South Carolina. Many states have adopted it or some variation of it, including Ohio and Georgia. As I reiterate throughout my dissent, unless the South Carolina Constitution mandates a right to abortion, which it does not, the policy decision of our legislature should be upheld.

providing exceptions for rape, incest, fetal anomalies, and the life and physical health of the mother—is within the legislature's province and not an "unreasonable invasion of privacy."

## VII.

I do recognize that some other states have taken a different view on the issue of abortion. The lead majority opinion cites to case law from other states where a state constitutional provision was interpreted in line with Petitioners' desired outcome. I, however, do not believe we should be bound by what other states have done. I offer five reasons why I place little weight in what other states do. First, the cases cited in the lead majority opinion were decided post-*Roe* but pre-*Dobbs*, when the states' authority to legislate in abortion matters was very limited. Second, some states have permitted abortions even prior to the *Roe* decision in 1973. In *Valley Hospital Association v. Mat-Su Coalition for Choice*, the Supreme Court of Alaska observed that "[a]bortion has been permitted in Alaska since 1970, when the state legislature passed the current abortion law." 948 P.2d 963, 965 (Alaska 1997). Third, in those cases where a state constitutional provision is interpreted, the history of the provision in other states does not mirror the history and process of adopting the privacy provision in our article I, section 10 search and seizure section. I would be more inclined to find authority from other states persuasive if there were *any* evidence linking the history of our state constitutional privacy provision to abortion—but there is none. Fourth, South Carolina has always legislatively restricted and regulated abortions. Unlike some other states, South Carolina policy has always been one that attempts to impose a high level of protection for the life of the unborn child.

This leads to my fifth and final reason why I assign little weight to case law from other states. A central theme in *Dobbs* is federalism. The issue of abortion was returned to *each* of the states. *Each* state must determine its own way on abortion. For states like Alaska that have longstanding constitutional, statutory, and case law precedent favoring abortion, the decision has been made. South Carolina is not Alaska, Florida, Minnesota, Montana, or Tennessee. South Carolina is a sovereign state, and in our history, we have not the slightest hint of a precedent of any kind in support of a state constitutional right to abortion. As a judge, I am not a legislator or policy maker. The policy decision must be made by the citizens of South Carolina. Our citizens have spoken through the South Carolina legislature in the passage of the Act.

## VIII.

With no law supporting a right to abortion, we are left with a thinly disguised plea to interpret the privacy provision in line with Petitioners' desired outcome. As a Court, it is our solemn duty to resolve legal disputes based on the rule of law. A central feature of our responsibility is to adjudicate the controversy within the framework of the law and not legislate by elevating personal policy preferences to legal status. This is a fundamental principle and limitation on the exercise of judicial power. The Court majority violates this principle today, and in doing so, I believe the Court oversteps its bounds.

*State v. Counts* discussed the role of the Court in interpreting the constitutional privacy provision:

> As previously stated, the South Carolina Constitution provides citizens an express right to privacy. S.C. Const. art. I, § 10. But, other than the use of the word "unreasonable" to modify this right, there are no parameters concerning the right or a definition of what constitutes "unreasonable invasions of privacy." As a result, legal scholars interpreting the legislative history of this constitutional provision have concluded that "the drafters were depending upon the state judiciary to construct a precise meaning of this phrase." Jaclyn L. McAndrew, *Who Has More Privacy?:* State v. Brown *and Its Effect on South Carolina Criminal Defendants*, 62 S.C. L. Rev. 671, 694 (2011). As will be discussed, our state jurisprudence is scant on the right to privacy. Thus, this case presents us with an opportunity to further define this state constitutional right.

413 S.C. at 167, 776 S.E.2d at 67.

This statement in *Counts* is true in all constitutional challenges—this Court is the arbiter of what the state constitution means. Yet the *Counts* Court's reference to judicial interpretation must not be transformed into a judicial license to legislate by elevating a judge's personal preferences to constitutional status. There is a reason "our state jurisprudence is *scant* on the right to privacy." *See id.* (emphasis added). Our Court has been careful not to transform this provision embedded in our search and seizure clause into a judicial vending machine for members of this Court to create rights to coincide with their personal preferences. I strongly reject Petitioners' invitation to view the privacy provision as malleable, with its reach to be subjectively

determined by the preferences of unelected judges. "[I]t is not within the power or province of members of the Judiciary to advance their own personal wishes or to implement their own personal notions of fairness under the guise of constitutional interpretation." *Abbeville II*, 410 S.C. at 683, 767 S.E.2d at 191–92 (Kittredge, J., dissenting) (quoting *Hornbeck v. Somerset Cnty. Bd. of Educ.*, 458 A.2d 758, 790 (Md. 1983)).

## IX.

Turning to Petitioners' remaining challenges, I would dismiss Petitioners' equal protection claim. *See Dobbs*, 142 S. Ct. at 2245–46 (holding that "a State's regulation of abortion is not a sex-based classification and is thus not subject to the 'heightened scrutiny' that applies to such classifications"); *State v. Wright*, 349 S.C. 310, 313, 563 S.E.2d 311, 312 (2002) (finding equal protection is not implicated when a law "realistically reflects the fact that the sexes are not similarly situated in certain circumstances"). Concerning the vagueness challenge, the Act is sufficiently clear to inform those affected of its provisions. Petitioners' briefs and the briefs of supporting amici set forth in detail the provisions of the Act; there is no vagueness or uncertainty as to what the Act allows and forbids. I would summarily dismiss Petitioners' remaining claims as manifestly without merit. Because I would not invalidate any provision in the Act, I would not reach the question of severability.

## X.

The matter of abortion involves not only the pregnant mother but the potential life of the unborn child. The state unquestionably has a legitimate interest in making policy determinations that affect both interests. Legislative policy determinations invariably include competing considerations. The competing considerations may be compelling and difficult, even seemingly "irreconcilable" as Justice Kavanaugh opined. Yet the law must be determined. As for me, because the state constitution does not mandate otherwise, I would honor the policy decision made by the General Assembly. The Act reflects the balance struck by the legislature between the important, competing interests of the mother, the State, and the unborn. Our legislature elected to give meaningful consideration—and not turn a blind eye—to the lives of unborn children. The fact that the legislature struck the balance contrary to the desires of Petitioners in no manner renders the policy determination unreasonable or otherwise unlawful.

Abortion presents an important moral and policy issue. The citizens, through their duly elected representatives, have spoken. The South Carolina legislature, not this Court, should determine matters of policy.

Because Petitioners have failed to establish the Act is unconstitutional, I would declare the Act constitutional and dismiss the complaint.

I dissent.

**JAMES, J., concurring in part.**

**JUSTICE JAMES:** Like Justice Kittredge, I would uphold the Act. However, I disagree with Justice Kittredge on one point: I would hold the privacy provision in article I, section 10 provides citizens with heightened Fourth Amendment protections, especially protection from unreasonable law enforcement use of electronic devices to search and seize information and communications. It goes no further. Therefore, I concur in part with Justice Kittredge's dissent, and I respectfully dissent from Justice Hearn's lead opinion, Chief Justice Beatty's concurrence, and Justice Few's concurrence (the three of which I will sometimes collectively refer to as "the majority"). I write separately to explain my reasoning.

Bodily autonomy is an intensely personal issue for South Carolinians and justifiably so. In particular, a woman's right to have an abortion is a subject of great debate and differing personal opinions. These personal opinions are deserving of consideration and understanding. However, when I put aside any personal preferences and review the issue under South Carolina <u>law</u>, I conclude a citizen's right to be free from unreasonable invasions of privacy does not extend beyond the context of searches and seizures. Unlike the majority, I believe the intent of the West Committee, the General Assembly, and the people should factor into our decision in this case. As for South Carolina caselaw citing article I, section 10, I would overrule or modify the few decisions that directly or impliedly extend the privacy provision beyond the context of searches and seizures. As for caselaw from other jurisdictions cited in the lead opinion, we are not bound by those decisions, many of which are misinterpreted in the lead opinion.

## I.    Our Role

"We do not sit as a superlegislature to second guess the wisdom or folly of decisions of the General Assembly." *Keyserling v. Beasley*, 322 S.C. 83, 86, 470 S.E.2d 100, 101 (1996). The General Assembly has plenary power to make policy decisions "unless limited by some constitutional provision." *Hampton v. Haley*, 403 S.C. 395, 403, 743 S.E.2d 258, 262 (2013) (stating the General Assembly has "the sole prerogative to make policy decisions"). Therefore, our role in this case is limited to determining whether the Act violates the South Carolina Constitution. We cannot find the Act unconstitutional simply because we would have written it differently or because we would not have written it at all.

"[T]he fundamental purpose in construing [a constitutional] amendment is to ascertain and give effect to the intent of its framers and of the people who adopted it; and the court must keep in mind the object sought to be accomplished, and the evils sought to be remedied." *Heinitsh v. Floyd*, 130 S.C. 434, 438, 126 S.E. 336, 337 (1925). We stated in *Reese v. Talbert*,

When the language of a constitutional amendment is of doubtful import, the object of judicial inquiry as to its meaning is to ascertain the intent of its framers and of the people who adopted it. And in attempting to attain that object, the courts may consider the history of the times in which the amendment was framed, the object sought to be accomplished, and legislative interpretation of its provisions.

237 S.C. 356, 358, 117 S.E.2d 375, 376-77 (1960) (citations omitted).

As I will explain, the scope of article I, section 10 is ambiguous, or "of doubtful import." *Id.* Therefore, we must consider the history of the late 1960s and early 1970s in South Carolina; the intent of the framers of article I, section 10; and the intent of the people who adopted article I, section 10.

## II.     Article I, Section 10

Article I, section 10 provides:

The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures and unreasonable invasions of privacy shall not be violated, and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, the person or thing to be seized, and the information to be obtained.

S.C. Const. art. I, § 10 (emphasis added to show the 1971 amendment).

The course to the amendment was charted in 1966, when the General Assembly adopted a resolution establishing a committee to study the South Carolina Constitution of 1895 and recommend possible amendments. *See Final Report of the Committee to Make a Study of the South Carolina Constitution of 1895*, at 3 (1969) [hereinafter *Final Report*]. Part of the committee's tremendous task included studying South Carolina's version of the Fourth Amendment to the United States Constitution. Of course, the Fourth Amendment addresses the citizenry's right to be free from unreasonable searches and seizures. *See* U.S. Const. amend. IV. The committee's work concluded in 1969 with a report to the General Assembly. *See Final Report*, *supra*, at 3. Over time, the committee became known as the West Committee (Committee) because it was chaired by Senator John C. West, who was elected Lieutenant Governor during the Committee's period of study.

### III.    We Must Consider the Intent of the Framers and the People

The Committee minutes and *Final Report* demonstrate the Committee's remarkable foresight in formulating its intent behind the proposed privacy amendment.  From its first meeting, the Committee focused on the potential evils occasioned by the intrusion of modern technology into people's lives, especially by law enforcement.  Members were cognizant of the ramifications of electronic interception of communications, mass data collection, and the like, and they aimed to draft an amendment that would protect the privacy of citizens within the construct of law enforcement and administrative overreach in these areas.  Citing various reasons, the majority argues we should not consider the intent of the framers or the people who adopted the privacy provision.  I will respond to those arguments now.

### A.

In support of his argument that we should not consider the Committee's intent in drafting the privacy provision, Justice Few states in his concurrence that "the word 'privacy'—though broad—is clear as to its scope: it includes all forms of privacy." This characterization does nothing but beg the question of what that scope is.  "The wording of the amendment throws no light on this question, and therefore the court can consider the conditions under which the amendment was passed." *Covington v. McInnis*, 144 S.C. 391, 394, 142 S.E. 650, 651 (1928); *see Reese*, 237 S.C. at 358, 117 S.E.2d at 376-77 ("When the language of a constitutional amendment is of doubtful import, the object of judicial inquiry as to its meaning is to ascertain the intent of its framers and of the people who adopted it.  And in attempting to attain that object, the courts may consider the history of the times in which the amendment was framed, the object sought to be accomplished, and legislative interpretation of its provisions." (citations omitted)).

Similarly, Justice Few argues the word "privacy," as used in article I, section 10, "means the full panoply of privacy rights Americans have come to enjoy over the history of our Nation."  That characterization, while certainly broad, is hardly clear.  Justice Few does not attempt to identify what privacy particulars are included in the "full panoply."[101]  This strained characterization reflects substantial doubt as

---

[101] Certainly, "the full panoply of privacy rights Americans have come to enjoy over the history of our Nation" <u>does not</u> include a woman's right to have an abortion, because that would mean the right to an abortion is a right "Americans have come to enjoy over the history of our Nation."  This "full panoply" characterization implies

to what rights are included in the privacy provision.  Because the scope of the right to privacy set forth in article I, section 10 is "of doubtful import," we must look to the Committee's detailed work as a starting point for ascertaining the intent of the framers.

## B.

Interestingly, the lead opinion states, "Respondents' argument that the West Committee notes control our decision as to the scope of our privacy provision completely ignores, and arguably perpetuates, the societal landscape of the time [the amendment was adopted]."  According to the lead opinion, that "landscape" included the fact that "[t]hroughout its work from 1966-1969, a total of fourteen people served on the West Committee, only one of whom was a woman."  The lead opinion states, "Given this historical backdrop, we decline to limit our review of article I, section 10 to what the West Committee members may have thought at the time."  Thus, the lead opinion diminishes the importance of the West Committee because it was dominated by males.

I will accept for the moment the lead opinion's premise that the male-dominated Committee did not have the foresight or inclination to draft a privacy provision that encompassed the notion of bodily autonomy or a woman's right to have an abortion.  Similarly, there were no women among the 170 members of the 1969-70 General Assembly that submitted article I, section 10 to the voters.  *South Carolina During the 1900s – The General Assembly*, Carolana, https://www.carolana.com/SC/1900s/sc_1900s_98th_general_assembly_members. html (last visited Dec. 5, 2022).  We must therefore assume the 1969-70 General Assembly, like the Committee, had neither the foresight nor the inclination to draft and submit to the voters a privacy provision that encompassed the notion of bodily autonomy (or a woman's right to have an abortion).  We certainly cannot go back fifty years in time and draft out of thin air a privacy provision encompassing features the male-dominated Committee and General Assembly did not envision.  That leaves us with an amendment containing a privacy provision that serves, at most, to enhance our pre-existing Fourth Amendment right against unreasonable searches and seizures.

---

a woman's right to have an abortion is "deeply rooted" in the history of our nation. Because Justice Few summarily rejects Petitioners' due process challenge, I suspect he also rejects this "deeply rooted" premise.

Even as it argues the intent of the West Committee is meaningless, the lead opinion travels to Montana and cites *Armstrong v. State*, in which the Montana Supreme Court struck down as unconstitutional a statute prohibiting certified physician assistants from performing pre-viability abortions. 989 P.2d 364, 384 (Mont. 1999). The *Armstrong* court held "the procreative autonomy component of personal autonomy is protected by Montana's constitutional right of individual privacy . . . ." *Id.* at 379. However, the lead opinion ignores the fact that the *Armstrong* court relied in no small part upon the work of Montana's 1972 Constitutional Convention—a close cousin to a body such as the Committee. The notes from the convention show the delegates specifically intended the privacy right to be expansive, "encompass[ing] more than just traditional search and seizure" and protecting citizens from "governmental practices that interfere with the autonomy of each individual to make decisions in matters generally considered private." *Id.* at 373. Surprisingly, the lead opinion almost entirely discounts the intent of the Committee but cites with approval a decision that relies greatly upon the intent of a similar body in Montana.

The lead opinion cites *Valley Hospital Association, Inc. v. Mat-Su Coalition for Choice*, in which the Alaska Supreme Court addressed a hospital's policy prohibiting abortions unless one of three exceptions applied. 948 P.2d 963, 965 (Alaska 1997). Apparently, the *Valley Hospital* court was unable to consider the history of Alaska's constitutional right to privacy because its "legislative history [was] insufficient to limit the general language of the privacy amendment." *Id.* at 969. Here, we have sufficient legislative history, if only the majority would choose to look at it.

The lead opinion also cites the Florida Supreme Court's decision in *In re T.W.*, 551 So. 2d 1186 (Fla. 1989). The Florida Constitution provides, "Every natural person has the right to be let alone and free from governmental intrusion into his private life except as otherwise provided herein." Fla. Const. art. I, § 23. That provision on its face is markedly more specific than the privacy provision in article I, section 10. In *In re T.W.*, the court cited its decision in *Winfield v. Division of Pari-Mutuel Wagering,* 477 So. 2d 544 (Fla. 1985). The *Winfield* court <u>did</u> consider the intent of the drafters of article I, section 23 and noted the privacy provision "was intentionally phrased in strong terms." *Id.* at 548.

The lead opinion also looks to Minnesota for support, citing *Women of Minnesota v. Gomez*, 542 N.W.2d 17 (Minn. 1995). The Minnesota Constitution did not contain an express privacy provision, so the *Gomez* court looked to three constitutional provisions to determine whether a woman has the right to have an abortion. These provisions were, in pertinent part, the right to not be "deprived of

any of the rights or privileges secured to any citizen" (Minn. Const. art. I, § 2); the right to not "be deprived of life, liberty or property without due process of law" (Minn. Const. art. I, § 7); and "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." (Minn. Const. art. I, § 10). Much like the United States Supreme Court in *Roe v. Wade*, the *Gomez* court seized upon these provisions and held "the right of privacy under the Minnesota Constitution encompasses a woman's right to decide to terminate her pregnancy." 542 N.W.2d at 27. Because *Roe* has been overruled, such an approach is of no import.

Finally, the lead opinion cites *Planned Parenthood of Middle Tennessee v. Sundquist*, in which the Tennessee Supreme Court held "a woman's right to terminate her pregnancy is a vital part of the right to privacy guaranteed by the Tennessee Constitution." 38 S.W.3d 1, 4 (Tenn. 2000). It is difficult to tell which constitutional provisions the *Sundquist* court based its decision upon, but it is clear this post-*Roe* and post-*Casey* decision arose from the court's conclusion that "a woman's right to legally terminate her pregnancy is fundamental." *Sundquist*, 38 S.W.3d at 15. There was no specific privacy right upon which the court relied. Instead, the court seemed to look at numerous nonspecific provisions in the Tennessee Constitution and, much like the United States Supreme Court in *Roe*, detect a fundamental right to privacy within the shadows of those provisions; therefore, the decision is not of much importance to us today. The *Sundquist* dissent/concurrence indicated the majority may have pulled a liberty interest out of thin air, stating, "Any such protection of 'liberty' by the judiciary, however, must be accompanied by something more than a mere declaration of the fact[.]" *Id*. at 26 (Barker, J., concurring in part and dissenting in part).

## C.

The Chief Justice states that "[a]t the outset," how the right to privacy is set forth in the text of article I, section 10 is instructive as to whether we should consider the Committee notes. He points to the use of a semicolon in the heading of article I, section 10 ("Searches and seizures; invasions of privacy") and claims the placement of that heading reflects the General Assembly's intent to separate the two topics. We have held that "[f]or interpretative purposes, the title of a statute and heading of a section are of use only when they shed light on some ambiguous word or phrase and as tools available for resolution of doubt, but they cannot undo or limit what the text makes plain." *Garner v. Houck*, 312 S.C. 481, 486, 435 S.E.2d 847, 849 (1993). I agree with the Chief Justice that we should look outside the text to ascertain the meaning of an ambiguous phrase—here, the scope of the privacy provision. But if

we resort to considering a semicolon in the heading of article I, section 10, we ought to look at the Committee notes.

In sum, the majority veers as far as possible away from the work of the West Committee; otherwise, they would look full in the inconvenient face of the unmistakable intent of the West Committee and the General Assembly. They relegate the history of the drafting and approval of the privacy amendment to little more than trivia.

## IV.    The Committee's Meeting Minutes and *Final Report*

Justice Few challenges that if we <u>do</u> consider the history of the intent behind the Committee's work, "we should consider it carefully and in its entirety" and not engage in "cherry-picking out-of-context language that appears to support the result one wants[.]" I agree, but we must also realize that the final version of the privacy provision submitted to the General Assembly is of great importance, as it was the culmination of the Committee's debate of the privacy provision.

### A.

Because it was the final product of the Committee's discussion and debate of the privacy provision, I will begin with the *Final Report*. The entire report consists of 147 pages, while the Committee's comment on the proposed privacy provision constitutes roughly one page. The comment is as follows:

> **Section J.  Searches and seizures.** The Committee recommends that the historic provision on searches and seizures be retained. In addition, the Committee recommends that the citizen be given constitutional protection from an unreasonable invasion of privacy by the State. <u>This additional statement is designed to protect the citizen from improper use of electronic devices, computer databanks, etc.</u> Since it is almost impossible to describe all of the <u>devices</u> which exist or which may be perfected in the future, the Committee recommends only a broad statement on policy, leaving the details to be regulated by law and court decisions.

*Final Report*, *supra*, at 15 (emphasis added).

The Committee's focus was clear. The Committee acknowledged it was "almost impossible to describe those devices which exist or which may be perfected in the future[.]" *Id.* Therefore, it recommended the privacy amendment be broad, with "the details to be regulated by law and court decisions." *Id.* All of the words

in this comment—sans cherry-picking—are purely in the context of electronic "devices."  There is no mention of bodily autonomy, a full panoply of rights, or a woman's right to have an abortion.  However, the lead opinion would have us believe a woman's right to have an abortion is embraced in article I, section 10.  Justice Few maintains "the details" referred to in the comment implicate undefined and broad-based privacy considerations, including a woman's right to have an abortion.  However, a simple reading of the comment shows "the details" refer back to "devices which exist or which may be perfected in the future," not broad-based privacy considerations.

## B.

Because Justice Few does so, I will discuss the minutes of each Committee meeting in which the privacy provision was debated.

### 1. *September 15, 1967*

As in the *Final Report,* the meeting minutes show the Committee was focused on the privacy dangers posed by electronic surveillance, electronic devices, computer databanks, and the like.  During their initial meetings on the subject, Committee members agreed the then-existing constitutional provision on searches and seizures "should be revised to take care of the invasion of privacy through modern electronic devices."  Minutes of Committee Meeting 6 (Sept. 15, 1967), *in* 1 *Proceedings of the Committee to Make a Study of the Constitution of South Carolina (1895).*  Rightly or wrongly, there was no mention of broad-based privacy rights.

In their brief, the House Speaker and Senate President refer to a letter written by Attorney General Daniel R. McLeod to West Committee Staff Consultant Robert H. Stoudemire.  The Speaker and President argue the letter shows General McLeod (1) contemplated a privacy provision that would guard against invasions of privacy in the form of electronic interception of communications, mass data collection by government agencies, and computer data banks and (2) noted a trend toward securing individual privacy in the field of data processing.  I agree.

The background of the letter is helpful.  During the September 15, 1967 meeting, the Committee requested Mr. Stoudemire contact General McLeod to gauge his impressions about the scope of a provision protecting against unreasonable invasions of privacy.  General McLeod responded to Mr. Stoudemire by letter dated October 2, 1967.  In the first paragraph, General McLeod acknowledged that the proposed privacy provision "relate[d] to interception of communication which is

generally done by electronic means."  Letter from Daniel R. McLeod, S.C. Att'y Gen., to Robert H. Stoudemire, Staff Consultant, Comm. to Make a Study of the S.C. Const. (Oct. 2, 1967), 1967 WL 12658, at *1.  He then noted an "additional factor [that] may be taken into consideration" is the "protection of privacy in areas such as information gotten through data processing." *Id.*  The letter as a whole speaks solely in terms of "securing individual privacy in the field of data processing" and in terms of protecting against intrusions into privacy occasioned by (1) interception of communication and information by electronic means, (2) mass collection of data, (3) unguarded income tax and health information, and (4) unguarded information stored in computers.  *Id.*  General McLeod stated, "The need to formulate a decision as to what information should or should not be made available under a multitude of circumstances is clearly dictated if privacy is to fulfill its function in our democratic society." *Id.*  He also stated, "Unless thought is given to protection of the individual's privacy within the bank of information stored in the computers, there can be a potential invasion of that individual's right of privacy." *Id.*  He explained, "[T]here is a definite trend toward securing individual privacy in the field of data processing." *Id.*

General McLeod ended his comments on these specific points by suggesting the privacy provision include "general phraseology such as 'protection against unreasonable invasion of the individual's right of privacy.'" *Id.*  Read in full context, General McLeod's input on the subject of privacy was confined to the protection of information that could be obtained by unreasonably invasive means.  He did not suggest any language supporting the protection of a "full panoply" of privacy rights.

*2.  October 6, 1967*

The Committee's next discussion of the privacy provision took place on October 6, 1967, when it reviewed General McLeod's letter in detail.  *See* Minutes of Committee Meeting 3-6, 8-10 (Oct. 6, 1967), *in* 1 *Proceedings of the Committee to Make a Study of the Constitution of South Carolina (1895)*.  There was no mention of any privacy concern other than electronic devices, data processing banks, interception of communications, and the constantly changing world of technology. The minutes from that day reflect long and considered discussion of a possible amendment protecting against unreasonable invasions of privacy, and the Committee members' comments remained completely in line with matters of electronic intrusion.

Justice Few recites an exchange between Mr. Stoudemire and Committee member William D. Workman during this meeting.  When Mr. Stoudemire was reviewing General McLeod's letter, he commented on the possibility of the Tax

Commission improperly releasing income tax information and asked whether that would give an aggrieved party a cause of action against the offending person or entity. Mr. Workman responded, "What our goal is, is to insert into the Constitution that which would give an aggrieved individual a cause of action if the authorities get out of hand in invasion of privacy by whatever means." *Id.* at 5. Justice Few claims "[t]his dialogue supports a broader interpretation of the 'unreasonable invasions of privacy' provision than the State proposes." I disagree. The dialogue was a small portion of the October 6 debate, and the minutes of that day reflect the Committee's continued focus upon protecting citizens against unreasonable searches and seizures, primarily in the area of data collection and electronic interceptions by law enforcement agencies. During the same meeting, Mr. Workman stated:

> Let me suggest that we might accomplish what we are trying to do by accepting the first sentence, "The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures and" from unreasonable invasions of privacy "shall not be violated[.]" That injects into the Constitution guarantees this element of privacy against unreasonable search.

*Id.* at 9. Though his last sentence is not entirely clear, it is apparent Mr. Workman was trying to articulate a privacy provision limited to searches and seizures. And the provision he suggested is remarkably similar to the provision ultimately recommended by the Committee to the General Assembly.

Mr. Workman also stated during the October 6 meeting, "[O]ur problem is arriving at a language to protect the rights of law enforcement agents and, at the same time, or as best we can, balance the rights of individuals against unreasonable searches." *Id.* at 8.

The lead opinion, the Chief Justice, and Justice Few (and, as I will discuss below, this Court in *State v. Forrester*[102]) mistakenly claim a statement made by Committee member Huger Sinkler during the October 6, 1967 meeting indicates the Committee contemplated a privacy provision stretching beyond searches and seizures. They seize upon the following statement of Mr. Sinkler: "I think this is an area that, really, should develop and should not be confined to the intent of those who sit around this table." *Id.* at 6. This is the cherry-picking Justice Few duly warned us against. Context matters. The "area" referred to by Mr. Sinkler was the meaning of the word "unreasonable," not the eventual scope of privacy rights. A

---

[102] 343 S.C. 637, 541 S.E.2d 837 (2001).

<u>complete</u> reading of the minutes reflects Mr. Sinkler and other Committee members were debating the scope of the term "unreasonable" as it would be used in the privacy provision. Mr. Sinkler first commented, "I think the court can take 'unreasonable' and push it any way they want to do it. I agree with you that [the meaning of the word 'unreasonable'] is something that the courts are going to write and not the people sitting around this table." *Id*. Committee member T. Emmet Walsh responded, "[W]hat might be reasonable today might not be reasonable in the future." *Id.* Mr. Sinkler then repeated his comment that the question of what is "unreasonable" was "an area that, really, should develop and should not be confined to the intent of those who sit around this table." *Id.*

Mr. Sinkler's concern during the October 6 meeting was whether, in drafting a privacy provision, the Committee was "going too far in one direction without giving thought to protecting the populace against criminals. They're going to get into this electronic stuff very quickly[.]" *Id.* at 5. Interestingly, still in the vein of what searches might be unreasonable, Mr. Sinkler stated, "I didn't want to deny perhaps other areas of snooping that might become necessary, really, to preserve law and order." *Id.* at 7.

Other members of the Committee weighed in as well. The full context of the October 6 minutes reflects the Committee continued to debate the privacy provision in the context of searches and seizures involving electronic and other technological intrusions. There was not a hint of discussion regarding broad privacy rights, bodily autonomy, or a woman's right to have an abortion.

### 3. October 7, 1967

There was limited discussion about the privacy provision during the October 7, 1967 meeting. *See* Minutes of Committee Meeting 154-55 (Oct. 7, 1967), *in* 1 *Proceedings of the Committee to Make a Study of the Constitution of South Carolina (1895)*. Mr. Workman read aloud a privacy provision from another (unknown) source. The provision exclusively dealt with "unreasonable interception of telephone, telegraph, and other electronic communications" and "unreasonable interception of oral or other communication by electric or electronic means." *Id.* at 154. There was no discussion about the privacy provision being extended beyond the context of searches and seizures.

*4. January 24, 1968*

There was again limited discussion about the privacy provision during the January 24, 1968 meeting. *See* Minutes of Committee Meeting 48-49 (Jan. 24, 1968), *in* 3 *Proceedings of the Committee to Make a Study of the Constitution of South Carolina (1895)*. Mr. Stoudemire proposed language that became the standalone provision the Committee ultimately proposed to the General Assembly: "[T]he right of the people to be secure from unreasonable invasions of privacy shall not be violated . . . ." *Id.* at 49. There was also discussion of a provision concerning warrants that could be issued in the execution of laws related to health and safety. *Id.* Language related to that subject was the subject of a proposed amendment submitted by the Committee to the General Assembly. *See Final Report*, *supra*, at 14. It is irrelevant to the issue before us.

*5. November 19, 1968*

During this meeting, Chairman West brought up the privacy provision, and Mr. Stoudemire reminded the Committee,

> This is getting down to your mass computer data. It's getting to all electronic stuff . . . . [W]e got into long discussions on this and decided that there was no way we could find language to foresee what was going to be an unreasonable invasion in 1980 and the agreement was that we would strike a general statement . . . rather than trying to itemize.

Minutes of Committee Meeting 7 (Nov. 19, 1968), *in* 3 *Proceedings of the Committee to Make a Study of the Constitution of South Carolina (1895)*.

*6. April 1, 1969*

The Committee approved its proposed constitutional amendments on April 1, 1969. *Final Report*, *supra*, at 7. The section recommending the privacy provision bears repeating:

> **Section J.  Searches and seizures.** The Committee recommends that the historic provision on searches and seizures be retained. In addition, the Committee recommends that the citizen be given constitutional protection from an unreasonable invasion of privacy by the State. This additional statement is designed to protect the citizen from improper use of electronic devices, computer databanks, etc. Since it is almost

impossible to describe all of the devices which exist or which may be perfected in the future, the Committee recommends only a broad statement on policy, leaving the details to be regulated by law and court decisions.

*Id.* at 15. As I previously noted, the Committee's recommendation of a privacy provision was centered upon unreasonable invasions of privacy in the form of "improper use of electronic devices, computer databanks, etc." *Id.* Because it was impossible to describe "all of the devices which exist or which may be perfected in the future," the Committee recommended "only a broad statement on policy." *Id.*

At every turn, the Committee focused upon drafting a privacy provision that would protect citizens from searches and seizures of information and communications through the improper use of electronic devices and the like. The Committee had no intention of drafting an amorphous statement of privacy considerations extending beyond the context of searches and seizures.

## V. The General Assembly

The General Assembly received the proposed amendment from the Committee in 1969. The General Assembly agreed with the language of the privacy provision, but it did not propose the provision as a standalone sentence. Instead, the General Assembly folded the proposed privacy provision into the existing searches and seizures sentence. In 1970, the General Assembly submitted a ballot question to the voters, which asked, "Shall the Constitution of this State be amended by . . . substituting a new Article I, which new Article I shall provide for . . . searches and seizures[?]" S.C. Election Comm'n, *Report of the South Carolina Election Commission for the Period Ending June 30, 1973*, at 205. The proposed amendment was approved by the voters and became what is now article I, section 10.

The lead opinion argues the privacy provision contemplates a woman's right to an abortion. I disagree. We cannot ignore the fact that the very same General Assembly that received the *Final Report* and submitted the privacy amendment to the voters also passed legislation restricting abortions under certain circumstances. *See* 1970 S.C. Acts 821 § 1; *see also Reese*, 237 S.C. at 360, 117 S.E.2d at 377 (stating the framers would not write a provision into an amendment that was "not suggested by its language or by any pertinent circumstances shown by the record to have surrounded its proposal and adoption"). The General Assembly would not have presented to the voters a privacy provision including the right to an abortion on the heels of passing legislation restricting the right to an abortion. Similarly, if bodily autonomy in general had been at the forefront of the privacy debate in South Carolina

in the late 1960s or early 1970s, there would be at least some evidence the Committee and the General Assembly intended the privacy provision to extend to bodily autonomy or abortion.

Further, as Justice Kittredge notes, only two years after the privacy amendment was presented to and approved by the voters, this Court relied upon *Roe* to reverse a doctor's conviction for performing an abortion. *State v. Lawrence*, 261 S.C. 18, 21-22, 198 S.E.2d 253, 255 (1973). Despite Dr. Lawrence being prosecuted during a time when, according to Petitioners, abortion rights were front and center in South Carolina, neither the State nor Dr. Lawrence referenced article I, section 10 or raised any argument pertaining to it. There was no mention in *Lawrence* of article I, section 10 or even the word "privacy." It was a sign of the times that the newly adopted privacy provision did not extend beyond the search and seizure of a citizen's information and communications through the improper use of electronic devices. *Reese*, 237 S.C. at 358, 117 S.E.2d at 376 (explaining that when construing a constitutional amendment, the Court should consider "the history of the times in which the amendment was framed").

More evidence our legislature did not intend the privacy provision to extend beyond the context of searches and seizures is found in the General Assembly's codification of *Roe* in 1974. *See* Act No. 1215, 1974 S.C. Acts 2837 (codified as amended in scattered sections of S.C. Code Ann. §§ 44-41-10 to -80 (2018 & Supp. 2022)). The adoption of article I, section 10 was surely still fresh in the mind of the General Assembly during the 1973-74 legislative session, but in the codification of *Roe*, there is no mention of a right to privacy under the South Carolina Constitution.

## VI.   South Carolina Caselaw

The lead opinion claims this Court has "found that the right to privacy may be implicated in many ways, from requiring a witness to divulge medical information during a criminal trial [*State v. Blackwell*[103]] to forcing a convicted felon to take medication so that he may be competent enough to be executed [*Singleton v. State*[104]]." Note that of these "many" cases, only *Blackwell* and *Singleton* come close to relying upon article I, section 10 outside the context of searches and seizures, and *Blackwell* is really not an article I, section 10 case. The lead opinion—Justice Few also notes the supposed import of *Blackwell*—claims the "novel issue" in *Blackwell*

---

[103] 420 S.C. 127, 801 S.E.2d 713 (2017).

[104] 313 S.C. 75, 437 S.E.2d 53 (1993).

was "whether a criminal defendant's constitutional right to confront a witness trumps a witness's state constitutional right to privacy and statutory privilege to maintain confidential mental health records." The lead opinion also states, "In *Blackwell*, the Court, in an attempt to recognize both the right to privacy and the United States Constitution's Sixth Amendment right of confrontation, proffered a balancing test to determine when a witness may be forced to divulge personal medical testimony." We did not address the right to privacy in *Blackwell*; our analysis addressed only the statutory privilege and the right of confrontation. *Blackwell* was a murder case in which the defendant shot and killed an eight-year-old girl. The defendant's ex-wife was a prosecution witness. The defendant subpoenaed his ex-wife's mental health records to use during his cross-examination of her. South Carolina Code subsection 44-20-100(A) (2018) provides such records are confidential and must not be disclosed unless an exception applies. One exception to confidentiality is contained in subsection 44-20-100(A)(2); this exception provides the records may be disclosed if a court finds "that disclosure is necessary for the conduct of proceedings before the court and that failure to make the disclosure is contrary to public interest[.]"

The *Blackwell* "balancing test" cited by the lead opinion has nothing whatsoever to do with the privacy provision contained in article I, section 10. Instead, the *Blackwell* balancing test is <u>statutorily</u> driven and sets forth how the trial court is to arrive at a determination of whether the statutory right of confidentiality— not the constitutional right of privacy—has been overcome. We noted that in making the determination of whether disclosure of mental health records is required, "the judge should assess the importance of the witness to the prosecution's case and whether the records contain exculpatory evidence, including, *but not limited to*, evidence relevant to the witness's credibility." *Blackwell*, 420 S.C. at 155, 801 S.E.2d at 727-28. In *Blackwell*, our supposed implication of the article I, section 10 right to privacy was nothing more than (1) our recognition of a <u>statutory right</u>—not a constitutional right—of confidentiality with respect to mental health records and (2) our creation of a balancing test to determine whether a statutory exception to that right applies.

This leaves *Singleton* as our only true non-search and seizure case to implicate article I, section 10 in a meaningful way. In *Singleton*, this Court considered whether antipsychotic medication could be forcibly administered to an incompetent inmate to facilitate his competency for execution. 313 S.C. at 87, 437 S.E.2d at 60. The Court first discussed the Fourteenth Amendment substantive due process implications and noted "[t]he leading case" on this issue is *Washington v. Harper*, 494 U.S. 210 (1990). In *Harper*, the United States Supreme Court acknowledged an incarcerated inmate "possesses a significant liberty interest in avoiding the

unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." *Id.* at 221-22. The *Harper* Court held "the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will[] if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." *Id.* at 227. The *Singleton* Court noted that *Harper* and *Riggins v. Nevada*, 504 U.S. 127 (1992), "have established the federal due process analysis required in a forced medication case." *Id.* at 88, 437 S.E.2d at 60.

After the *Singleton* Court discussed the Fourteenth Amendment substantive due process concerns, it went on to hold "the [article I, section 10] right of privacy would be violated if the State were to sanction forced medication solely to facilitate execution." *Id.* at 89, 437 S.E.2d at 61. The *Singleton* Court reached this conclusion without mentioning the intent of the drafters of article I, section 10 or the history of article I, section 10.

> In *Hughes v. State*, we stated our holding in *Singleton* in a nutshell:
>
> The State may not forcibly medicate an inmate solely to facilitate execution. An inmate has a right, grounded in the state constitutional right to privacy and the Fourteenth Amendment's Due Process [C]lause of the federal constitution, to be free from unwanted medical intrusions. The State may forcibly medicate an inmate only when he is dangerous to himself or others, and then only when it is in the inmate's best medical interest.

367 S.C. 389, 398 n.2, 626 S.E.2d 805, 810 n.2 (2006) (citing *Singleton*, 313 S.C. at 89, 437 S.E.2d at 61).

In *Singleton*, we could have and should have decided the issue of forced medication solely by employing the Fourteenth Amendment substantive due process analysis set forth in *Harper* and *Riggins*. Because article I, section 10 does not apply outside the context of searches and seizures, I would overrule that portion of our holding in *Singleton*.

Another case cited by the lead opinion, the Chief Justice, and Justice Few is *State v. Forrester*, 343 S.C. 637, 541 S.E.2d 837 (2001). The issue in *Forrester* was whether the article I, section 10 privacy provision requires law enforcement to affirmatively inform suspects of their right to refuse consent to a search of their possessions. Even though the *Forrester* Court noted *Singleton* applied the privacy provision outside the search and seizure context, the holding in *Forrester* was

limited to the search and seizure arena. In discussing the added protections afforded by the privacy provision in article I, section 10, the *Forrester* Court noted "the people of South Carolina have indicated that <u>searches and seizures</u> that do not offend the federal Constitution may still offend the South Carolina Constitution[,] resulting in the exclusion of the discovered evidence." *Id*. at 644, 541 S.E.2d at 841 (emphasis added). And the Court repeated the issue was limited to searches and seizures: "The issue in the case before the Court is whether this privacy provision goes so far as to require informed consent to government searches." *Id*. at 645, 541 S.E.2d at 841.[105]

> The *Forrester* Court considered the Committee minutes:
>
> The drafters of our state constitution's right to privacy provision were principally concerned with the emergence of new electronic technologies that increased the government's ability to conduct searches. *See* Committee to Make a Study of the Constitution of South Carolina, 1895, Minutes of Committee Meeting 6 (Sept. 15, 1967). According to their minutes, "The committee agreed that [the search and seizure provision] should remain, but that is [sic] should be revised to take care of the invasion of privacy through modern electronic devices." *Id.* However, the committee also recognized that the provision would have an impact beyond just the area of electronic surveillance. As Committee Member Sinkler stated, "I think this is an area that, really, should develop and should not be confined to the intent of those who sit around this table." *Id.* at 6 (Oct. 6, 1967).

*Forrester*, 343 S.C. at 647, 541 S.E.2d at 842 (alterations in original). As I previously noted, the lead opinion, the Chief Justice, and Justice Few take Mr. Sinkler's comments out of context. The "area" referred to by Mr. Sinkler was the meaning of the word "unreasonable," not an as-yet undeveloped panoply of privacy rights. The *Forrester* Court also took Mr. Sinkler's comments out of context.

> The *Forrester* Court stated,
>
> It is important to note that [the Committee] minutes will not be controlling of the intent behind, or interpretation of, our state

---

[105] A twist in the *Forrester* holding that does not impact the instant case was the Court's holding that under the privacy provision, law enforcement must not exceed the scope of the consent to search granted by a suspect. *Id*. at 648-49, 541 S.E.2d at 843.

constitution. This fact was even noted in Committee Member [Huger] Sinkler's observation that [the Committee's] discussions would not control any subsequent interpretation. We include these discussions for their historical context and interest.

*Id.* at 647 n.7, 541 S.E.2d at 842 n.7. Again, Mr. Sinkler's comments must be read in context; he was discussing how courts, not the Committee, would have to develop the scope of what might be "unreasonable." He was not debating the issue of how broadly privacy interests might eventually be construed.

I also note the word "controlling" in the foregoing quote. While the Committee minutes and *Final Report* do not exclusively control our interpretation of article I, section 10, they are a helpful starting point and should inform our construction of the privacy provision. After all, the *Forrester* Court itself relied on its own (erroneous) interpretation of Mr. Sinkler's comments. To the extent *Forrester* stands for the proposition that we must not seek guidance from the Committee minutes and *Final Report*, I would overrule that portion of the opinion.[106]

There may be concern about overruling or modifying what some may consider settled precedent in the area of article I, section 10. However, in *McLeod v. Starnes*, Justice Hearn, writing for the majority, noted:

> "Stare decisis should be used to foster stability and certainty in the law, <u>but not to perpetuate error</u>." *Fitzer v. Greater Greenville S.C. Young Men's Christian Ass'n*, 277 S.C. 1, 4, 282 S.E.2d 230, 231 (1981), *superseded by statute on other grounds*, S.C. Code Ann. § 33-55-200 *et seq.* (2006). Stare decisis applies with full force with respect to questions of statutory interpretation because the legislature is free to correct us if we misinterpret its words. *Layton v. Flowers*, 243 S.C. 421, 424, 134 S.E.2d 247, 248 (1964). <u>However, the doctrine is at its weakest with respect to constitutional questions because only the courts or a constitutional amendment can remedy any mistakes made</u>. *Agostini v. Felton*, 521 U.S. 203 (1997).

---

[106] *State v. Counts*, 413 S.C. 153, 776 S.E.2d 59 (2015), should not be interpreted to hold the privacy provision extends beyond the context of searches and seizures; however, to the extent *Counts* can be so interpreted, I would overrule that holding.

396 S.C. 647, 655, 723 S.E.2d 198, 203 (2012) (emphasis added) (cleaned up).[107]

## VII. Conclusion

The scope of the privacy right included in article I, section 10 is of doubtful import. Therefore, we must consider the intent of the framers and the voters. It is clear the framers did not intend to create a full panoply of privacy rights, much less the right to bodily autonomy or the right to have an abortion. Our right under article I, section 10 to be free from "unreasonable invasions of privacy" provides citizens with heightened Fourth Amendment protections, especially protection from law enforcement searches and seizures of communications and information through improper use of electronic devices. I respectfully dissent from the lead and concurring opinions. I concur in part with Justice Kittredge's dissent.

---

[107] The Chief Justice states, "Under *Singleton* and *Forrester*, our touchstones, the right to privacy extends outside of the search and seizure context and encompasses 'unwarranted medical intrusions.'" I disagree. These two cases are not touchstones. *Forrester* is a search and seizure case and has nothing to do with unwarranted medical intrusions, and as I previously discussed, *Singleton* should be partially overruled.